UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (SPRINGFIELD)

ACCESS 4 ALL, INC., a Not for Profit
Corporation, and FELIX ESPOSITO,
Individually,

                           Case No. 3:04-cv-12347-KPN

       Plaintiffs,

v.

DELANCEY CLINTON ASSOCIATES, L.P., a
Pennsylvania Limited Partnership,

       Defendant.

_____/

## PLAINTIFFS' VERIFIED APPLICATION FOR ATTORNEYS' FEES, COSTS AND EXPERT'S FEES AND ACCOMPANYING MEMORANDUM OF LAW

COMES NOW the Plaintiffs, Access 4 All, Inc., a Florida not-for-profit corporation ("Access") and Felix Esposito ("Esposito"), individually, by and through his undersigned attorneys, pursuant to the Final Order of Dismissal entered by the Court on June 14, 2006 [DE 34], and pursuant to Fed. R. Civ. P. 54(d)(2), hereby submit a Verified Application for this Court's determination of the amount of attorney's fees, costs, and expert fees, and as grounds therefor state as follows:

### Concise Statement of Issues Presented

1.      On November 14, 2004, the Plaintiffs, Access and Esposito, brought this action against Defendant, Delancey Clinton Associates, LP. ("Delancey"), a Pennsylvania Limited Partnership, on the basis that the Defendant owns, operates or leases its property, a hotel, as a public accommodation as defined by 28 C.F.R. Section 36.201(a) and 36.104 in violation of the Americans With Disabilities Act, 42 U.S.C. Section 12181 et seq. ("the ADA"), because architectural barriers exist at the property which prevent Plaintiffs and other disabled

persons from equally using and enjoying the goods and services offered at the premises known as Holiday Inn Springfield, located at 711 Dwight Street, Springfield, Massachusetts.

2. In June, 2006, the parties entered into a Settlement Agreement [DE 33] resolving the issues concerning the violations of the Americans with Disabilities Act relating to the subject property. In the Settlement Agreement, the Defendant agreed to a comprehensive remedying of ADA violations in regards to areas such as parking, exterior accessible routes, interior ramp, accessible public restrooms, accessible guest rooms, access to goods and services, alarms and training. [DE 33].

3. The Settlement Agreement at paragraph 5 stated that Defendant "shall pay Plaintiffs' counsel, Fuller, Fuller, and Associates, for Plaintiffs' reasonable attorneys' fees, litigation expenses and costs incurred in this matter." The Settlement Agreement further stated at paragraph 5 that if "counsel for the parties are unable to determine the reasonable attorneys' fees, including reasonable litigation expenses, expert's fees and costs to be paid, the amount to be paid shall be determined by the Court."

4. On June 2, 2006, the parties entered into a Stipulation for Approval of Settlement Agreement [DE 32]. Said Stipulation stated that "the parties also jointly move that the United States Magistrate Judge determine the amount of attorneys' and experts' fees, litigation expenses, and costs to be awarded to Plaintiffs' counsel and expert and for entry of final judgment theron."

5. On June 14, 2006, the Honorable Kenneth P. Neiman entered a Final Order of Dismissal [DE 34] approving the Settlement Agreement and retaining jurisdiction over the matter for the purpose of enforcement of the Settlement Agreement and for determination of the amount

2

of attorneys' fees, litigation expenses, expert fees and costs to be awarded to Plaintiffs and

for entry of a Final Judgment thereon.

6.      The parties have not resolved the matter of the entitlement to or amount of attorneys' fees,

costs and expert fees and these matters need to be resolved by the Court.

## VERIFIED APPLICATION AND INCORPORATED MEMORANDUM OF LAW

### I. Prevailing Party

Attorney's fees, experts's fees, litigation expenses and costs are recoverable under the ADA.

42 U.S.C. § 12205. The Supreme Court has held that a plaintiff must be a prevailing party in order

to recover attorney's fees under 42 U.S.C. § 12205. Buckhannon Bd. & Care Home, Inc. v. W.Va.

Dep't of Health & Human Res., 532 U.S. 598 (2001). Under Buckhannon, in order to be a

"prevailing party" a Plaintiff must obtain a judgment on the merits or a court-ordered consent decree.

Buckhannon held that enforceable judgments upon the merits and court ordered consent decrees

create a material change in the legal relationships of the parties, the kind required to permit an award

of prevailing party attorney fees under a fee-shifting statute. Other Courts have awarded prevailing

party attorneys fees where there is some material alteration of the legal relationship of the parties,

that is judicially sanctioned. Doe v. Boston Public Schools, 358 F.3 20, 24-25 (1st Cir. 2004);

Rolland v. Cellucci, 106 F.Supp.2d 128, 131-134 (D.Mass. 2000); Habich v. City of Dearborn, 331

F.3d 524 (6th Cir. 2003); Roberson v. Giuliani, 346 F.3d 75 (2d Cir. 2004); American Disability

Association, Inc. v. Chimielarz, 289 F.3d 1315 (11th Cir.2002); Barrios v. Cal. Interscholastic Fedn.,

277 F.3d 1128 (9th Cir.2002). In the case at bar, the Court approved the Settlement Agreement and

then expressly retained jurisdiction to enforce its terms, creating a judicially sanctioned change in

3

the legal relationship of the parties. *See* Buckhannon, Boston Public Schools, Rolland, Roberson, Chimielarz, Habich and Barrios.

## II. Calculating Attorneys' Fees

In a civil rights case, the amount of an award of attorneys' fees is determined by using the "lodestar" method: the value of a lawyer's service is calculated by determining a reasonable hourly rate for the provision of legal services and multiplying that rate by hours reasonably expended. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Furtado v. Bishop, 635 F.2d 915, 919-20 (1st Cir. 1980). A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonable comparable skills, experience and reputation. U.S. v. Metropolitan Dist. Com'n, 847 F.2d 12, 19 (1st Cir. 1988); Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); LaPlante v. Pepe, 307 F.Supp.2d 219, 224 (D. Mass. 2004); Gaines v. Dougherty County Board of Education, 775 F.2d 1565, 1571 (11th Cir. 1985).

Factors to be considered when setting a fee include: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the awards in similar cases. See Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974). Grendel's Den, Inc. v. Larkin, 749 F.2d 945 (1st Cir. 1984).

Court holdings in Massachusetts provide evidence of the going rate in the community and

4

show that the Plaintiffs' counsel rates are comparable and reasonable. This year in <u>Bogan v. City of Boston</u>, 2006 WL 1283569, *5 (D.Mass. 2006), this Court held that an hourly rate of $300.00 was reasonable for an experienced attorney in a civil rights case. In 2004, in <u>LaPlante</u>, *supra*, this District Court found that $300.00 an hour to be a reasonable rate for an experienced litigation associate (with little experience in civil rights cases) in a §1983 action. In 2000 in <u>Rolland</u>, *supra*, at 142-143 (D.Mass. 2000), this Court held that $250.00 per hour was a reasonable rate for an experienced ADA attorney (in Northampton, MA) in an ADA case. Seven years ago, in <u>Zurakowski v. D'Oyley</u>, 46 F.Supp.2d 87, 89, FN2 (D.Mass. 1999), this Court held that $240.00 an hour was a reasonable rate for an experienced civil rights attorney in a §1983 action; in <u>Connolly v. T. Harrelson</u>, 33 F.Supp.2d 92, 95-96 (D.Mass. 1999), this Court held that $200.00 an hour was a reasonable rate for an attorney with over 25 years of bar membership in a civil rights case; and in <u>Alfonso v. Aufiero</u>, 66 F.Supp.2d 183, 197 (D.Mass. 1999), this Court held that $250.00 is a typical hourly rate for a senior private civil rights trial attorney in Boston. As far back as 1998, in <u>Guckenberger v. Boston University</u>, 8 F.Supp.2d 91, 105 (D.Mass. 1998), the Court found rates between $200.00 and $275.00 per hour to be reasonable for experienced civil rights attorneys and the Court noted that "[r]ates in excess of $300 per hour for Boston trial attorneys...have been approved in this District."

Evidence of rates in Springfield, Massachusetts is harder to find. As the Court knows, Springfield is about sixty miles west of Boston and thirty miles north of Hartford, Connecticut. It is a metropolitan area, ranking as the third largest city in Massachusetts (behind Boston and

Worcester).[1] Plaintiffs submit that the rates in Springfield, Massachusetts would be comparable to those of Boston, Massachusetts. The Court held as much in Rolland, *supra*, at p. 143, when determining attorneys fees of the Springfield and Boston attorneys it stated "[i]n choosing these rates, the court has not entered the fray as to whether 'Boston' or 'Springfield' rates apply; the varying...rates offered by the parties vary insignificantly."

Like the recent rates of $300.00 awarded to civil rights attorneys by this Court, it is respectfully submitted that $325.00 would be a fair hourly rate for the attorneys in the case at bar. In Bogan, *supra*, the Court recognized that experienced attorneys with over twenty-five years of experience generally bill between $350.00-$425.00 an hour but awarded the lead attorney only $300.00 because he had limited involvement in the case. In contrast, in the case at bar, the lead attorney with over twenty-five years experience, John P. Fuller, was actively involved in all facets of the case. In LaPlante, *supra*, the attorneys awarded hourly rates of $300.00 and $275.00 had overall trial experience, but no specific civil rights experience. In contrast, the counsel for the law firms representing the Plaintiffs are extremely experienced trial attorneys and have filed and litigated many ADA Title III cases. The Northampton, MA attorney awarded $250.00 in 2000 in Rolland had thirty years of experience (see **Exhibit 1**), similar to the lead attorney in the case at bar with twenty-five years experience. As the Court knows, Northampton and Springfield are in the same vicinity. However, with business rising costs and inflation, the rates of $250.00 - $200.00 would surely be comparable to a rate of $325.00 six - seven years later for experienced civil rights counsel. In

---

[1]According to a July 1, 2003 Census estimate of 152,157 people.

addition, if any other similarly experienced defense lawyers were to consider taking Plaintiff's civil rights representation, with the associated risk of nonpayment and delay in payment, they would be entitled at this point in time to well in excess of $325.00 per hour.

Attached are the resumes of the attorneys who performed the legal services in this case, John Fuller, O. Oliver Wragg and Tracie L. Dickerson (**Exhibit 2**)(*see also* Affidavits of John Fuller and O. Oliver Wragg at **Exhibits 3** and **4**). John Fuller has been a practicing attorney for more than 25 years. O. Oliver Wragg has been a practicing litigation attorney for fourteen (14) years, with a special focus on disability law for more than ten (10) years. Dickerson has four years of ADA experience. The resumes are being attached as an exhibit to support the reasonableness of Plaintiffs' request for attorneys' fees, which are based on $325.00 per hour for attorneys John Fuller and O. Oliver Wragg and $240.00 per hour for Tracie L. Dickerson. John Fuller expended **72.70** hours, O. Oliver Wragg **6.30** hours and Tracie L. Dickerson **9.30** hours. There is also **4.10** hours of paralegal time expended in the case.

Plaintiffs' counsel have the experience, reputation and ability that the Johnson Court, *supra*, looks to when determining fees. With over twenty-five (25) years experience as a trial attorney and over twenty-five (25) years in front of the federal bar, John Fuller, the lead attorney in this case, has substantial experience. He has been a member of the United States Court of Appeals for the 11th Circuit since 1979, the 5th Circuit since 1981, the United States District Court for the Southern District of Florida since 1979, the Northern District since 2003 and the Middle District since 2001. O. Oliver Wragg, who contributed some time in this case, has been a practicing litigation attorney for fourteen (14) years, with a special focus on disability law for more than ten (10) years. He has

7

been a member of the Florida Bar for fourteen years; the Georgia Bar for ten years, and the Massachusetts Bar for seven years. He is also a member of the 11th Circuit Court of Appeals, the United States District Court for the Southern and Middle Districts of Florida and the United States District Court for the Northern and Middle Districts of Georgia. Both John P. Fuller and O. Oliver Wragg have handled several lawsuits in Massachusetts seeking to force property owners to bring their property into ADA compliance and remove barriers to access. The breadth of John Fuller's and O. Oliver Wragg's experience, and the results obtained in this case as is evident in the Court-approved Settlement Agreement, justify an hourly rate of $325 per hour.

Other recent federal courts also provide guidance. In 2005, in Access 4 All, Inc. v. Park Lane Hotel, Inc., No. 04-civ-7174 (S.D.N.Y. 2005)(**Exhibit 5**), the Court awarded attorney John Fuller $350.000 per hour in an ADA discrimination case. In Disabled Patriots v. Regency Centers, L.P., No. 1:04-cv-0419-RWS (N.D. GA 2005) (**Exhibit 6**), the Court awarded John Fuller $300 an hour in a similar ADA case.  In Steven Brother v. BFP Investments, Ltd., Case No. 03-10129-civ-Marra/Dube (**Exhibit 7**), the Court awarded Plaintiffs' counsel $385 per hour in a Title III ADA case in March 2005. In Betancourt v. 3600 Centerpoint Parkway Investments, LLC, No. 03-72868 (E.D. Mich. 2004) (**Exhibit 8**), the Court awarded attorney John P. Fuller $325 per hour in an ADA discrimination case. In Morris v. Eversley, 343 F.Supp.234 (S.D.N.Y. 2004), attorneys in a civil rights case with 15 years of experience, were awarded $350 per hour.  Both John Fuller and O. Oliver Wragg have that type of experience.  In 2004, in Brother v. Miami Hotel Investments, Inc., 341 F.Supp.2d 1230, 1235 (S.D. Fla. 2004), the Court held that $325 per hour was an acceptable rate for the lead attorney in an uncomplicated ADA case that resulted with a consent decree and for an

8

attorney with eight years of ADA experience.

The Supreme Court has held that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. Hensley, *supra*, at 436; Farrar v. Hobby, 506 US 103, 114 (1992). *See also* Pearson v. Fair, 980 F.2d 37 (1st Cir. 1992). In this case, the Plaintiffs' achieved a great success, and one that will permit the Plaintiffs, and other disabled individuals, the full enjoyment of the use of the Defendant's place of public accommodation as is required under the law. As a result of the Plaintiff's initiation of this lawsuit, and the legal services performed by Plaintiffs' counsel, a Settlement Agreement was entered into and approved by this Court, which required the Defendant to bring its property, a hotel, into compliance with the ADA, by removing barriers to access and correcting the numerous ADA violations. The substantial corrective action to be undertaken by Defendant is explained in the Settlement Agreement [DE 33]. It includes remedying ADA violations in regards to areas such as parking, exterior accessible routes, interior ramps, accessible public restrooms, accessible guest rooms, access to goods and services, alarms and training. The time and labor required by Plaintiffs' law firms, is detailed in the bills of both of Plaintiffs' law firms (**Exhibit 9**).[2]

Plaintiffs submit that the benefit of the litigation to the public as a whole is a crucial factor under the Johnson analysis when determining fees. Pubic policy may support an award of attorneys' fees in civil rights cases when the plaintiffs have sued to vindicate a public right at a cost high in comparison to the actual damages suffered. Knight v. Auciello, 453 F.2d 852, (1st Cir. 1972). As

---

[2] Any and all time incurred by Plaintiffs' counsel in filing, preparing and litigating this fee application and any fee hearings thereon is compensable. *See* Guerrero v. Cummings, 70 F.3d 1111 (9th Cir. 1995); *See also*, Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist., 71 F. 3d 1053 (2nd Cir. 1995), Barlow-Gresham Union High School Dist. No. 2 v. Mitchell, 940 F.2d 1280 (9th Cir. 1991), Mallory v. Harkness, 923 F.Supp. 1546 (S.D. Fla. 1996).

such, in assessing attorneys' fee under the ADA, the Court must consider the benefits to the public as a whole attained as a result of the civil rights action. In <u>Villano v. Boynton Beach</u>, 254 F.3d 1302, 1306 (11th Cir. 2001) the Court held that a "successful civil rights actions vindicate a public interest ...[and]...[p]ublic benefit is a distinct measure of success in civil rights actions and ... a court must account for that distinct measure of success when calculating an award of fees and costs." See also <u>BFP Investments, Ltd.</u>, *supra*, at p. 17-18 (**Exhibit 7**). As required under the law, Plaintiffs respectfully request that the Court give proper weight to the public interests that were vindicated for the Plaintiffs and disabled persons as a result of this litigation. Plaintiffs refer to the detailed Consent Decree which delineates the extensive repairs that Defendant has agreed to make to its premises, which will assist not only the Plaintiffs but also all disabled persons. See <u>Gross v. Perrysburg Exempted Village School District</u>, 306 F.Supp2d 726 (ND Ohio 2004), that held "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensable fee."

What is also noteworthy in this litigation, is the substantial time and labor expended by Plaintiff's counsels as a result of Defendant's failure to cooperate in the resolution of this lawsuit. In fact, nineteen (19) months elapsed between the time Defendant was served with the Complaint and Defendant signed the Settlement Agreement. The Plaintiffs have continually attempted to settle this matter but the Defendant was not willing to. In fact, nine months elapsed between the time the Plaintiffs offered the Defendant a proposed Settlement Agreement and when, after extensive negotiation, the Defendant signed the Settlement Agreement. In fact, Defendant's counsel stated to Plaintiffs' counsel and to the Court that it hesitated settling the case because the Defendant may list the property for sale. In addition, Plaintiffs also responded to Defendant's Interrogatories and

Requests for Production.

### III. Costs

We turn now to the items requested to be taxed as costs in the case. Travel, telephone, reinspection fee, title search, filing fee, service of process fee and postage expenses are not unusual. "The attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party..." Culebras Enters.Corp. v. Rivera-Rios, 846 F.2d 94, 103 (1st Cir. 1988). These items were awarded in amount of $47,452.93 by this Court in the ADA case of Guckenberger, *supra*, at 111-112. These costs were also awarded in other decisions: $2,124.95 in Park Lane Hotel, *supra*, at 12 (**Exhibit 5**); $1028.42 in Betancourt, *supra* (**Exhibit 8**); $447.40 in LaPlante, *supra* at 226; $1,578.34 in Miami Hotel Investments, Inc, *supra*, at 1241. All of these items have been awarded in other decisions as well. See, Dowdell v. City of Apopka., 698 F.2d 1181, 1192 (11th Cir. 1983) and Access 4 All, Inc. et al. v. Safira Investments, Inc., 01–4795-CIV-JORDAN/BANDSTRA) (S.D. Fla. 2002). (**Exhibit 10**).

Furthermore, pursuant to 42 U.S.C. Section 12205, in an ADA case, a party may also recover expenses normally available under 28 U.S.C. Section 1920. Dowdell, *supra*. In Dowdell, a civil rights case involving fees and costs under 42 U.S.C. Section 1988, the 11th Circuit reversed the district court's refusal to tax travel, telephone and postage expenses as costs against the Defendants. The Court stated as follows:

> Where cost-shifting is expressly authorized by Statute, the traditional limitations of Rule 54(d) and 28 U.S.C. Section 1920 and 1923(a) do not apply." Id. at 1188-89. We hold, with the exception of routine office overhead normally absorbed by its practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as

11

> costs under Section 1988.  As is true in other applications of Section
> 1988, the standard of reasonableness is given a liberal interpretation.

In the case at bar, the costs of Fuller, Fuller & Associates, P.A. total **$2,651.87**.  The

photocopying charges were do largely to the pleadings, motions and briefs, that were filed.  The

phone charges were do largely to phone call with the client, and between Plaintiff's counsels to the

office of Defendant's attorney, and with Plaintiff's expert.  The reinspection fee is for the

reinspection contemplated after the Defendant completes the repairs of the existing barriers to access,

to confirm that the ADA violations have been corrected.

## IV. Expert Fees

Plaintiff also demand the payment of expert witness fees.  Under 42 U.S.C. 12205, the fees

paid to expert witnesses are deemed litigation expenses. The Court in Guckenberger, *supra*, at 111-

112 held that the Civil Rights Act of 1991 made explicit that attorneys fees should be awarded if the

Court deems them reasonable.  See Robins v. Scholastic Book Fairs, 928 F.Supp 1027, 1036 (D. Or.

1996) (finding that litigation expenses include the costs of expert witnesses).  Likewise, in Ziter v.

Vista Designs, Inc., 00-7137-CIV-LENARD (S.D. Fla. 2001), the Court awarded the Plaintiffs expert

witness fees on the basis that expert witness fees are considered "litigation expenses." See Ziter at

5 citing Robins at 1036 ("[l]itigation expenses include the costs of expert witnesses.")

As explained in Appendix B to 28 CFR Part 36 (p. 640)- PREAMBLE TO REGULATION

ON  NONDISCRIMINATION  ON  THE  BASIS  OF  DISABILITY  BY  PUBLIC

ACCOMMODATIONS AND IN COMMERCIAL FACILITIES (PUBLISHED JULY 26, 1991),

> Section 36.505 states that courts are authorized to award attorneys
> fees, including litigation expenses and costs, as provided in section
> 505 of the Act.  Litigation expenses include items such as **expert**

> **witness fees**, travel expenses, etc. . The Judiciary Committee Report
> specifies that such items are included under the rubric of "attorneys
> fees"...(emphasis added).

Federal courts have continually been awarding expert fees in actions to enforce the
Americans with Disabilities Act. In fact, they were awarded in the amount of $6,125.00 in
Betancourt, *supra* (**Exhibit 8**); $4,375.00 in Park Lane Hotel, *supra*, at 13 (**Exhibit 5**); $5,075.00
in Regency, *supra*, at p. 6 (**Exhibit 6**); and $3,165.35 in BFP Investments, *supra*, at 23 (**Exhibit 7**).
See also, Association of Disabled Americans, Inc., et al. v. North Beach Hotel, Inc.,Case No.97-133-
CIV-HIGHSMITH(S.D. Fla. 1998)(**Exhibit 11**) (awarding expert fees of $185.00 per hour);
Association for Disabled Americans, Inc. et al. v. Motiva Enterprises, L.L.C., Case No.99-580-CIV-
JORDAN/BANDSTRA (S.D. Fla. 2001) (**Exhibit 12**)(awarding expert fees of $12,339.95);
Advocates for the Disabled, et al .v. Boulevard Motel Corporation, Case No.99-6833-CIV-
HIGHSMITH/GARBER (S.D. Fla. 2000 )(**Exhibit 13**)(awarding expert fees of $2,000.00). As well,
in Motiva L.L.C., *supra*, the court stated that:

> It is within this Court's discretion to award a prevailing party under
> the ADA, not only the attorneys' fees, but also expert fees. See 42
> U.S.C. § 12117(a) (stating that the powers, remedies, and procedures
> available under Title VII, 42 U.S.C. § 2000e-5 are available under the
> ADA); see also 42 U.S.C. §12205.

In the case at bar, as reflected in the curriculum vitae of Plaintiffs' expert, Pablo Baez is a
certified accessibility inspector and plans examiner with outstanding qualifications (Resume at
**Exhibit 14**). He has been an ADA accessibility expert for three years and has inspected numerous
properties. His expert reports were heavily relied to satisfy Plaintiffs' attorneys' Rule 11 obligation
and in the formation of the Settlement Agreement. Due to his experience and the usefulness of his

13

efforts, Plaintiffs respectfully submit that the Court award Mr. Baez $175 an hour for a total of **$6,387.50**. A review of Mr. Baez' Investigative Reports describing the existing ADA violations at Defendant's premises, is proof in support of his expert bills rendered by Access-Ability, Inc. (see **Exhibits 15** and **16**).

## V. Conclusion

Under this background, the Plaintiffs' attorneys' fees, costs and expert fees, are the following:

(a)     To date, the Plaintiffs have incurred $ **28,972.50** for attorney's fees based on an hourly rate of **$325.00** per hour for the attorneys John P. Fuller and O. Oliver Wragg and **$240.00** for Tracie Dickerson. (Bill at **Exhibit 9**). This also includes **$435.50** in paralegal fees. Plaintiffs' counsel John P. Fuller has each certified that they has fully reviewed the time records and supporting data of his law firm, and that this motion is well grounded in fact, and is justified.

(b)     To date, the Plaintiffs have incurred **$2,651.87** in costs. This includes a **$750.00** reinspection fee, which is for  the reinspection contemplated after the Defendant completes the repairs of the existing barriers to access, to confirm that the ADA violations have been corrected.

(c)     Attached hereto as **Exhibits 14 & 15** are the credentials of the expert Pablo Baez of Access-Ability, Inc., who inspected the property, to certify the qualifications and expenses spent and the reports listing the violations found on the subject property.  Attached as **Exhibit 16** are the bills of Plaintiff's expert totaling $ **6,387.50.** Said amount of the expert bills are also included as costs in the attached bill of Fuller, Fuller & Associates.

14

Based upon the foregoing, Plaintiff seeks an award of attorneys' fees of $ **28,972.50**, to

Fuller, Fuller & Associates, P.A., $ **6387.50** in expert witness fees, and $ **2,651.87** in costs.

Plaintiffs herein reserve the right to seek an additional amount in attorney's fees and costs, if so

required.

_____

JOHN P. FULLER

15



_____    _____
John P. Fuller

**VERIFICATION**

STATE OF FLORIDA          )
COUNTY OF MIAMI-DADE)

    BEFORE ME, the undersigned authority, personally appeared this day JOHN P. FULLER and he acknowledged to and before me that he executed the foregoing Plaintiffs' Verified Application for Attorneys' Fees, Costs and Expert Fees, for the purposes contained therein and the facts alleged therein are true to the best of his knowledge and belief.

    WITNESS my hand and seal in the County and State last aforesaid this / day of June, 2006.



_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

Alicia S. Lamar-Hepburn
Commission # DD562415
Expires June 11, 2010
Bonded Troy Fain - Insurance, Inc. 800-385-7019

16

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to Michael Colgan Harrington, Esq., Murtha Cullina, LLP,185 Asylym Street, CityPlace I, Hartfort, CT 06103 on this 7th day of July 2006.


　　　　　　　　　　　　/s/John P. Fuller
　　　　　　　　　　　JOHN P. FULLER, Esq., pro hac vice

# CPR

## CENTER FOR PUBLIC REPRESENTATIO

A PUBLIC INTEREST LAW FIRM DEDICATED TO SERVING INDIVID
WITH DISABILITIES NATIONWIDE FOR MORE THAN 30 YEAR

**HOME    ABOUT CPR    LITIGATION AND CONSULTING SERVICES    STAFF**
**MAJOR CASES AND INITIATIVES    ALERTS    LINKS    PUBLICATIONS    SEARCH**

# Center for Public Representation Staff

## Steven Schwartz

Steven J. Schwartz, the Executive Director of the Center for Public Representation, began practicing mental disability law in 1971. He has extensive experience litigating class action cases challenging issues related to the institutional confinement and community integration of persons with disabilities, and has successfully resolved a number of damage cases for individuals with disabilities. Mr. Schwartz has authored a number of law review articles, testified before Congress on P&A authorizing legislation and abuse and neglect issues, and served on the faculty of the Harvard and Western New England Law Schools. He also is one of the Center's senior attorneys who provides technical assistance to P&A attorneys as part of the NAPAS' legal backup program.

## Bob Fleischner

Robert D. Fleischner has been practicing mental disability law since 1973. Mr. Fleischner is a national expert on P&A access, advance directives, and guardianship. He was on the faculty of the Western New England Law School and Smith College School of Social Work. Bob is the co-author of Guardianship and Conservatorship in Massachusetts, published by Lexis, and has written several law review articles. He has litigated community integration, civil commitment, guardianship, and fair housing cases. He provides technical assistance to P&A attorneys, has co-counseled cases with the P&A in Michigan, has worked closely on litigation with the Vermont and Maine P&As, and served as an expert witness for the Illinois P&A.

## Cathy Costanzo

Cathy Costanzo has worked in the mental disability law field since 1977 and has extensive experience in providing representation to institutionalized persons throughout the country. She is the former director of the Massachusetts PAIMI Project, the former chair of NAPAS' Legal Committee, and one of the Center's senior attorneys who provide legal backup to P&A attorneys. Ms. Costanzo is co-counsel in a number of class action cases in New Mexico, Massachusetts, Washington, and Arizona which seek to promote the integration and to expand the rights of persons with psychiatric and developmental disabilities. She has directed the Center's restraint and seclusion project, its death watch project, and its multi-state initiative on challenging the use of aversive punishment on persons with developmental disabilities.

## Susan Stefan

Prior to joining the staff of the Center for Public Representation in 2002, Susan Stefan taught Disability Law and Mental Health Law at the University of Miami School of Law. During that time she wrote two books, Unequal Rights: Discrimination against People with Mental Disabilities and the Americans with Disabilities Act (A
Hollow Promises: Employment Discrimination Against People wit
(APA Press 2002), as well as numerous articles and chapters on
disability law. She has litigated numerous ADA cases, submitted



the United States Supreme Court and other lower courts. Ms. Stefan is Vice President of the National Association for Rights Protection and Advocacy and a recipient of many awards for her advocacy and litigation on behalf of people with psychiatric disabilities. From 1986-1990, Ms. Stefan worked at the Mental Health Law Project, now the Bazelon Center for Mental Health Law, where she litigated several precedent settings cases on P&A access and restraint and seclusion.

## David Engle

Attorney David Engle directs the Center's Disability Benefits Unit, representing mentally and/or physically disabled SSDI claimants in administrative proceedings and federal court. He has been employed at CPR since 1988. A 1972 graduate of Dartmouth College, Dave received a master's degree in Special Education (1974) and his law degree (1978) from Boston University. Prior to coming to CPR, he was employed by the Citizen Advocacy Project of the Massachusetts Association for Retarded Citizens and as the Assistant Director of the Mental Health Legal Advisors Committee (MHLAC) of the Supreme Judicial Court. Dave has chaired the Beaverbrook-STEP Human Rights Committee and the Human Rights Advisory Committee of the Department of Mental Health, and currently serves, by appointment of the Massachusetts Supreme Judicial Court, on the Board of Directors of the Mental Health Legal Advisors Committee. In addition to his SSDI work, Dave represents mentally handicapped clients in civil commitment, substituted judgment, application for discharge, and discrimination cases.

## Kathryn Rucker

Kathryn Rucker received her undergrdauate education from the College of the Holy Cross in Worcester, Massachusetts where she studied English and Peace Studies. She is a graduate of Northeastern University School of Law, and has been working with the Center since August, 1999. Kathryn's individual representation and her systemic reform work focus on serving individuals with serious mental illness in hospital and community residential settings. She also provides litigation support for the Center's class action lawsuits.

## Santina Sciaba-Douglas

Santina Sciaba-Douglas provides representation to residents of Hampshire and Franklin Counties of Massachusetts in appeals of denials of SSI benefits. Santina is a 2000 graduate of Western New England College School of Law. She was a law clerk to the justices of the Massachusetts Superior Court and has had her own private law practice. In addition to her social security law expertise, she is an experienced mental health and juvenile law advocate. Santina is fluent in Spanish.

# JOHN P. FULLER
## 12000 BISCAYNE BLVD.
## SUITE 609
## MIAMI, FL 33181
## (305) 891-5199 (Dade)
## (954) 463-6570 (Broward)
## Fax: 305-893-9505

BAR MEMBERSHIP:

Florida State Bar, 1979
Dade County Bar Association, 1979
United States District Court, Southern District of Florida, 1979
United States District Court, Middle District of Florida, 2001
United States District Court, Northern District of Florida, 2003
United States Court of Appeals, 11th Circuit, 1979
United States Court of Appeals, 5th Circuit, 1981

WORK EXPERIENCE:

3/99 to Present:

FULLER, FULLER AND ASSOCIATES, P.A.
12000 Biscayne Boulevard, Suite 609
North Miami, Florida 33181

Partner - involved in all aspects of general law practice, including emphasis on trial practice, primarily concerning litigation involving enforcement of Title II and III of the Americans with Disabilities Act of 1990, personal injury and wrongful death, and commercial litigation.

7/91 to 3/99

JOHN FULLER, P.A.
1111 Lincoln Road Mall, Suite 802
Miami Beach, Florida 33139

Partner - involved in all aspects of general law practice, including emphasis on trial practice, personal injury and wrongful death, and commercial real estate matters.

1/89 to 7/98

SHAPIRO AND WEIL
Capital Bank Building, Suite 608
1666-79th Street Causeway
Miami Beach, Florida 33141

Of Counsel - involved in mostly complex commercial and probate litigation.

7/79 to 1/89

FULLER, FEINGOLD AND MALLAH, P.A.

Partner - involved in all aspects of general law practice, including emphasis on trial practice, personal injury and wrongful death, and real estate matters.

EXHIBIT
2

| | |
|---|---|
| 1978 | UNITED STATES DISTRICT COURT<br>The Honorable Joe Eaton<br>Certified Legal Intern |
| EDUCATION: | University of Florida<br>B.S. with Honors, 1975 |
| | Nova University School of Law<br>Juris Doctor, 1978 |
| HONORS: | Member, Florida Blue Key; President, TAU Epsilon Fraternity; Who's Who Among Students in American Universities and Colleges, 1975; President, Nor-Isle Optimist Club, Board Certified Real Estate Lawyer, 1989. |
| PROFESSIONAL ASSOCIATIONS: | Academy of Florida Trial Lawyers; Dade County Bar Association. |
| CIVIC ASSOCIATIONS: | Nor-Isle Optimist Club, Westview Country Club, Young President's Club, Mount Sinai Hospital |
| REFERENCES: | Upon request |
| PERSONAL: | Married with two children |

W:\WPDocs\EMPLOYEES\jp\Fuller, John\RESUME\00 ## Resume JOHN FULLER with new address.wpd

**O. OLIVER WRAGG**
**12000 Biscayne Boulevard, Suite 609**
**Miami, Florida 33181**
**Telephone: (305) 891-5199**
**E-Mail: oliver@wragglaw.com**

**EDUCATION:**
**UNIVERSITY OF MIAMI SCHOOL OF LAW,** Coral Gables, FL
Juris Doctorate, *cum laude* May 1992
Class Rank: 23%
Articles and Comments Editor, Entertainment and Sports Law Review
Moot Court Board
State Moot Court Team
Moot Court Board Scholarship - Student Instructor, Advanced Moot Court
The Order of Barristers

**BOSTON UNIVERSITY,** Boston, MA
Bachelor of Arts, International Relations. May 1986

**PROFESSIONAL EXPERIENCE:**

**THE LAW OF OFFICE O. OLIVER WRAGG,** Miami, FL     September 1999-present
*Owner*
 Civil litigation and trial practice, focusing on personal injury, insurance coverage and commercial litigation. Current case load of approximately 45 cases. One jury trial.

**FERRARO & ASSOCIATES, P.A.,** Miami, FL     October 1998- June 1999
*Associate Attorney*
 Six-attorney civil litigation firm, specializing in plaintiffs' asbestos litigation in state court.

**THE WEATHERLY LAW FIRM,** Atlanta, GA     September 1996 - September 1998
*Associate Attorney*
 Six-attorney defense firm representing public school districts in federal disability discrimination litigation. REPORTED CASE: School Bd. of Pinellas Co. v. J.M., 957 F.Supp. 1252 (M.D. Fla. 1997).

**ROBLES & GONZALEZ, P.A.,** Miami, FL     September 1992 - August 1996
*Associate Attorney*
 Ten-attorney plaintiffs' civil trial practice focusing on mass tort and class actions, including product liability, toxic tort, discrimination, commercial and personal injury litigation. Five jury trials. REPORTED CASE: W.R. Grace & Co. -- Conn. v. Waters, 638 So. 2d 502 (Fla. 1994).

**LICENSES:**   Florida (1992)
       Georgia (1996)
       Massachusetts (1999)
       11th Circuit Court of Appeals
       Southern, Middle Districts of Florida
       Northern, Middle Districts of Georgia

**AFFILIATIONS:**  Academy of Florida Trial Lawyers
       Dade County Bar Association
       Editor, *The Dade County Bar Association Bulletin,* 2000-present

**TRACIE L. DICKERSON**
4730 SW 67th Avenue, I-5
Miami, Florida 33155

<u>BAR LICENSES</u>

FLORIDA, April 2004
DISTRICT OF COLUMBIA, 2004 (*Anticipated*)

<u>EDUCATION</u>

**UNIVERSITY OF MIAMI SCHOOL OF LAW**, Coral Gables, Florida
Juris Doctor, May 2003
<u>Honors</u>: James Weldon Johnson Summer Institute, 2000 Fellow
<u>Activities</u>:    Maritime Law Society, Admiral 2003-03, Vice-Admiral 2001-02; Helping Others
        Through Pro-Bono Efforts, Project Leader 2002

**UNIVERSITY COLLEGE LONDON**, London, England
Summer 2002

**TEXAS A&M UNIVERSITY**, Galveston, Texas
Bachelor of Science in Maritime Administration, May 2000
<u>Honors</u>:    President's Academic Achievement Award; Environmental Writing Scholarship;
        Moody Foundation Scholarship; Rudy Tomjanovich Scholarship; Rotary Club of Galveston
<u>Activities</u>:    Island Scholarship; Texas A&M County Club Scholarship
        Texas Seaport Museum Volunteer; Texas Marine Mammal Stranding
        Network Volunteer

<u>EMPLOYMENT</u>

**Fuller, Fuller and Associates, P.A.**, North Miami, Florida
<u>Attorney</u>
                                            June 2004 – Present

**Fuller, Fuller and Associates, P.A.**, Miami Beach, Florida
<u>Law Clerk</u>
                                            May 2001-February 2003
Drafted and prepared Consent Decrees and Settlement Agreements. Set depositions. Prepared answers
to Request for Production/Interrogatories. Attended property inspections. Performed legal research on
elements and issues pertaining to Title III Americans with Disabilities Act.

**Lewis and Williams, LLP**, Galveston, Texas
<u>Law Clerk</u>
                                            December 2000-January 2001
Classified and organized thousands of documents for a large class action lawsuit. Prepared indexes to
assist local counsel in finding documents such as medical records, special appearance transcripts, and
depositions.

**Chimera Technologies, Inc.**, Galveston, Texas
<u>Office Manager</u>
                                            May 1998-June 2000
Supervised bookkeeping and successfully implemented inventory control plans. Worked with suppliers to
order and test products. Tutored clients for basic computer use.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (SPRINGFIELD)

ACCESS 4 ALL, INC., a Not for Profit
Corporation, and FELIX ESPOSITO,
Individually,

        Case No. 3:04-cv-12347-KPN

       Plaintiffs,

v.

       **AFFIDAVIT OF JOHN P. FULLER**

DELANCEY CLINTON ASSOCIATES, L.P., a
Pennsylvania Limited Partnership,

       Defendant.

_____/

STATE OF FLORIDA      )
                    ) SS
COUNTY OF MIAMI-DADE  )

**EXHIBIT**

**3**

      BEFORE ME personally appeared John P. Fuller, who, under oath, deposes and states the following:

    1.    The undersigned is a member of the law firm Fuller, Fuller & Associates, P.A. The law firm Fuller, Fuller & Associates, P.A. represents the Plaintiffs in the above styled matter. I was the lead attorney in the above styled matter.

    2.    I graduated from Nova University School of Law in 1978.

    3.    I have twenty-five years experience as a trial attorney and over twenty-five years in front of the federal bar. I have been a member of the Florida Bar since 1979. I have been a member of the United States Court of Appeals for the 11th Circuit since 1979. I have been a member of the United States Court of Appeals for the 5th Circuit since 1981. I have been a member of the United States District Court for the Southern District of Florida since 1979. I have been a member of the United States District Court for the Northern District since 2003. I have been a member of the United States District Court for the Middle District since 2001.

    4.    I have litigated hundreds of ADA Title III cases throughout the country.

    5.    I generally charge between $325.00 to $425.00 per hour for my legal services. This amount is consistent with the rates charged in the jurisdictions in which I

practice.

6. The Affiant certifies that the above information is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

_____
John P. Fuller

SWORN TO and subscribed before me by John P. Fuller, who is known to me personally, and who did take an oath, this _____ day of July, 2006.

_____
Notary Public, Florida at Large

Alicia S. Lamar-Hepburn
Commission # DD562415
Expires June 11, 2010
Bonded Troy Fain - Insurance, Inc. 800-385-7019

2

3588
copy DK

UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
ACCESS 4 ALL, INC., a Florida not    :    04 Civ. 7174 (SAS) (JCF)
for profit corporation, and PETER    :
SPALLUTO, Individually,              :
                                     :       MEMORANDUM
                 Plaintiffs,         :       AND  ORDER
                                     :
    - against -                      :
                                     :
PARK LANE HOTEL, INC., a             :
New York Corporation,                :
                                     :
                 Defendant.          :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiffs, Access 4 All, Inc. and Peter Spalluto, brought this action claiming that the Helmsley Park Lane Hotel, owned by defendant Park Lane Hotel, Inc. ("Park Lane"), contained architectural barriers that prevented disabled persons from using its full range of services, in violation of the Americans With Disabilities Act, 42 U.S.C. § 12181 et seq. (the "ADA"). The parties ultimately entered a settlement agreement addressing a number of features of the property. The parties reserved for decision by the Court the plaintiffs' application for an award of attorneys' fees and costs and consented to refer this issue to me for final disposition pursuant to 28 U.S.C. § 636(c).

The plaintiffs now move for an award of attorneys' fees of $67,056.50 and expert witness fees and costs of $11,349.41, based on the following hours and rates:

1



| Attorney | Hours | Rate | Total |
|----------|-------|------|-------|
| Fuller, Fuller & Assoc. | | | |
| John P. Fuller | 7.7 | $425 | $ 3,272.50 |
| Lawrence A. Fuller | 139.5 | $425 | $ 59,287.50 |
| Tracie Dickerson | 0.8 | $240 | $ 192.00 |
| Paralegal | 3.8 | $115 | $ 437.00 |
| Mario B. Mikelinich | 9.1 | $425 | $ 3,867.50[1] |
| Expert Fees | 46.0 | $175 | $ 8,050.00 |
| Costs | | | $ 3,299.95 |
| | | Total: | $ 78,405.95 |

(Plaintiffs' Verified Application for Attorneys' Fees, Expert's Fees, Litigation Expenses and Costs and Incorporated Memorandum of Law ("Pl. App.") at 12-13; Letter of Lawrence A. Fuller dated Nov. 28, 2005 ("Fuller Letter") at 4-5).

The defendant opposes an award of this magnitude on the grounds that (1) the plaintiff's counsel allegedly violated the confidentiality provisions of the settlement agreement by disclosing the terms of the agreement to a non-party; (2) the time spent by plaintiffs' counsel on many tasks was excessive; (3) the rates charged are not justified; (4) the expert witness fees are excessive; (5) the plaintiffs' costs other than the expert fees should be rejected; and (6) the plaintiff's "lodestar" recovery should be reduced based on their limited success.

The ADA provides that a prevailing plaintiff may recover

---

[1] Because of an apparent arithmetic error, the fee application seeks a total of $3,857.50 with respect to Mr. Mikelinich.

attorneys' fees, expert fees, litigation expenses, and costs. 42 U.S.C. § 12205. In a civil rights case such as this, the amount of an award of attorneys' fees is determined using the "lodestar" method: the number of hours reasonably expended multiplied by the appropriate hourly rates for attorneys or paralegals. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). "[T]he district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999) (citing Hensley, 461 U.S. at 433-35, 440). Finally, while the lodestar can be adjusted in light of factors such as the results obtained, Hensley, 461 U.S. at 434-35, "[t]here is . . . a strong presumption that the lodestar figure represents a reasonable fee." Quaratino, 166 F.3d at 425 (citation and internal quotation omitted). The parties' contentions may now be considered within this framework.

A. Violation of the Confidentiality Provision

The settlement agreement contains a strict confidentiality provision. Park Lane contends that plaintiffs' counsel violated it by sharing the terms of the agreement with William Norkunas, the defendant's former expert witness in this case, and should therefore have their fees reduced or denied altogether. (Letter of Sandor Frankel dated Nov. 18, 2005 ("Frankel Letter"). The primary basis of this allegation is a memorandum that Mr. Norkunas sent to a representative of Park Lane stating in part:

> Your attorneys did not serve you well in this case. The settlement you are asked to sign is horrible. There must

3

> always be language in any such settlements that the
> plaintiffs and their attorneys cannot sue you in the
> future.  You don't have that!

(Memorandum from Bill Norkunas to Abe Wolf dated June 8, 2005, attached as Exh. 1 to Frankel Letter).  In addition, Park Lane notes that Mr. Norkunas knew that he was replaced as the defendant's expert by Elliot Vilkas even though no one from Park Lane provided that information, and it argues that this shows that Mr. Norkunas must have learned this from plaintiffs' counsel as well.  (Frankel letter at 1-2 & Exh. 2).

In light of the questions raised by Park Lane, I permitted the defendant to depose Mr. Norkunas.  However, I declined to permit a deposition of plaintiffs' counsel.  (Order dated July 11, 2005, attached as Exh. 3 to Frankel Letter).  Mr. Norkunas testified that neither the plaintiffs nor plaintiffs' counsel had shown him a copy of the settlement agreement in this case nor discussed it with him. Rather, because he had worked with plaintiffs' counsel in numerous cases and was familiar with the terms that they always insisted upon, he simply assumed that the settlement in this case followed the same pattern.  (Deposition of  William Norkunas ("Norkunas Dep."), attached as Exh. 4 to Frankel Letter, at 52-54, 62-64, 66, 80-81).    Likewise,  Mr.  Norkunas  testified  that  neither  the plaintiffs nor plaintiffs' counsel told him that Elliot Vilkas had replaced him as defendant's expert.  Rather, Mr. Norkunas inferred that Park Lane had hired Mr. Vilkas when a representative told him that it had engaged the top accessibility architect in New York. (Norkunas Dep. at 30-34, 47, 78).

4

Park Lane contends that I should discount Mr. Norkunas' testimony as inherently incredible or, at least, permit the deposition of plaintiffs' counsel. I decline the invitation. Mr. Norkunas' explanations for assuming the content of the settlement agreement and for inferring the identity of the defendant's expert are plausible, even though his conduct toward Park Lane after his discharge was plainly inappropriate. Furthermore, plaintiffs' attorney has submitted an affidavit declaring unequivocally that he neither showed the settlement agreement to Mr. Norkunas nor discussed it with him. (Affidavit of Lawrence A. Fuller dated Nov. 25, 2005, attached as Exh. 1 to Fuller Letter). This issue has been fully explored, and Park Lane has not demonstrated a basis for denying or reducing the plaintiffs' fee award on the basis of a breach of confidentiality.

B.  Excessive Hours

Park Lane maintains that plaintiffs' counsel spent excessive time on various tasks in this case. To determine the number of hours that are compensable, a court must initially look to the amount of time spent on each category of task, as documented by contemporaneous time records of the moving party's attorney. Kuper v. Empire Blue Cross and Blue Shield, No. 99 Civ. 1190, 2003 WL 23350111, at *11 (S.D.N.Y. Dec. 18, 2003). In calculating the number of "reasonable hours," the court may rely on its own familiarity with the case and the evidentiary submissions and arguments of the parties. Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992). And, "[i]f the court concludes that portions of the

expended time were not reasonably necessary to achieve the successful result obtained by the movant, it should reduce the time for which compensation is awarded." <u>Kuper</u>, 2003 WL 23350111, at *11.

Park Lane argues first that the compensation for plaintiffs' counsel should be reduced because they refused to explore settlement prior to formal litigation. Indeed, the Honorable Shira A. Scheindlin, U.S.D.J., briefly stayed the lawsuit to give counsel an opportunity to conduct an inspection of the premises and attempt to reach a resolution. However, that process was stymied when Park Lane initially failed to respond to the suggestions of plaintiffs' counsel with respect to dates for the inspection. (Plaintiffs' Reply to Defendant's Memorandum of Law in Opposition to Plaintiffs' Application for an Award of Attorney's Fees, Expert's Fees, Litigation Expenses and Costs ("Pl. Reply"), Exhs. 1, 2). Moreover, a party simply has no obligation to resolve a dispute outside the context of a lawsuit.

Next, Park Lane contends that an inordinate amount of time was spent preparing the Complaint and Amended Complaint in light of the fact that the plaintiffs' pleadings closely tracked their complaints in other ADA actions. However, the 4.4 hours spent on the original Complaint and the 3.8 hours devoted to amending it were modest expenditures of time and warranted by the resulting product.

Park Lane further argues that an excessive amount of time was spent on researching the issue of the permissible scope of the

6

releases to be provided by the plaintiffs.    That research was
necessitated, however, by the defendant's insistence that any
settlement include terms that would have precluded the plaintiffs'
counsel from ever representing any plaintiff in litigation
involving property owned by Helmsley Enterprises, Inc., the
indirect owner of the Park Lane Hotel.    Plaintiffs' counsel
demonstrated that such a provision would have violated Rule 5.6 of
ABA Model Rules of Professional Conduct as well as New York
Disciplinary Rule 2-108.    Park Lane can hardly complain about work
that was the result of its own improper settlement demands.

The defendant also maintains that plaintiffs' counsel spent an
inordinate amount of time reviewing documents that it produced on
May 25, 2005, the date upon which, according to Park Lane, all
essential elements of a settlement had been agreed to.    However, at
that time, Park Lane had not yet withdrawn its demand that
plaintiffs' counsel agree not to represent anyone suing Helmsley
properties in the future.    Consequently, there was no assurance
that a settlement would be executed, and counsel were facing a June
discovery deadline imposed by Judge Scheindlin.    Indeed, the fact
that defendant's counsel produced documents at that time
demonstrates their own understanding that discovery was ongoing.

Finally, Park Lane argues that fees sought by counsel who have
not been adequately identified should be rejected.    With respect to
John Fuller and Mario Mikelinich, this contention is puzzling,
since both of them, along with Lawrence Fuller, provided their
curricula vitae as part of the initial fee application.    (Pl. App.,

7

Exh. 2). It is true that no résumé was submitted for the unnamed paralegal. However, given the type of work to which paralegals are limited, their credentials would have no impact on the compensability of their time. The situation is different with respect to Tracie Dickerson, an attorney first identified in the plaintiffs' reply papers. Because her qualifications have not been disclosed, her billing rate cannot be evaluated at all, and I therefore reject the application for fees related to her work.

C. Rates

The plaintiffs seek compensation for Lawrence Fuller, John Fuller, and Mr. Mikelinich at the rate of $425 per hour, which the defendant claims is excessive. In determining a reasonable rate, the Court should rely on rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984); see also Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998)); S.W. ex rel. N.W. v. Board of Education of City of New York (District Two), 257 F. Supp. 2d 600, 604 (S.D.N.Y. 2003). The relevant community is the district in which the case was brought, In re Agent Orange Product Liability Litigation, 818 F.2d 226, 232 (2d Cir. 1987), which in this case is the Southern District of New York.

Within the last five years, courts have approved rates ranging from $250 to $425 per hour for work done by partners in small firms in this district. See Kuper v. Empire Blue Cross and Blue Shield, No. 99 Civ. 1190, 2003 WL 23350111, at *9-10 (S.D.N.Y. Dec. 18,

8

2003) (lead attorney of small firm in civil rights case is awarded $425 an hour); New York State NOW v. Pataki, No. 93 Civ. 7146, 2003 WL 2006608, at *2 (S.D.N.Y., April 30, 2003) (approving $430 an hour for small firm civil rights litigator with thirty-four years experience); Gonzalez v. Bratton, 147 F. Supp. 2d 180, 211-12 (S.D.N.Y. 2001) (rates up to $390 an hour for senior attorneys are "within the range of reason" for "civil rights cases in this district" but at the "high end of the scale for a small law firm"); Pascuiti v. New York Yankees, 108 F. Supp. 2d 258, 266 (S.D.N.Y. 2000) ($250 for attorneys at small firm with twenty-nine and twenty-eight years of experience is reasonable); Marisol A. ex rel. Forbes v. Giuliani, 111 F. Supp. 2d 381, 386-88 (S.D.N.Y. 2000) ($350 for attorneys with more than fifteen years of experience is a reasonable rate scale for civil rights cases in the Southern District of New York). Currently, hourly rates in excess of $400 can be applied to small firms.    In a similar ADA lawsuit in 2004, Lawrence Fuller was awarded $325 per hour for work done iin the Eastern District of Michigan.    Betancourt v. 3600 Centerpoint Parkway Investments, LLC, No. 03-72868 (E.D. Mich. 2004).

Lawrence Fuller, John Fuller, and Mario Mikelinich each have 20 years of legal experience or more. (Pl. App., Exh. 2). Given their qualifications, the quality of the work performed in this case, and the range of hourly rates approved in similar cases in this district, the appropriate rate with which to calculate an award is $350 per hour.

With respect to the work performed by a paralegal, the

9

requested rate of $115 per hour is reasonable.   See Morris v. Eversley, 343 F. Supp. 2d 234, 248 (S.D.N.Y. 2004) (allowing paralegal rate of $125/hour in civil rights case).

C.   Expert Fees

The plaintiffs have applied for an award of expert fees for their expert witness, Herbert Neff, for 46 hours of work at a billing rate of $175 per hour, for a total of $8,050. (Pl. App., Exh. 8). It is within the Court's discretion to award a prevailing party under the ADA its litigation expenses, including expert witness fees. 42 U.S.C. §§ 12117(a), 12205.

Mr. Neff's charges are excessive in a number of respects. First, he submitted an invoice in August 2004 that included claims for time spent conducting an on-site inspection (Pl. App., Exh. 8), despite the fact that during a joint inspection with all counsel in January 2005, Mr. Neff stated that he had not visited the hotel in years. (Declaration of M. Breeze McMennamin dated July 19, 2005 ("McMennamin Decl."), ¶¶ 10-12). Second, Mr. Neff billed for travel related to the January inspection and for a mediation in March, even though he was previously scheduled to be in New York on those dates in connection with other matters. (McMennamin Decl., ¶¶ 10, 16). Third, he billed for attendance of his assistant, Pablo Baez, at a settlement conference in May 2005. However, Mr. Baez appeared as a representative of the plaintiffs with settlement authority, and his time is not compensable as an expert. Mr. Neff did prepare an expert report for which he may be compensated. Unfortunately, he has not provided a detailed breakdown for how his

10

time was allocated among various tasks, and any ambiguity in his time records must be construed against him. At the most, Mr. Neff is entitled to be compensated for 25 hours of work at $175 per hour, for a total of $4,375.

Lastly, Park Lane has cited a court decision indicating that Mr. Neff is in a witness protection program, and argues that his application for fees should be rejected because his background and credentials cannot be verified. However, defendant's counsel have proffered no evidence that they, in fact, attempted to check Mr. Neff's qualifications but were unable to do so. Indeed, they never attempted to depose him in order to ascertain the authenticity of his résumé. It would not be appropriate to reject his claim for fees on the basis of mere speculation.

E.   Costs

The plaintiffs have applied for an award of $3,299.95 for costs other than expert fees. Most of the items, such as photocopying and postage, are based on detailed records and are plainly compensable. See Duke v. County of Nassau, No. 97-CV-1495, 2003 WL 23315463, at *6 (E.D.N.Y. April 14, 2003). Two entries, however, raise some concern. On January 5, 2005, plaintiffs' counsel charged $850 to travel and accommodations in connection with an inspection of the hotel premises. However, as noted above, that trip was scheduled to coincide with counsel's presence in New York on another case. Therefore, reimbursement for those costs in this case will be reduced by half. Second, counsel billed $750 on January 25, 2005, for "Re-inspection Fee(s) to disability group."

11

(Pl. App., Exh. 5 at 9). This expense is purportedly for "the reinspection contemplated after the Defendant completes the repairs of the existing barriers to access, to confirm that ADA violations have been corrected." (Pl. App. at 11-12). But there is no basis for assessing against the defendant the costs of monitoring compliance where the monitoring entity has not been identified and the work has not been performed. No compensation is warranted for this item. Therefore, the total costs awarded shall be $2,124.95.

F. Degree of Success

Finally, Park Lane argues that the plaintiffs obtained only a fraction of the relief they sought and that the lodestar recovery should be reduced in proportion to their limited success. An award may not be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation. See Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005); Quaratino, 166 F.3d at 425-26. Nevertheless, in the Second Circuit, fees may be reduced based on the limited success of the plaintiff, even if the case was litigated on the basis of a single, unitary theory, and even if the plaintiff recovered more than nominal relief. Kassim, 415 F.3d at 253-55.

Here, however, no such reduction is warranted. Without breaching confidentiality, it is sufficient to observe that the settlement agreement, which the Court retains jurisdiction to enforce, requires the defendant to spend a substantial amount of money to improve accessibility for disabled persons to a number of the Park Lane Hotel's facilities and services. It is true, as the

12

defendant argues, that the relief obtained falls short of what was demanded in the complaint. But, by the same token, it far exceeds what Park Lane contended was the limit of its legal obligations. Moreover, the remedies obtained will inure not only to the benefit of the parties, but also to other disabled persons using the hotels facilities in the future.  See Morris, 343 F. Supp. 2d at 248. Measuring the plaintiffs' accomplishment by the magnitude of the relief rather than by the expectations of the parties, they have achieved a sufficient level of success to justify compensation at the full amount of the lodestar.

Conclusion

    For the reasons set forth above, the plaintiff's application for an award of attorneys' fees and costs is granted to the following extent:

| Attorney | Hours | Rate | Total |
|----------|-------|------|-------|
| Fuller, Fuller & Assoc. | | | |
| John P. Fuller | 7.7 | $ 350 | $ 2,695.00 |
| Lawrence A. Fuller | 139.5 | $ 350 | $48,825.00 |
| Paralegal | 3.8 | $ 115 | $   437.00 |
| Mario Mikelinich | 9.1 | $ 350 | $ 3,185.00 |
| Costs | | | |
| Expert fees | | | $ 4,375.00 |
| Other | | | $ 2,124.95 |
| | | Total: | $61,641.95 |

The Clerk of Court shall therefore enter judgment in favor of the

13

plaintiffs and against the defendant in the amount of $61,641.95.

SO ORDERED.

_James C. Francis IV_

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           December 7, 2005

Copies mailed this date:

Lawrence A. Fuller, Esq.
Fuller, Fuller and Associates, P.A.
12000 Biscayne Blvd., Suite 609
North Miami, FL  33181

Mario B. Mikelinich, P.C.
6800 Jericho Turnpike, Suite 104W
Syosset, New York  11791

Sandor Frankel, Esq.
M. Breeze McMennamin, Esq.
Frankel & Abrams
230 Park Avenue
New York, New York  10169

William D. Tucker, Esq.
Law Offices of William D. Tucker, PA
718 N.E. Second Avenue
Fort Lauderdale, FL  33304

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DISABLED PATRIOTS of
America, Inc., a Florida
nonforprofit corporation , et al.,

       Plaintiffs,

v.

REGENCY CENTERS, L.P., a
Delaware limited partnership, f/k/a
Regency Retail Partnership, L.P., a
Delaware limited partnership,

       Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:04-CV-0419-RWS

## ORDER

This action was originally brought by Plaintiffs on February 2, 2004

alleging that Defendant owned and operated a property, Loehman's Plaza, as a

public accommodation as defined by 28 C.F.R. § 36.201(a) and 36.104 in

violation of the Americans With Disabilities Act, 42 U.S.C. § 12181, et seq. (the

"ADA"). Defendant filed an answer to the Complaint and the parties proceeded

with discovery. Thereafter, Plaintiff filed a Motion for Partial Summary

Judgment. Before the Court ruled on the motion, the parties entered into a

Settlement Agreement on October 4, 2004. As a part of the Agreement, the



EXHIBIT
6

72A
v.8/82)

parties agreed that Defendant would pay Plaintiffs' counsel for attorney's fees, litigation expenses, and costs incurred in this matter as well as expert fees and costs incurred for Plaintiffs' expert. The Agreement provided that the parties would seek to reach agreement as to the amount due, and if they were unable to reach agreement, the amount would be determined by the Court. The Settlement Agreement of the parties was approved by the Court on November 9, 2004. The parties have not been able to resolve the matter of attorney's fees, litigation costs, expenses, and expert fees. Those issues are presently before the Court on the application of Plaintiffs [22].

The starting point for the determination of an award of attorney's fees "is to multiply hours reasonably expended by a reasonable hourly rate." Norman v. Hous. Auth. of City of Montgomery, 836 F.2d 1292, 1298 (11th Cir. 1988). "The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." Id. "The next step in the computation of the lodestar is the ascertainment of reasonable hours. . . . [E]xcessive, redundant, or otherwise unnecessary hours should be excluded from the amount claimed. In other words, the Supreme Court requires the applicants to exercise 'billing judgment.'" Id. at 1301 (internal citations and quotations omitted). "After the lodestar is determined by multiplication of a

2

reasonable hourly rate times hours reasonably expended, the court must next consider the necessity of an adjustment for result obtained. If the result was excellent, then the court should compensate for all hours reasonably expended. If the result was partial or limited success, then the lodestar must be reduced to an amount that is not excessive." Id. at 1302 (internal citations omitted).

Attorney's fees, expert fees, litigation expenses and costs are recoverable under the ADA. 42 U.S.C. § 12205. To recover attorney's fees under 42 U.S.C. § 12205, a plaintiff must be a prevailing party. Buckhannon Bd. and Care Home, Inc. v. W.Va. Dept. of Health & Human Resources, 532 U.S. 598 (2001). A plaintiff is a prevailing party if he is "awarded some relief" by the court and "achieved an alteration in the legal relationship of the parties." Id. at 603-05. Such a change in the relationship of the parties occurs when the court approves a settlement agreement and expressly retains jurisdiction to enforce its terms. Amer. Disability Ass'n, Inc. v. Chmielarz, 289 F.3d 1315 (11th Cir. 2002). Plaintiffs in the present case are the prevailing party because the Court has approved the Settlement Agreement entered into by the parties and has retained jurisdiction to enforce its terms. Further, the Settlement Agreement expressly provides for the Defendant to be responsible for Plaintiffs' attorneys' fees, experts' fees, litigation expenses, and costs.

3

72A
(8/82)

Defendant does not contest Plaintiffs right to recover fees and expenses but does contest the amounts sought by Plaintiffs. First, Defendant contends that Plaintiffs' hourly rates are excessive. In support of their hourly rates, Plaintiffs' attorneys cite cases from various jurisdictions awarding fees ranging as high as $500 per hour. Defendant counters that the illustrative rates submitted by Plaintiffs are from different markets and involved more complex litigation. A reasonable hourly rate for an attorney is "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Williams v. Bd. of Comm'rs of McIntosh Co., 938 F. Supp. 852, 858 (S.D. Ga. 1996), citing Blum v. Stenson, 465 U.S. 888 (1984). In addition to evidence offered by parties, a court "may consider it own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." Norman at, 836 F.2d at 1303. Based on the evidence submitted by Plaintiffs as well as the Court's experience with the Atlanta market, the Court finds that $300 per hour is a reasonable hourly rate for attorneys engaged in ADA litigation with the background and experience of attorneys Lawrence A. Fuller and John P. Fuller. Likewise, $250 per hour is an

appropriate hourly rate for an attorney with the experience of attorney Oliver
Wragg.

Defendant also objects to the number of hours requested by Plaintiffs'
attorneys. Defendant asserts that Plaintiffs' counsel have not exercised "billing
judgment" and have included "excessive, redundant, or otherwise unnecessary
hours." Def.'s Resp. Br. at 13. However, Defendant fails to cite specific hours
claimed by Plaintiffs' attorneys that Defendant contends are excessive,
redundant, or unnecessary. A party opposing a fee application has an obligation
to state the hours that should be excluded in "specific and reasonably precise"
terms. Am. Civil Liberties Union of Ga. v. Barnes, 168 F.3d 423, 428 (11th Cir.
1999). The Court has reviewed the itemized statements of Plaintiffs' counsel
and finds that they have avoided duplication of effort. Further, the time
expended on the various tasks performed is not inordinate. The Court finds the
time requested by Counsel is reasonable.

Finally, Defendant objects to certain of the expenses claimed by
Plaintiffs' counsel. In the Reply Brief, Plaintiffs' counsel has agreed to forego
its claim for telephone and fax charges and travel for attorneys. Defendant has
also objected to expert fees. However, the Court finds that the expert fees have
been adequately justified and are reasonable.

Based on the foregoing, Plaintiffs are awarded attorneys' fees in the total sum of $23,537.50, expert fees in the sum of $5,075.00, and costs in the sum of $1,532.40.

SO ORDERED, this __3rd__ day of February, 2005.


/s/ Richard W. Story
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

6



**UNITED STATES DISTRICT COURT**
**Southern District of Florida**
**Case No.: 03-60129-CIV-MARRA/DUBE**

STEVEN BROTHER,
    Plaintiff,

vs.

BFP INVESTMENTS, LTD., a Florida limited
partnership, GALT OCEAN MANOR CONDOMINIUM
ASSOCIATION, INC., and TRIBECA STEAK AND
CHOP HOUSE, INC.,
d/b/a Ocean Manor Resort Hotel,
    Defendants.



FILED by _____ D.C.

**MAR 3 0 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

_____/

## ORDER AND JUDGMENT FOR PLAINTIFF

### I. INTRODUCTION

THIS CAUSE came before the Court on Plaintiff's Motion for Summary Judgment against Galt Ocean Manor Condominium Association, Inc., including Verified Application for Attorney's Fees, Litigation Expenses and Costs (DE #37; 2/18/05). The Court has reviewed the motion and application, and the Affidavit of Plaintiff, Steven Brother in Support of Plaintiff's Motion for Summary Judgment (DE #41; 2/18/05), the Declaration of Thomas J. Ricci, Plaintiff's ADA Expert in Support of Plaintiff's Motion for Summary Judgment (DE #39; 2/18/05), and the Affidavit of Gil Haddad (DE #43; 2/18/05). Defendant Galt Ocean Manor Condominium Association, Inc. has failed to file a response to the Motion for Summary Judgment, which is in addition to its failure to obtain substitute counsel, failure to file a response to Plaintiff's motion regarding mediation (DE #31), failure to file a status report within thirty (30) days as required by this Court's Order Granting Leave to Withdraw (DE #33; 12/8/04), and failure to appear at the calendar call on January 21, 2005. The facts, as stated in Plaintiff's Statement of Undisputed Facts, are supported by specific references to the record. As a result, and as indicated below, they are deemed admitted for purposes of Plaintiff's motion for summary judgment. See S.D. Fla. L.R. 7.5(D). The matter is now ripe for review.

- 1 -



EXHIBIT
7



## II.  BACKGROUND AND UNDISPUTED FACTS

### A.  Generally

The Plaintiff, Steven Brother (hereinafter "Mr. Brother") is an individual with disabilities as defined by and pursuant to the ADA. 28 C.F.R. 36.104. Mr. Brother is partially paralyzed in his lower body and is deaf. Thus, Plaintiff Brother is limited in his major life activities by his disabilities in that he is unable to hear or walk independently, and uses a wheelchair to ambulate. Brother Aff. ¶ 2.

### B.  Undisputed Facts

The premises at issue is commonly known as the Ocean Manor Resort Hotel, and is located at 4040 Galt Ocean Drive, Fort Lauderdale, Florida (hereinafter the "resort"). There are 191 individually owned living units and 21 individually owned cabanas at the resort. A portion of those units and cabanas are put into a "hotel pool" and rented out to the public as transient lodging - the Ocean Manor Resort Hotel. As such, the resort is a public accommodation as defined by and is subject to Title III of the ADA. [Ricci Declar., ¶ 3]

Defendant Galt Ocean Manor Condominium Association, Inc. ("Galt Ocean") is a Florida corporation which is authorized to transact and which transacts business in Florida. [Galt Ocean's Ans. to ¶ 4 of the Complaint.]. While Defendant Galt Ocean does not own the units in the "hotel pool," it owns and operates the common areas of the resort, which common areas are open to and used by the guests of the resort. [Galt Ocean's Ans. to ¶ ¶ 4 and 10 of the Complaint; Ricci Declar., ¶ 4; Brother Aff. ¶ 3].

The common areas of the resort, which are owned, controlled and operated by Defendant Galt Ocean, are public accommodations and commercial facilities, and thus subject to the requirements of the ADA which apply to "public accommodations and commercial facilities." 42 U.S.C. Sec. 12183(b). Ricci Declar., ¶3.

Before this action was filed Mr. Brother made an attempt to stay at the resort and to access all of the common areas and facilities thereof, and in the future he will stay the resort and again attempt to access and use its commons areas. Brother Aff. ¶ 3.

During his pre-suit visit to the resort, Mr. Brother wanted to stay the night. He was unable to do so, however, because of the numerous barriers to access which precluded access him and which precluded him from using the common areas of the resort. The barriers Mr. Brother encountered, and which precluded his ability to access and use the common areas of the resort are set in Plaintiff's Motion for Summary Judgment, section I, pages 2 - 8, in Plaintiff's ADA expert, Thomas Ricci's Declaration, and in his expert's report attached thereto, and in section II.B.1 (ADA Violations - Barriers to Access), below. Brother Aff. ¶ 4.

Mr. Brother presently has, and since before the filing of this action has had, a specific intent on visiting and staying at the resort once the common areas and the facilities thereof are modified to comply with the ADA and are accessible to and useable by him. However, unless and until Defendant Galt Ocean makes the modifications to the common areas of the resort to effect ADA compliance, Mr. Brother will be and will remain unable to access and use the resort. Brother Aff. ¶ 5.

The common areas of the resort contain barriers to access by the disabled, and those barriers to access have not been modified by Defendant Galt Ocean to comply with the ADA [Ricci Declar., ¶ 4] The illegal barriers to access within the common areas of the resort, which common areas are owned and controlled by Defendant Galt Ocean, include the following:

## 1. ADA Violations - Barriers to Access

Exterior Routes

1.      There is not at least one accessible route complying with 4.3 of Appendix A to 28 CFR part 36 (the "ADAAG") within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones, and public

streets and sidewalks to an accessible building entrance, in violation of 4.1.2.1 of the ADAAG. Defendant Galt Ocean should construct an accessible firm, stable path of access, of at least 3 feet in width, complying with 4.3 of the ADAAG, from the sidewalk to the accessible building entrance (through the grass area on the north side of the resort). [Ricci Declar., ¶ 5.A]

2.    The accessible passenger drop-off/loading zone on the west side of the entrance does not have a sign indicating the area is reserved for the loading and unloading of guests with disabilities, as required by and in violation of 4.6.6 of the ADAAG. Defendant Galt Ocean should post a sign at the drop-off/loading zone identifying that area as the accessible drop-off/loading zone. The sign should also contain a pictogram of the international symbol of accessibility and should comply with 4.1.2(7), 4.30.7 and Figures 43(a) and (b) of the ADAAG. [Ricci Declar., ¶ 5.B]

3.    There are no accessible parking spaces in the parking area on the west side of Galt Ocean Drive, in violation of 4.1.2(5) of the ADAAG. Thus, Defendant Galt Ocean should provide two (2) accessible parking spaces in the parking area on the west side of Galt Ocean Drive, which spaces should comply with 4.6 of the ADAAG. [Ricci Declar., ¶ 5.C]

4.    The ramp that leads to the entrance of the resort lacks a minimum 60 inch clear level landing at the top of the ramp, in violation of 4.8.4 of the ADAAG, and it has a slope of in excess of 1:12, in violation of 4.8.2 of the ADAAG. Thus, Defendant Galt Ocean should modify that ramp to have a clear, level landing at the top of the ramp which complies with 4.8.4 of the ADAAG and to have a slope of 1:12 or less, in compliance with 4.8.2 of the ADAAG, or should provide an alternative ramp complying with 4.8 of the ADAAG providing such access. [Ricci Declar., ¶ 5.D]

Lobby Area

5.    The counter provided at the bell station lacks a lowered accessible section as required by 7.2 of the ADAAG. Thus, Defendant Galt Ocean should modify that counter to comply with 7.2 of the ADAAG. [Ricci Declar., ¶ 5.E]

6.    The public telephones are mounted so that all operational controls are higher than the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. Additionally, the volume controlled telephones are not identified by a sign showing a handset with radiating sound waves, in violation of 4.30.7(2) of the ADAAG. Thus, Defendant Galt Ocean should lower at least one public area accessible telephone so that all operational controls are reachable within the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. And, each volume controlled telephone should be identified by a sign showing a handset with radiating sound waves, in compliance with 4.30.7(2) of the ADAAG. [Ricci Declar., ¶ 5.F]

7.    The drinking fountain on the lobby level is not accessible as required by 4.15 of the

ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible drinking fountain on the lobby level which complies with 4.15 of the ADAAG on the lobby level. [Ricci Declar., ¶ 5.G]

### Public Elevator

8. The public elevators lack visual and audible signals at each hoistway indicating which car is answering the call and the direction of the elevators, in violation of 4.10.4 of the ADAAG. Thus, Defendant Galt Ocean should modify each public elevator to comply with 4.10.4 of the ADAAG. [Ricci Declar., ¶ 5.H]

9. The hall call buttons for the public elevators are centered higher than 42 inches above the floor, in violation of 4.10.3 of the ADAAG. Defendant Galt Ocean should relocate the hall call buttons for the public elevators so that they are centered at 42 inches above the floor, in compliance with 4.10.3 of the ADAAG. [Ricci Declar., ¶ 5.I]

### Public Restrooms - Lobby Level

#### Men's and Women's Restroom - Lobby Level

10. The sign identifying the men's and women's lobby level restrooms are mounted in the wrong location, lack braille, lack the requisite contrast, and lack a pictogram of the international symbol of accessibility. Defendant Galt Ocean should modify the signs to comply with 4.30.3, 4.30.4, 4.30.5, 4.30.6, 4.30.7 and Figure 43 (a) and (b). [Ricci Declar., ¶ 5.J]

11. The doors into the men's and women's lobby level restrooms have an opening resistance exceeding 5.0 foot pounds, in violation of 4.13.11(2)(b) of the ADAAG. Defendant Galt Ocean should adjust the opening resistence on those doors so that it does not exceed 5.0 foot pounds, in compliance with 4.13.11(2)(b) of the ADAAG. [Ricci Declar., ¶ 5.K]

12. The doors into the men's and women's lobby level restrooms have a clear opening width of less than 32 inches, in violation of 4.13.5 of the ADAAG. Defendant Galt Ocean should modify those doors to have a clear opening of 32 inches with the doors open 90 degrees, measured between the face of the doors an the opposite stop, in compliance with 4.13.5 of the ADAAG. [Ricci Declar., ¶ 5.L]

13. The doors into the men's and women's lobby level restrooms lack the clear maneuvering clearances required by 4.13.6 of the ADAAG. Defendant Galt Ocean should supply and install a power door opener on those doors so that the doors have the effective usability required by 4.13.6 of the ADAAG. [Ricci Declar., ¶ 5.M]

14. The handicapped toilet stalls in the men's and women's lobby level restrooms lack

the requisite maneuvering clearances required by the ADAAG, the toilets lack the requisite grab bars, and the toilets are not mounted 18 inches from the side wall to the centerline of the toilets, in violation of 4.17 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the lobby level men's and women's restrooms to each have an accessible toilet stall which complies with 4.17 of the ADAAG. [Ricci Declar., ¶ 5.N]

15.    The lavatories in the men's and women's lobby level restrooms do not comply with the requirements of 4.22.6, 4.23.6 and 4.19 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the lobby level men's and women's restrooms to each have at least one accessible lavatory which complies with 4.22.6, 4.23.6 and 4.19 of the ADAAG. [Ricci Declar., ¶ 5.O]

16.    The fire alarms (strobes) in the men's and women's lobby level restrooms are improperly mounted on the ceiling, as opposed to on the wall no higher than 80 inches above the finisher floor, in violation of 4.28.3(6) of the ADAAG. Thus, Defendant Galt Ocean should relocate the fire alarms (strobes) in the men's and women's lobby level restrooms to be on the wall no higher than 80 inches above the finisher floor, in compliance with 4.28.3(6) of the ADAAG. [Ricci Declar., ¶ 5.P]

17.    The paper towel dispensers in the men's and women's lobby level restrooms are mounted so that all operational controls and the towels are higher than the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. Thus, Defendant Galt Ocean should lower at least one paper towel dispenser in the men's and in the women's lobby level restrooms so that the operational controls and the towels are reachable within the reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. [Ricci Declar., ¶ 5.Q]

18.    The urinal in the men's lobby level restroom does not have an elongated rim which is at a maximum of 17 inches above the finished floor, in violation of 4.18 of the ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible urinal in the men's lobby level restroom which complies with 4.18 of the ADAAG. [Ricci Declar., ¶ 5.R]

19.    The mirror in the men's lobby level restroom is mounted so that the bottom of the reflecting surface is more than 40 inches above the finished floor, in violation of 4.19.6 of the ADAAG. Thus, Defendant Galt Ocean should provide an accessible mirror in the men's lobby level restroom which is mounted so that the bottom of the reflecting surface is no more than 40 inches above the finished floor, in compliance with 4.19.6 of the ADAAG. [Ricci Declar., ¶ 5.S]

Basement Level

20.    The route from the basement level to the pool level has a ramp upon entering the pool area that has a slope exceeding 1:12, and the ramp lacks grab bars on both sides of

the ramp, in violation of 4.8.2 and 4.8.5 of the ADAAG. Thus, Defendant Galt Ocean should modify that ramp to have a slope of less than 1:12, in compliance with 4.8.2 of the ADAAG, and to have handrails on both sides of the ramp which comply with 4.8.5 of th ADAAG. [Ricci Declar., ¶ 5.T]

21.    The drinking fountain on the basement level is not accessible as required by 4.15 of the ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible drinking fountain on the basement level which complies with 4.15 of the ADAAG on the lobby level. [Ricci Declar., ¶ 5.U]

Public Restrooms - Basement Level

   Men's and Women's Restroom - Basement Level

22.    The sign identifying the men's and women's basement level restrooms are mounted in the wrong location, lack braille, lack the requisite contrast, and lack a pictogram of the international symbol of accessibility. Defendant Galt Ocean should modify the signs to comply with 4.30.3, 4.30.4, 4.30.5, 4.30.6, 4.30.7 and Figure 43 (a) and (b). [Ricci Declar., ¶ 5.V]

23.    The doors into the men's and women's basement level restrooms have inaccessible knob door handles, in violation of 4.13.9 of the ADAAG. Defendant Galt Ocean should modify those door handles so that the handles are easy to grasp with one hand and so that they do not require tight grasping, tight pinching or twisting of the wrist to operate, in compliance with 4.13.9 of the ADAAG. [Ricci Declar., ¶ 5.W]

24.    The doors into the men's and women's basement level restrooms have a clear opening width of less than 32 inches, in violation of 4.13.5 of the ADAAG. Defendant Galt Ocean should modify those doors to have a clear opening of 32 inches with the doors open 90 degrees, measured between the face of the doors an the opposite stop, in compliance with 4.13.5 of the ADAAG. [Ricci Declar., ¶ 5.X]

25.    The handicapped toilet stalls in the men's and women's basement level restrooms lack the requisite maneuvering clearances required by the ADAAG, the toilets lack the requisite grab bars, the toilets are not 17-19 inches above the finished floor, and the toilets are not mounted 18 inches from the side wall to the centerline of the toilets, in violation of 4.17 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the basement level men's and women's restrooms to each have an accessible toilet stall or area which complies with 4.17 or 4.22 of the ADAAG. [Ricci Declar., ¶ 5.Y]

26.    The lavatories in the men's and women's basement level restrooms do not comply with the requirements of 4.22.6, 4.23.6 and 4.19 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the basement level men's and women's restroom to each have at least one accessible lavatory which complies with 4.22.6,

- 7 -

4.23.6 and 4.19 of the ADAAG. [Ricci Declar., ¶ 5.Z]

27.    The paper towel dispensers in the men's and women's basement level restrooms are mounted so that all operational controls and the towels are higher than the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. Thus, Defendant Galt Ocean should lower at least one paper towel dispenser in the men's and in the women's basement level restrooms so that the operational controls and the towels are reachable within the reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. [Ricci Declar., ¶ 5.AA]

Pool Area

28.    The tables in the pool area to not provide the requite knee clearances as required by 4.32.3 and 4.32.3 of the ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible table in the pool area which complies with 4.32.3 and 4.32.3 of the ADAAG. [Ricci Declar., ¶ 5.BB]

29.    The drinking fountain in the pool area is not accessible as required by 4.15 of the ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible drinking fountain on the pool area which complies with 4.15 of the ADAAG on the lobby level. [Ricci Declar., ¶ 5.CC]

Men's and Women's Restroom - Pool Area

30.    The signs identifying the men's and women's pool area restrooms are mounted in the wrong location, lack braille, lack the requisite contrast, and lack a pictogram of the international symbol of accessibility. Defendant Galt Ocean should modify the signs to comply with 4.30.3, 4.30.4, 4.30.5, 4.30.6, 4.30.7 and Figure 43 (a) and (b). [Ricci Declar., ¶ 5.DD]

31.    The doors into the men's and restrooms pool area restrooms have inaccessible knob door handles, in violation of 4.13.9 of the ADAAG. Defendant Galt Ocean should modify those door handles so that the handles are easy to grasp with one hand and so that they do not require tight grasping, tight pinching or twisting of the wrist to operate, in compliance with 4.13.9 of the ADAAG. [Ricci Declar., ¶ 5.EE]

32.    The doors into the men's and women's pool area restrooms have a clear opening width of less than 32 inches, in violation of 4.13.5 of the ADAAG. Defendant Galt Ocean should modify those doors to have a clear opening of 32 inches with the doors open 90 degrees, measured between the face of the doors an the opposite stop, in compliance with 4.13.5 of the ADAAG. [Ricci Declar., ¶ 5.FF]

33.    The handicapped toilets in the men's and women's pool area restrooms lack the requisite maneuvering clearances required by the ADAAG, the toilets lack the requisite grab bars, the toilets are not 17-19 inches above the finished floor, and the

toilets are not mounted 18 inches from the side wall to the centerline of the toilets, in violation of 4.17 and 4.22 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the pool area men's and women's restrooms to each have an accessible toilet stall or toilet room which complies with 4.17 or 4.22 of the ADAAG. [Ricci Declar., ¶ GG]

34.    The lavatories in the men's and women's pool area restrooms do not comply with the requirements of 4.22.6, 4.23.6 and 4.19 of the ADAAG. Accordingly, Defendant Galt Ocean should modify the pool area men's and women's restroom to each have at least one accessible lavatory which complies with 4.22.6, 4.23.6 and 4.19 of the ADAAG. [Ricci Declar., ¶ HH]

35.    The paper towel dispenser in the men's and women's pool area restrooms are mounted so that all operational controls and the towels are higher than the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. Thus, Defendant Galt Ocean should lower at least one paper towel dispenser in the men's and in the women's pool area restrooms so that the operational controls and the towels are reachable within the reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. [Ricci Declar., ¶ II]

36.    The mirror in the men's and women's pool area restrooms are mounted so that the bottom of the reflecting surfaces is more than 40 inches above the finished floor, in violation of 4.19.6 of the ADAAG. Thus, Defendant Galt Ocean should provide an accessible mirror in the men's and women's pool area restrooms which are mounted so that the bottom of the reflecting surface is no more than 40 inches above the finished floor, in compliance with 4.19.6 of the ADAAG. [Ricci Declar., ¶ JJ]

Tiki Bar

37.    The tables in the Tiki Bar area do not provide the requite knee clearances as required by 4.32.3 and 4.32.3 of the ADAAG. Thus, Defendant Galt Ocean should provide at least one accessible table in the pool area which complies with 4.32.3 and 4.32.3 of the ADAAG. [Ricci Declar., ¶ KK]

Pool Shower

38.    There is not an accessible route complying with 4.3 of the ADAAG to the pool shower, in violation of 4.1.2(2) of the ADAAG. Defendant Galt Ocean should construct an accessible firm, stable path of access, of at least 3 feet in width, complying with 4.3 of the ADAAG, to the pool shower. [Ricci Declar., ¶ 5.LL]

39.    The operational faucet control for the pool shower is mounted higher than the accessible reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. Thus, Defendant Galt Ocean should modify the pool shower control so that it is reachable within the reach parameters prescribed by 4.2.5 and 4.2.6 of the ADAAG. [Ricci

PAGE 10

Declar., ¶ 5.MM]

40.    There is not an accessible route complying with 4.3 of the ADAAG to the private beach, in violation of 4.1.2(2) of the ADAAG. Defendant Galt Ocean should provide an accessible firm, stable path of access, of at least 3 feet in width, complying with 4.3 of the ADAAG, to the private beach. [Ricci Declar., ¶ 5.NN]

## IIII. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56( c).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. _See_, _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  A fact is material if it is one that might affect the outcome of the case. _Id_.  The party seeking summary bears the initial burden of informing the court of the basis of its motion and identifying those matters that demonstrate the absence of a genuine issue of material fact. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  Once the movant satisfies this requirement, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 584 (1986).  To meet this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings." Fed.R.Civ.P. 56(e).  Nor may the non-moving party rely on a mere scintilla of evidence supporting its position. _Walker v. Darby_, 911 F.2d 1573, 1577 (11th Cir. 1990).  Rather, for a court to find a genuine for trial, the non-moving party must establish, through evidence presented to the court, that it is capable of providing evidence sufficient for a reasonable jury to return a verdict in its favor. _Cohen v. United Am. Bank_, 83 F.3d 1347, 1349 (11th Cir. 1996).  When a court considers whether or not to enter summary judgment, it views all evidence, and all inferences drawn therefrom, in the

PAGE 11

light most favorable to the non-moving party. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The Court does not weigh conflicting evidence or make credibility determinations. *Hilburn v. Maruta Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).

## IV. LEGAL ANALYSIS

In this case Plaintiff Steven Brother ( herein after "Mr. Brother") seeks injunctive relief against the remaining Defendant, Galt Ocean under 42 U.S.C. § 12181, *et seq*. ("Americans With Disabilities Act" or "ADA"). Plaintiff also seeks recovery of his attorneys' fees, litigation expenses and costs against the Defendants pursuant to 42 U.S.C. § 12205.

Mr. Brother alleges that Defendant Galt Ocean has violated the ADA by excluding him from proper, unobstructed access to and use of the public areas of the resort which are operated and operated by Defendant Galt Ocean.

### A.    Jurisdiction.

This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331. Venue in this District was not disputed.

### B.   Title III - General Framework; Public Accommodations

Title III of the ADA, which relates to discrimination by public accommodations, provides generally that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a)

In a private action under Title III of the ADA, such as this one, a court may provide to "any person who is being subjected to discrimination on the basis of disability in violation of this title or who has reasonable grounds for believing that such person is about to be subject to discrimination

PAGE 12

in violation of section 303 [42 USCS § 12183]," injunctive relief which "shall include an order to alter facilities "to make such facilities readily accessible to and useable by individuals with disabilities to the extent required by this title." 42 U.S.C. §12188(a)(1) and (2).

The ADA was enacted by Congress on July 26, 1990. The congressional legislation provided commercial businesses one and a half years from the enactment for property owners of existing buildings to implement the requirements imposed by the ADA. That phase-in period ended January 26, 1992. Thus, by January 26, 1992 Defendant Galt Ocean was to have removed barriers to access in the common areas of the resort and to have modified those common areas to comply with the ADA. 42 U.S.C. §12181; 28 CFR §36.508(a).

The ADA provides "broad principles for the elimination of discrimination against persons with disabilities." _Paralyzed Veterans v. Ellerbe Becket Architects & Engineers, P.C._, 950 F.Supp 393, 395 (1996). To implement the ADA, Congress charged the Attorney General with issuing specific standards for complying with Title III of the ADA. 42 U.S.C. § 12186(b). In accordance with that mandate, with respect to Title III of the ADA, the Department of Justice ("DOJ") adopted standards regarding public accommodations, which are known as the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"). The ADAAG, which are codified in 28 C.F.R. Part 36, App. A, constitute "legally binding regulation." _Independent Living Resources v. Oregon Arena Corp._, 1 F.Supp.2d 1124, 1130 n. 2 (1998).

As expressly provided therein, the purpose of the ADAAG standards is to set forth "guidelines for accessibility and commercial facilities by individuals with disabilities. [The] guidelines are to be applied during the design, construction, and alteration of such buildings and facilities to the extent required by regulations issued by Federal agencies, including the Department of Justice, under the Americans With Disabilities Act of 1990." The statutory scheme of the ADA

PAGE 13

contemplates that the courts would defer to the DOJ's reasonable interpretations of its regulations. *Paralyzed Veterans of America et al. V. D.C. Arena L.P. et al.*,117 F.3d 579, 586 (D.C. Cir. 1997). The DOJ's regulations and its interpretations thereof must be sustained, even if the court was to find the DOJ's regulations or its interpretations are not the only reasonable ones or that the court would have reached a different result if the question had first arisen in a judicial proceeding. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996); *Chan v. Reno*, 916 F.Supp. 1289 (S.D. N.Y. 1996); *E.E.O.C. v. Kloster Cruise Ltd.*, 888 F.Supp. 147 (S.D. Fla. 1995); *Pinnock v. International House of Pancakes Franchisee*, 844 F.Supp 574 (S.D. Cal. 1993).

Congress intended for the ADA to serve as a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals. 42 U.S.C. §12101(b)(1). Congress envisioned "clear, strong, consistent, enforceable standards addressing discrimination against [disabled] individuals." 42 U.S.C. § §12101(b)(2). Further, the ADA is a remedial stature. *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 487 (8th Cir. 1996). Thus, the ADA should be construed broadly to effectuate its purpose. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

Furthermore, "[c]ivil rights law depends heavily on private enforcement . . . Attempts to weaken the remedies available under the ADA are attacks on the ADA itself and their success would make the ADA an empty promise of equality." Committee Print, Vol. II, 101st Cong., 2d Sess., at 1481-82 (1990). Congress envisioned "clear, strong, consistent, enforceable standards" to address discrimination against disabled individuals. 41 U.S.C. §12101(b)(2). *Parr v. L & L Drive-In Restaurant*, 2002 WL 684800, at *1 (D.Haw. May 16, 2000).

When a party, such as Defendant Galt Ocean, fails to remove architectural barriers in existing facilities, injunctive relief is mandated and "shall include an order to alter [the] facilities to make

PAGE 14

such facilities readily accessible to and usable by individuals with disabilities to the extent required

by this title." 42 U.S.C. §12188(a)(2); 42 U.S.C. §12188(b)(2)(A)(iii). The ADA provides a private

right of action for any person who is being subjected to discrimination on the basis of disability in

violation of Title III. 42 U.S.C. §12188(a)(1). The broad language of the statute "expand[s] the

definition of what constitutes an injury" and "appear[s] to allow for broad injunctive relief." *Hoeplf*

*v. Barlow*, 906 F.Supp. 317, 323-24 (E.D. Vir. 1995)

In addition to the access barriers as described by Mr. Brother and by his ADA expert, Thomas

Ricci, further indices of the barriers to access at the resort are established by the resort's failure to

comply with the ADAAG standards, 28 C.F.R. § 36 *et seq*. While the ADAAG sets out construction

requirements for new and altered buildings, it also provides "valuable guidance for determining

when existing facilities contain architectural barriers" to access. *Access Now*, 161 F.Supp.2d at 1368

(*quoting Pasuitti v. New York Yankees*, 87 F.Supp.2d 221, 226 (S.D.N.Y. 1999); *Pickern*, 2002 WL

202442 at *2. In fact, the implementing regulations promulgated by the D.O. J. treat any element

in an existing facility, of which there are numerous in the resort, that do not meet or exceed the

ADAAG standards as a barrier to access. *Parr*, 96 F.Supp.2d at 1086; *See also*, 28 C.F.R. §§

36.304(d), 36.402(b)(2) (measures taken to comply with the barrier removal requirements . . .shall

comply with the applicable requirements for alterations," which are set forth in the ADAAG); U.S.

Department of Justice, Supplemental Commentary to the Final Regulations, 56 Fed.Reg. 34, 544

(1991)("Section 36.304(d) requires that measures taken to remove barriers under § 36.304 be subject

to [the] requirements for alterations... . It only permits deviations from [those] requirements when

compliance with [them] is not readily achievable. . .."); *Pickern*, 2002 WL 202442 at *2.

In this case the Plaintiff has established that numerous barriers to access exist in the common

areas of the resort, and that the removal of those barrier is readily achievable. Ricci Declar., ¶¶ 4,

PAGE 15

5.A. - NN., and 7; Brother Aff. ¶ 4. Furthermore, most of the actions for barrier removal at this property are deemed to be readily achievable. *See*, 28 C.F.R. § 36.304(b) providing a non-exclusive list of examples of readily achievable barrier removal, including: 1) installing ramps, 2) making curb cuts in sidewalks and entrances, 3) repositioning shelves, 4) rearranging tables, chairs, vending machines, display racks, and other furniture; 5) repositioning telephones; 6) installing flashing alarm lights; 7) widening doors, 8) installing offset hinges to widen doorways, 9) installing accessible door hardware, 10) installing grab bars in toilet stalls, 11) rearranging toilet partitions to increase maneuvering space, 12) insulating lavatory pipes to prevent burns; 13) installing a raised toilet seat; 14) repositioning paper towel dispensers in restrooms; 15) creating designated accessible parking spaces, and 16) installing an accessible paper cup dispenser at existing inaccessible water fountains.

### C.  Burden of Proof

In order to establish a *prima facie* case for discrimination under Title III of the ADA, a plaintiff must provide: 1) that he is disabled; 2) that the subject facility is a place of public accommodation, and 3) that he was denied equal access to the facility.  42 USC § 12188(a)(1); *Mayberry v. Von Valtier,* 843 F. Supp. 1160 (E.D. Mich. 1994).

#### 1.    Plaintiff's Disabilities

It is undisputed that Plaintiff is an individual with disabilities as defined by and pursuant to the ADA. 28 C.F.R. 36.104.

#### 2.    Public Accommodation / Commercial Facility

It is also undisputed that the common areas of the resort, which are owned, controlled and operated by Defendant Galt Ocean are public accommodations and commercial facilities, and thus subject to the requirements of the ADA which apply to "public accommodations and commercial facilities." Congress gave the term "commercial facilities" an extremely broad definition - including

PAGE 16

all facilities that are "intended for nonresidential use" whose "operations will affect commerce." 42

U.S.C. 12181(2). And, the term "public accommodation" includes "an inn, hotel, motel, or other

place of lodging." 42 U.S.C. Sec. 12181(7)(A).

### 3.     Denial of Equal Access - Non-Compliance With ADAAG Minimum Standards

Plaintiff has also clearly established by Plaintiff's ADA expert that the common areas of the

resort fails to comply with the ADAAG minimum standards in many respects.  *See*, Ricci's

Declaration and Exhibit "A" thereto.

Thus, Plaintiff has established his case for discrimination by Defendant Galt Ocean against

Plaintiff under the ADA. *South Florida Stadium Corp.*, 161 F.Supp.2d at 1362; *Concorde Gaming*

*Corporation*, 158 F.Supp.2d at 1362, n 5.

### 4.     ADA Violations Which Must Be Remediated

Plaintiff is seeking, and has standing to assert, relief which relates to his disabilities -

mobility and hearing impairments.

Plaintiff's ADA expert identified numerous ADA violations on the subject common areas

of the resort. Ricci Declar.,   ¶¶ 3, 4, 5.A. - NN.  Plaintiff's ADA expert also established that

Defendant could alter those common areas of the resort to remove those barriers, and that the

removal of the barriers is readily achievable. Ricci Declar.,   ¶¶ 5.A. - NN and 7.

Thus, Plaintiff has met his burden of establishing the presence of ADA violations on the

commons areas of the resort and that the removal of said barriers is readily achievable.

### V.   ATTORNEY'S FES, LITIGATION EXPENSES AND COSTS

Mr. Brother also seeks an award of his attorneys' fees, litigation expenses and costs. Mr.

Brother, as the prevailing party, is entitled to an award of those fees, litigation expenses and costs

pursuant to 42 USC § 12205, which provides:

PAGE 17

> In any action or administrative proceeding commenced pursuant to this Act, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs . . . .

Mr. Brother is entitled to a judgment against Defendant for all attorneys' fees, litigation expenses (including expert fees and costs) and costs incurred in this action. The relief obtained by Mr. Brother in this cause will not only benefit him, but every other individual with a disability who enters into and/or uses the resort. Therefore, Mr. Brother is entitled to an award of attorneys' fees equal to the unreduced lodestar amount where, as here, the public interest is also served. *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1305 (11th Cir. 2001)(In analyzing plaintiff's application the Court must also consider the benefits the public as a whole obtained from this civil rights action); *Duckworth v. Whisenant*, 97 F.3d 1393 (11th Cir. 1996), *Williams v. Roberts*, 904 F.2d 634 (11th Cir. 1990), *Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996). Where, as here, the relief sought is injunctive (damages are not awardable under Title III of the ADA[1]), it would be an error for the this court to reduce an award of attorneys' fees in this civil rights action even if the damages obtained were nominal where the Plaintiff vindicated a public policy. *Lynch v. City of Milwaukee*, 747 F.2d 423 (7th Cir. 1984); *Staples v. Wickesberg*, 122 F.R.D. 541 (E.D. Wis. 1988); *Butler v. Bourd*, 979 F.2d 661 (8th Cir. 1992); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). And, a successful civil rights claimant should not have his fee award reduced even if he failed to prevail of every contention raised in the lawsuit. *March v. Digital Equipment Corp.*, 699 F.Supp. 1411(D. Ariz. 1988); *See also, Burston v. Com. of Va.*, 595 F.Supp. 644 (D.C.Va. 1984); *Gillen v. Gates*, 847 F. Supp. 1475 (C.D. Cal. 1994); *Mallory v. Harkness*, 923 F.Supp. 1546 (S.D.Fla. 1996).

In this situation, "the public as a whole benefits from this civil rights litigation, as

---

[1] *See*, 42 U.S.C. § 12188; *Powers v. MJB Acquisition Corp.*, 993 F.Supp. 861, 867 (D. Wyo. 1998) (Title III of the ADA does not provide for a private cause of action for damages).

PAGE 18

distinguished from a private tort suit where only the individual plaintiff benefits. . . . "[S]uccess in a civil rights claim is measured differently than success in a private tort claim. Indeed, 'Congress has elected to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large, irrespective of whether the action seeks monetary damages. . . . Moreover, the Supreme Court has articulated th[is] distinction [by stating that] '[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.'" *Villano*, 254 F.3d at 1305 (*quoting*, *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) and *City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). Thus, a court would err if it reduced Plaintiff's attorney's fees award or if it ignored the fact that the Plaintiff in this civil rights action benefitted the public interest by vindicating his civil rights. *Villano*, 254 F.3d at 1306.

Therefore, the Court finds that Plaintiff should be awarded all fees, litigation expenses (including expert's fees and costs) and costs he incurred in this action.

### A.  Attorneys' Fees

### 1.  A Reasonable Hourly Rate

Under 42 U.S.C. § 12205 the Court may award attorneys' fees, litigation expenses and costs to the prevailing party in an ADA case. Plaintiff's counsel submitted records showing they incurred 86.40 hours working on this case, at an average rate of $297.14 per hour, for a total of $25,673.00.

The starting point in determining fees to be awarded to is multiply the number of hours reasonable expended on the case by a reasonable rate, to arrive at what is termed the "lodestar" amount. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar

PAGE 19

services of lawyers with comparable skill, experience and reputation. *Id.* 1299. Plaintiff's Motion indicates the following applicable rates:

William N. Charouhis (senior partner) - $385.00 per hour

Lori I. Barkus (senior associate) - $235.00 per hour

Brandi Ward (paralegal)- $90.00 per hour

Plaintiff's counsel "is extremely experienced in litigating cases under the ADA, having litigated approximately 260 cases (for Mr. Charouhis) and 150 ADA Cases (for Ms. Barkus), including trying several cases and litigating several class actions which will effect ADA compliance in thousands of retail locations." Mot. for Summary Judg., pg. 19 As additional support, Plaintiff referred the Court to several other reports and judgments in support of the fee request. Those other reports and judgements, based on the same attorney and identical ADA claims, especially those based upon an evidentiary hearing with expert witnesses, are sufficient evidence to establish the rates sought for counsel in this matter to be reasonable. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Duckworth v. Whisenart*, 97 F.3d 1993 (11th Cor. 1996); *Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir. 1991). It is well established that "[p]roof of prevailing market rates may be demonstrated in a number of ways, including: (1) affidavits of other attorneys or experts [or] (2) citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases. . ." *Haugh v. Sec. of the Dept of H.& H.S.*, 1999 WL 525539 (Fed.Cl. 1999); *Design and Production, Inc. v. United States*, 20 Cl.Ct 207 (U.S.C.C 1990). Plaintiff's counsel also submitted to the Court as additional support for the fees sought an Affidavit of Gil Haddad(Regarding Reasonable Attorneys' Fees)(DE #43; 2/18/05), in which Mr. Haddad opines that the present hourly rates of $385 and $235 for Mr. Charouhis and Ms. Barkus, respectively, are reasonable. Additionally, it is reasonable that Mr. Charouhis' rate should

PAGE 20

be $385.00 given his 19 years in practice, his having concentrated in the litigation of ADA and

disability matters for over nine years, his having litigated approximately 260 such cases, including

several class actions, and his AV rating by Martindale-Hubbell. Further, the rate of $235.00 per hour

for lawyer Lori I. Barkus is also reasonable given her exclusive concentration in litigating ADA and

disability cases, her vast experience in that area and the number of ADA cases she has litigated

(approximately 150).

In addition to the foregoing, the Court has also considered its own knowledge and experience

concerning reasonable and proper attorneys' fees, and has formed an independent judgment on the

reasonableness of the rates awarded herein based upon that knowledge and experience. *Norman*, 836

F.2d at 1303; *Loranger v. Stierheim*, 10 F.3d 776, 781. In arriving at its determination, the Court

has also considered fee awards in similar cases, the attorneys' customary fees, the time involved in

the case, the novelty and difficulty of the type of case, preclusion of other employment while the

action is pending, the undesirability of the case, whether the fee was fixed or contingent, the

attorneys' level of skill and experience, and the attorneys' ongoing relationship with the client.

*Norman*, 836 F.2d at 1299; *Mallory v. Harkness*, 923 F.Supp. 1546, 1555 n.5 (S.D.Fla. 1996, *aff'd*,

109 F.3d 771 (11th Cir. 1997).

Considering the Court's knowledge of the rates charged by attorneys in the Southern District

of Florida and the other matters set forth above, the Court finds that the hourly rates of $385 for Mr.

Charouhis and $235 for Ms. Barkus are reasonable for the work they performed in this case. The

Court also finds the hourly rate of $90.00 for Ms. Ward a reasonable paralegal rate. The Court also

notes that Plaintiff's counsel has been delayed in receiving payment for over two years. As such,

the use of counsel's current rates of $385 and $235 per hour should be applied on all time incurred

to properly account for inflation and delay in receipt of payment, and the calculations and judgement

PAGE 21

entered herein are based upon those current hourly rates. _Behrens v. Wometco Enter._, 118 F.R.D. 534
(S.D.Fla. 1988); _Missouri v. Jenkins_, 491 U.S. 274, 109 S.Ct 2463, 105 L.Ed.2d 229 (1989); _Johnson
v. University College Of University of Ala. in Birmingham_, 706 F.2d 1205, 1210-11 (11th Cir. 1983).
The hourly rates awarded herein are also commensurate with the amount and type of work Plaintiff's
attorneys did in this case.

Furthermore, all time incurred by Plaintiff's counsel in filing, preparing and litigating the fee
application is also compensable. _Martin v. Univ. of S. Ala._, 911 F.2d 604, 610 (11th Cir. 1990);
_Guerrero v. Cummings_, 70 F.3d 1111 (9th Cir. 1995); _Valley Disposal, Inc. v. Central Vermont Solid
Waste Mgmt. Dist._, 71 F.3d 1053 (2d Cir. 1995); _Barlow-Gresham Union High School District No.
2 v. Mitchell_, 940 F.2d 1280 (9th Cir. 1991); _Robinson v. Alabama State Dept. of Edu._, 727 F.Supp.
1422 (S.D. Ala. 1989); _Sugarman v. Village of Chester_, 2002 WL 1777714, (S.D.N.Y. July 15, 2002);
_Volk v. Gonzalez_, 262 F.3d 528 (5th Cir. 2001); _Miller v. Artistic Cleaners_, 153 F.3d 781 (7th Cir.
1998); _Johnson v. Univ. College of the Univ. of Ala. in Birmingham_, 706 F.2d 1205 (11th Cir. 1983);
_Jones v. MacMillan Bloedel Containers, Inc._, 685 F.2d 236 (8th Cir. 1982); _Johnson v. The State of
Mississippi_, 606 F.2d 635 (5th Cir. 1979).

## 2. The Hours Reasonable Expended

The next step is for the Court to determine the number of hours reasonably expended. The
Court has reviewed the time sheets submitted by Plaintiff's counsel, attached as Exhibit "1" to the
Motion for Summary Judgment, and the Affidavit of Mr. Haddad wherein he opines that the hours
sought are reasonable "for the time incurred and the services performed by those professionals."
Haddad Aff. ¶ 7. The Court does not find any work excessive or duplicative, and finds 86.40 hours
is a reasonable amount of time to have spent on this case, especially given the result obtained. As
a result, the Court finds the "lodestar" amount to be $27,144.50 determined as follows:

PAGE 22

| Timekeeper | Hrs. | Rate | Atty. Total |
|---|---|---|---|
| William N. Charouhis | 48.60 | 385.00 | 18,711.00 |
| Lori I. Barkus | 34.70 | 235.00 | 8,154.50 |
| Brandi Ward | 3.10 | 90.00 | 279.00 |
| TOTAL | 86.40 | | 27,144.50 |

### 3. Costs

The ADA provides for an award of costs, including litigation expenses, in addition to attorneys' fees. 42 U.S.C. § 12205; _Guckenberger v. Boston Univ._, 1998 WL 300945 *1, *20 (D.Mass. May 29, 1998); _Benson v. Northwest Airlines_, 1997 WL 122897 *1. *5 (D.Minn. March 18, 1997). Neither Section 12205, nor the statute on which it was based, 42 U.S.C. §1988, defines the term "costs." However, the inclusion of the term "litigation expenses, and costs" in the statute indicates that the intent was to make the statute much broader than simple "costs" statutes, and allow for the recovery of all litigation expenses as well.

The Court has carefully reviewed the Plaintiff's request for litigation expenses and costs totaling $506.63 ($3,788.80 less $3,282.17 in expert's fees and costs which will be addressed below), and has determined that the litigation expenses and costs incurred are reasonable and appropriate, and are well within the more expansive definition of 42 U.S.C. § 12205. Therefore, the Court will award the full amount of $506.63 for litigation expenses and costs.

### B. Expert Fees and Costs

Attorney's "fees and litigation expenses" awardable under 42 U.S.C. § 12205 also includes an entitlement to an award of expert fees and costs. _Guckenberger_, 1998 WL 300945 at *20; _Benson_, 1997 WL 122897 at *6; _Robins v. Scholastic Book Fairs_, 928 F.Supp. 1027, 1034 (D.Or. 1996). The court applies the same standard of reasonableness in awarding expert fees as it does to determine attorney's fees. _E.g., Guckenberger_, 1998 WL 300945 at *20.

**PAGE 23**

Those reports and judgements clearly establish the prevailing market hourly rate of $185 per hour for

Mr. Ricci. Likewise, a review of Mr. Ricci's billing statements, Exhibit "2" to the Motion for

Summary Judgment, indicates that the 17.11 hours incurred by him were reasonable. Therefore, the

Court will also award Plaintiff $3,165.35 (17.11 hours at $185.00 per hour) for the fees incurred for

Plaintiff's ADA expert in this cause. Additionally, the Court also finds the $116.82 in costs incurred

by Plaintiff's expert to be appropriate, reasonable and awardable.

## CONCLUSION

Based upon the foregoing, and there being no just reason for delay, it is **ORDERED AND**

**ADJUDGED** that:

1.    The Plaintiff, Steven Brother's Motion for Summary Judgment, including his Verified

Application for Attorney's Fees, Litigation Expenses and Costs (DE #41; 2/18/05) is **GRANTED**.

2.    Final Judgment is hereby entered for Plaintiff Steven Brother and against Defendant,

Galt Ocean Manor Condominium Association, Inc.

3.    Defendant Galt Ocean Manor Condominium Association, Inc. shall make all

alterations and modifications referenced in section II.B.1 (ADA Violations - Barriers to Access),

pages 4 - 10 of this Order, to the Ocean Manor Resort Hotel, located at 4040 Galt Ocean Drive, Fort

Lauderdale, Florida, on or before September 30, 2005. If the alterations and modifications are not

completed in all respects by September 30, 2005, then the resort shall be closed to the public until

all of the required alterations and modifications are completed.

4.    Plaintiff, Steven Brother shall also recover from Defendant, Galt Ocean Manor Condominium

Association, Inc. $27,144.50 in attorneys' fees, $506.63 for attorneys' litigation expenses and costs,

$3,165.35 in expert's fees, and $116.82 for expert's costs, for a total of $30,933.30. Judgment shall

**PAGE 24**

bear interest at the rate of 3.38% per annum, for which let execution issue.

5.  This Court retains jurisdiction of the above-styled action to ensure Defendant's subsequent

compliance with this judgment and the Americans With Disabilities Act.

6.  All pending motions are **DENIED as MOOT**.

7.  The Clerk shall **CLOSE** this case.[2]

DONE AND ORDERED in Chambers in Fort Lauderdale, Florida this _30_ day of

_March_ , 2005.

_____
KENNETH A. MARRA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

William N. Charouhis, Esq.
Suite 2800 - Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Fax: (305) 913-6452

Galt Ocean Manor Condominium Association, Inc.
c/o its Registered Agent:
Antolin Pestano, Jr.
7758 N.W. 44th Street
Sunrise, Florida 33351
Fax: (305) 375-9506

Galt Ocean Manor Condominium Association, Inc.
4040 Galt Ocean Drive
Fort Lauderdale, FL 33308

---

[2]  This case is stayed as to Defendant BFP Investments, Ltd., which has filed a Suggestion of Bankruptcy (DE 7), and the Clerk has entered a default against Tribeca Steak and Chop House, Inc. (DE 14). This Order and Final Judgment in Plaintiff's Favor is without prejudice to Plaintiff to seek final relief against the other Defendants.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

DEC 27 2004

U.S. DISTRICT COURT
FLINT, MICHIGAN

GUADALUPE BETANCOURT,
Individually,

     Plaintiff,

v.

3600 CENTERPOINT PARKWAY
INVESTMENTS, L.L.C. a Limited
Liability Company,

     Defendant.

_____/

Case No. 03-72868

Hon. Arthur J. Tarnow
Magistrate Judge Wallace Capel, Jr.

STEVEN E. GOREN (P36581)
Goren, Goren & Harris, P.C.
Attorney for Plaintiff
30400 Telegraph Road, Suite 470
Bingham Farms, MI 48025-5818
(248) 540-3100

LAWRENCE A. FULLER
Fuller, Fuller & Associates, P.A.
Attorney for Plaintiff
12000 Biscayne Boulevard, Suite 609
North Miami, FL 33181
(305) 891-5199

FREDERICK F. BUTTERS (P45426)
GARY D. QUESADA (P48268)
Thomas M. Keranen & Associates, P.C.
Attorneys for Defendant
6895 Telegraph Road
Bloomfield Hills, MI 48301-3138
(248) 647-9653

A TRUE COPY
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

BY: _____
                        DEPUTY CLERK

## FINAL JUDGMENT AWARDING ATTORNEY'S FEES, COSTS AND EXPERT FEES

At a session of the Court
held in Flint, Michigan

on _____DEC 27 2004_____

PRESENT: HONORABLE _____WALLACE CAPEL, JR._____
UNITED STATES MAGISTRATE JUDGE

     The parties having entered into a Settlement Agreement which provided *inter alia*

that the parties agreed to request that the District Judge refer the determination of the

**EXHIBIT**

8

amount of fees, litigation expenses and costs to be paid to the Plaintiff to the Magistrate Judge and that the Magistrate Judge may enter a final judgment pursuant to 28 U.S.C. § 636(c); an Order Approving Settlement and Referring Case to United States Magistrate for Determination of Attorney's Fees, Costs and Expert Fees having been signed by the District Judge on October 25, 2004; Plaintiff having filed a Verified Application for Attorneys' Fees, Costs, and Expert Fees; Defendant having filed a response; counsel having been heard; the Magistrate Judge having found that Plaintiff's attorneys' hourly rate of $325 per hour is reasonable and that the number of hours expended by Plaintiff's attorneys was reasonable; the Magistrate Judge specifically having found that the attorney's fees of Fuller, Fuller & Associates, P.A. in the amount of $28,892.50 and the attorney's fees of Goren, Goren & Harris, P.C. in the amount of $7,410.00 are reasonable, that Plaintiff's expert's fees in the amount of $6,125.00 are reasonable and that the costs of Fuller, Fuller & Associates, P.A. in the amount of $870.00 and the costs of Goren, Goren & Harris, P.C. in the amount of $158.42 are reasonable; and the Magistrate Judge being fully advised in the premises;

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff Guadalupe Betancourt recover $43,455.92 (forty-three thousand four hundred and fifty-five dollars and ninety-two cents) from Defendant 3600 Centerpoint Parkway Investments, L.L.C.

WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

2

Fuller, Fuller & Associates, P.A.
12000 Biscayne Boulevard, Suite 609
North Miami, FL  33181


Invoice submitted to:
Delancey Clinton Associates, L.P.
711 Dwight Street
Springfield MA


July 06, 2006

In Reference To:d/b/a: Holiday Inn Springfield

Invoice #10222


Professional Services

|  |  | Hours | Amount |
|---|---|---|---|
| | JPF | | |
| 9/13/2004 | Phone call(s) with client | 0.30 | 97.50 |
| 9/14/2004 | Phone call(s) with Mr DiPalma | 0.30 | 97.50 |
| 9/15/2004 | Phone call(s) with Access-Ability | 0.30 | 97.50 |
| 9/21/2004 | Conference with client;  reviewing expert report  to determine nature and extent of A.D.A. violations and  relevant ADAAG citations; researched ADAAG'S;Phone call(s) with Mr DiPalma | 1.60 | 520.00 |
| 10/19/2004 | Reviewed notes re: ownership; Reviewing pertinent title documents; confirmed proper Defendant; prepared notes to file ; Reviewing Quit Claim Deed; Reviewing Certificate  of Title | 1.00 | 325.00 |
| 2/17/2005 | Prepared Response to Clerk's Request for Status of Service of Process | 0.30 | 97.50 |
| 2/18/2005 | Reviewed Due Diligence Worksheet from Process Server, Reviewing file, Phone call(s) with process server | 0.50 | 162.50 |
| 4/14/2005 | Reviewed Order Dismissing Case, 2x phone conversation with process server, Reviewing file, research, reviewed pacer, prepared Motion to Reopen | 1.20 | 390.00 |
| 5/10/2005 | Reviewing Notice of Appearance; Reviewing Motion for Extension of Time | 0.20 | 65.00 |
| 5/18/2005 | Reviewing Order Opening Case; Reviewing Order Granting Extension of Time | 0.20 | 65.00 |



Delancey Clinton Associates, L.P.                                                      Page    2

|  |  | Hours | Amount |
|---|---|---|---|
| 6/2/2005 | Reviewed Stipulation for Settlement executed by Defendant; Prepared Email to opposing counsel to resolve fee issue. | 0.10 | 32.50 |
| 6/6/2005 | Reviewing Defendant's Web Site | 0.40 | 130.00 |
| 6/7/2005 | Reviewing Defendant's Answer and Special Defenses; Phone call(s) with client, prepared notes to file | 1.30 | 422.50 |
| 6/8/2005 | Reviewing Order Referring Case to Magistrate Judge; Reviewing Notice of Scheduling Conference | 0.30 | 97.50 |
| 7/7/2005 | Review Joint Statement with opposing counsel's suggested changes | 0.50 | 162.50 |
| 7/14/2005 | Review ltr from court regarding Consent to Jurisdiction of Magistrate; execute Consent to Jurisdiction of Magistrate | 0.20 | 65.00 |
| 7/19/2005 | Reviewing file in preparation of scheduling conference on July 20, 2005, Phone conference with client, prepared notes to file, Reviewed case law on Rule 34 Inspection | 0.80 | 260.00 |
| 7/20/2005 | Telephonic appearance before Court for Scheduling Conference, prepared notes to file ; Phone call(s) with client | 1.00 | 325.00 |
|  | Phone conversation with client, phone conversation with expert Access-Ability regarding issue of outdoor pool, Reviewing Order of Court | 0.70 | 227.50 |
| 7/21/2005 | Reviewing Scheduling Order | 0.30 | 97.50 |
|  | Prepared Interrogatories, Requests for Production and Requests for Admission ; Phone call(s) with Mr DiPalma | 0.90 | 292.50 |
| 7/25/2005 | Reviewed Interrogatories and Request for Production propounded by Defendant | 0.80 | 260.00 |
| 8/4/2005 | Reviewing file in preparation for inspection, Phone call(s) with client | 0.80 | 260.00 |
| 8/5/2005 | Traveling to and attendance at property inspection, prepared notes to file | 4.20 | 1,365.00 |
| 8/6/2005 | Phone call(s) with client to discuss observations from inspection on 8/5/05 | 0.40 | 130.00 |
| 8/18/2005 | Phone call(s) with client ; Phone call(s) with Mr Baez | 0.60 | 195.00 |
| 8/19/2005 | Preparing Plaintiff's Agreed Motion for Extension of Time & proposed Order | 0.50 | 162.50 |
| 8/30/2005 | Reviewing report of Access Ability dated 8/11/05; Phone call(s) with Mr Baez; Reviewing ADAAG | 1.30 | 422.50 |
| 8/31/2005 | Preparing initial draft of Settlement Agreement; Phone call(s) with client | 4.00 | 1,300.00 |
| 9/1/2005 | Preparing Notice of deposition; Updated expert witness disclosure; Making modifications to proposed Settlement Agreement; Reviewing expert's proposed policies and procedures; Preparing Stipulation for policies and procedures; | 3.80 | 1,235.00 |

Delancey Clinton Associates, L.P.                                                                 Page     3

|  |  | Hours | Amount |
|---|---|---|---|
|  | Preparing Stipulation for Costs & Fees; Preparing Stipulation for Dismissal; Preparing proposed Final Order; Preparing letter to opposing counsel |  |  |
| 9/2/2005 | Phone call(s) with Michael Harrington Esq regarding expert report | 0.30 | 97.50 |
| 9/8/2005 | Preparing responses to Defendant's Interogitories and Request for Production; Phone call(s) with Esposito; and Mr. DiPalma | 1.40 | 455.00 |
|  | Reviewing letter from opposing counsel dated 9/7/05 along with def's responses & objections to request for admission | 0.40 | 130.00 |
| 9/9/2005 | Reviewed Defendant's Answers to Interrogatories and request for production Tasked same for follow up, phone conv't with client | 1.40 | 455.00 |
|  | Received letter from Michael Harrington regarding Notice of Reviewing Notice of Taking Deposition of Felix Esposito and Access 4 All, Tasked same and advised clients of same | 0.40 | 130.00 |
| 9/19/2005 | Phone call(s) to Michael Harrington (left msg) | 0.20 | 65.00 |
| 10/5/2005 | Reviewed message from Michael Harrington, Reviewing file, Returned Phone call(s) and left messages, Phone conversation with Mr. Harrington | 0.60 | 195.00 |
| 10/6/2005 | Reviewing Joint Motion for Extension of Time; Phone call(s) with client | 0.40 | 130.00 |
| 10/7/2005 | Reviewing Revised Scheduling Order | 0.10 | 32.50 |
| 10/10/2005 | Reviewed file, prepared letter to Michael Harrington regarding discovery objected to, prepared revised 26a2 disclosure | 0.70 | 227.50 |
| 10/11/2005 | Reviewing Revised Scheduling Order dated 10-7-05 | 0.20 | 65.00 |
|  | Phone call(s) to Michael Harrington (left msg) | 0.20 | 65.00 |
| 10/17/2005 | Phone call to Michael Harrington (left msg to secretary) | 0.20 | 65.00 |
| 10/21/2005 | Phone conversation with Michael Harrington regarding Status of matter and settlememt | 0.20 | 65.00 |
| 11/7/2005 | Reviewing terms of proposed settlement forwarded by Michael Harrington, Esq., reviewed prior Settlement Agreement forwarded by Plaintiff's | 1.10 | 357.50 |
| 11/8/2005 | Phone conversation with clients to discuss proposed terms of settlement, Preparing letter to clients | 0.90 | 292.50 |
| 11/9/2005 | Phone conversation with Mr. Harrington, phone conversation with client | 0.40 | 130.00 |
| 11/30/2005 | Reviewing file, Phone call(s) to Michael Harrington, Esq. (left msg) | 0.40 | 130.00 |
| 12/5/2005 | Phone call(s) to Michael Harrington (left msg), Phone conversation with Mr. Harrington, prepared notes to file | 0.40 | 130.00 |

Delancey Clinton Associates, L.P.                                                            Page     4

|            |                                                                                                                                                                                                                | Hours | Amount   |
|------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|----------|
| 12/10/2005 | Phone conversation with Michael Harrington, Phone call(s) to Mr. Harrington's office to obtain copy of proposed Settlement Agreement                                                                             | 0.20  | 65.00    |
| 12/19/2005 | Phone call(s) to Michael Harrington (left msg)                                                                                                                                                                   | 0.20  | 65.00    |
| 12/20/2005 | Reviewing proposed Settlement Agreement, phone conversation with client, Preparing letter to Mr. Harrington                                                                                                     | 1.00  | 325.00   |
| 12/21/2005 | Phone conversation with Michael Harrington, Esq. regarding settlement                                                                                                                                            | 0.20  | 65.00    |
| 12/28/2005 | Reviewing Settlement Agreement and Release, Phone call(s) with client, prepared responsive letter to Mr. Harrington                                                                                             | 1.40  | 455.00   |
| 12/29/2005 | Phone call(s) to Michael Harrington, Esq. (left msg)                                                                                                                                                             | 0.20  | 65.00    |
| 1/3/2006   | Phone call(s) to Michael Harrington (left msg)                                                                                                                                                                   | 0.20  | 65.00    |
| 1/4/2006   | Reviewing e-mail from Michael Harrington                                                                                                                                                                         | 0.20  | 65.00    |
| 1/18/2006  | Reviewing file, Phone call(s) to Michael Harrington (left msg)                                                                                                                                                   | 0.20  | 65.00    |
| 1/20/2006  | Extensive phone conversation with Michael Harrington regarding settlement, prepared notes to file                                                                                                               | 0.50  | 162.50   |
| 1/24/2006  | Phone call(s) to Michael Harrington (left msg)                                                                                                                                                                   | 0.20  | 65.00    |
| 1/25/2006  | Phone call(s) to Michael Harrington (left msg), Reviewing e-mail from Mr. Harrington, Reviewing file as to status of matter to appear telephonically at Pre-trial Conference, Reviewing local rule 16.3 regarding Case Management Conference | 4.50  | 1,462.50 |
| 1/27/2006  | Phone call(s) with Michael Harrington regarding status of matter                                                                                                                                                | 0.30  | 97.50    |
| 2/23/2006  | Reviewing file, preparation for Scheduling Conference, prepared notes regarding outstanding matters                                                                                                             | 0.80  | 260.00   |
|            | Phone conversation with Michael Harrington regarding possible settlement                                                                                                                                         | 0.20  | 65.00    |
|            | Attendance at telephonic scheduling conference before Judge Kenneth Neiman, prepared notes to file                                                                                                              | 1.00  | 325.00   |
| 2/24/2006  | Reviewed Scheduling Order and instructed staff to task same                                                                                                                                                      | 0.20  | 65.00    |
| 3/23/2006  | Reviewed file; Phone conversation with Michael Harrington; Prepared notes to file.                                                                                                                               | 0.20  | 65.00    |
| 3/29/2006  | Review file; Phone call to Michael Harrington (left message); Phone conversation with Mr. Harrington.                                                                                                           | 0.20  | 65.00    |

Delancey Clinton Associates, L.P.                                                        Page      5

| | | Hours | Amount |
|---|---|---|---|
| 3/31/2006 | Retrieved voice mail message from Mr. Harrington, reviewed file and prepared status report to the court, reviewed proposed settlement agreement and compared same to prior agreement | 0.40 | 130.00 |
| | phone conversation with Felix Esposito regarding settlement agreement | 0.20 | 65.00 |
| | Extensive phone conversation with Mr. Harrington regarding settlement, prepared notes to file | 0.30 | 97.50 |
| | Retrieved voicemail message; Reviewed file and prepared Status Report to the Court; Reviewed Proposed Settlement Agreement; Phone conversation with client. | 0.40 | 130.00 |
| 4/3/2006 | Retrieved e-mail from Mr. Harrington, forwarded current invoice | 0.10 | 32.50 |
| | Reviewed Email from Mr. Harrington; prepared invoice of fees per request. | 0.20 | 65.00 |
| 4/11/2006 | Phone call to Michael  Harrington (left Message) | 0.10 | 32.50 |
| 4/12/2006 | Reviewed Email from Mr. Harrington. | 0.10 | 32.50 |
| 4/25/2006 | reviewed email from Michael Harrington with revised proposed settlement agreement,prepared email response to Mr. Harrington | 0.40 | 130.00 |
| 4/27/2006 | Phone conversation with Michael Harrington; reviewed file; second call to Mr. Harrington (left message) | 0.20 | 65.00 |
| 4/28/2006 | Phone conversation with Michael Harrington regarding settlement. | 0.20 | 65.00 |
| 5/3/2006 | reviewed file, prepared email to Mr. harrington regarding proceeding forward | 0.20 | 65.00 |
| | phone call to Michael Harrington(left message with Mr. Harrington's secretary) | 0.10 | 32.50 |
| 5/4/2006 | phone conversation with Mr. harrington, prepared note to file regarding settlement proposal | 0.10 | 32.50 |
| 5/5/2006 | Reviewed file to discuss with Mr. Harrington required changes to the proposed settlement agreement in light of unresolved fee issue, p/c to Mr. harrington(left message), prepared letter to Mr. Harrington with proposed changes to proposed settlement agreement, prepared proposed Stipulation for dismisal and approval of settlement agreement and reference to us magistrate judge and prepared proposed order | 1.00 | 325.00 |
| 5/8/2006 | reviewed emails from mr.Harrington | 0.20 | 65.00 |
| 5/10/2006 | Reviewed email from Mr. Harrington, reviewed revised proposed settlement agreement and release,reviewed prior proposals | 0.40 | 130.00 |
| | conference with Mr. esposito to review final proposed settlement agreement and release and obtain his execution thereof | 0.50 | 162.50 |

Delancey Clinton Associates, L.P.                                                                    Page    6

|            |                                                                                                                                                                                                   | Hours | Amount |
|------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|--------|
| 5/11/2006  | travel to and attendance at conference with Mr. DiPalma to review settlement agreement and obtain his execution therof on behalf of the organization                                               | 1.50  | 487.50 |
|            | reviewed file to determine whether magistrate can determine issues of fees,litigation expenses and costs without district judge's order, prepared proposed revised stip for dismissal and revised proposed order of dismissal, prepared email to Mr. harrington | 0.40  | 130.00 |
| 5/15/2006  | Phone call to Michael Harrington (left message).                                                                                                                                                  | 0.10  | 32.50  |
| 5/16/2006  | Prepared Email to Michael Harrington regarding status of settlement; Reviewed response from Mr. Harrington.                                                                                         | 0.10  | 32.50  |
| 5/22/2006  | reviewed E-mail from Michael Harrington                                                                                                                                                            | 0.10  | 32.50  |
| 5/25/2006  | Prepared Email to Mr. Harrington regarding status of finalizing settlement.                                                                                                                        | 0.10  | 32.50  |
| 5/26/2006  | Prepared Email to Mr. Harrington regarding status of setttlement; reviewed response.                                                                                                               | 0.10  | 32.50  |
| 6/1/2006   | Review of executed Consent Decree sent by opposing counsel; Call to opposing counsel regarding execution of Stipulation/left message.                                                              | 0.10  | 32.50  |
| 6/12/2006  | reviewed minute entry from the court requiring the filing of the consent decree,prepared notice of filing settlement agreement                                                                     | 0.30  | 97.50  |
| 6/14/2006  | Reviewing file in Preparation to draft Application for Fees and outlined pertinent parts therein                                                                                                    | 0.70  | 227.50 |
|            | Reviewed final order of dismissal, reviewed local rules and federal rules regarding time to file fee application and tasked same                                                                    | 0.30  | 97.50  |
|            | Started drafting of Application for Fees; legal research regarding: same.                                                                                                                          | 0.60  | 195.00 |
| 6/16/2006  | prepared plantiff's agreed motion for extension of time to file fee application and proposed order                                                                                                  | 0.30  | 97.50  |
| 6/20/2006  | Reviewed order granting extension of time and tasked same                                                                                                                                          | 0.20  | 65.00  |
| 6/26/2006  | Research on Attorney's fees                                                                                                                                                                        | 1.30  | 422.50 |
| 6/28/2006  | Research & Drafting of application for fees                                                                                                                                                        | 4.00  | 1,300.00 |
| 7/5/2006   | Prepared and Edited Application for Fees; legal research regarding: same; Assembled some exhibits.                                                                                                  | 4.00  | 1,300.00 |
| 7/6/2006   | Prepared and Edited Application for Fees; legal research regarding: same; Drafted Affidavits for John P. Fuller and OOW; Assembled all of the exhibits.                                             | 2.80  | 910.00 |

SUBTOTAL:                                                                                            [    72.70   23,627.50]

Delancey Clinton Associates, L.P.                                                                    Page     7

|  |  | Hours | Amount |
|---|---|---|---|
| | OOW | | |
| 10/27/2004 | Reviewing expert report and prepared Complaint and Summons; Phone call(s) with client, prepared witness and exhibit list; Preparing letter to Mr DiPalma; Preparing letter to Mr Esposito | 2.20 | 935.00 |
| 1/17/2005 | Reviewed Return of Service from Process Server, Reviewed file to determine alternative methods of service, prepared notes to file | 0.50 | 212.50 |
| 3/2/2005 | Reviewing Return of Service | 0.30 | 127.50 |
| 4/15/2005 | Prepared Motion to reopen Case | 0.90 | 382.50 |
| 6/7/2005 | Preparing letter to opposing counsel along with proposed Joint Scheduling Statement; Preparing Rule 26 Disclosure; Preparing Expert Witness Disclosue | 1.80 | 765.00 |
| 6/15/2005 | Prepared Local rule 16.1(d) disclosure certificate for Felix Esposito and Access 4 All, p/c with client | 0.40 | 170.00 |
| 7/5/2005 | Reviewed and filed Rule 16.1(d) disclosure | 0.20 | 85.00 |
| | SUBTOTAL: | [    6.30 | 2,677.50] |
| | Paralegal | | |
| 10/12/2004 | Ordered relevant title documents; organized documents to identify owner; prepared notes to file | 0.60 | 69.00 |
| 10/20/2004 | Prepared Pacer search and status search on owner | 0.70 | 80.50 |
| 5/11/2005 | Preparing letter to Court | 0.20 | 15.00 |
| 7/21/2005 | Docketing trial orders/scheduling set by Court for case | 0.70 | 52.50 |
| 10/11/2005 | Docketing trial orders/scheduling set by Court for case and/or setting up various for trial | 0.50 | 57.50 |
| | SUBTOTAL: | [    2.70 | 274.50] |
| | Paralegal- | | |
| 6/14/2005 | Telephone conference with opposing counsel's assistant; Prepared documents for opposing counsel's assistant; Prepared e-mail to opposing counsel's assistant | 0.50 | 57.50 |
| 6/23/2005 | Telephone conference with opposing counsel regarding scheduling report | 0.20 | 23.00 |
| 7/5/2005 | Telephone call to opposing counsel regarding scheduling report | 0.20 | 23.00 |

Delancey Clinton Associates, L.P.

Page    8

| | | Hours | Amount |
|---|---|---|---|
| 7/7/2005 | Telephone call with opposing counsel's assistant Diane; Review ltr from opposing counsel's assistant. | 0.20 | 23.00 |
| 7/14/2005 | Prepare letter to opposing counsel; scan and enclose attachment | 0.20 | 23.00 |
| 7/18/2005 | Review letter from opposing counsel dated 7-15-05 | 0.10 | 11.50 |
| | SUBTOTAL: | [ 1.40 | 161.00] |
| | TD | | |
| 12/20/2004 | Reviewing file to determine status of case with regard to service & scheduling conference | 0.40 | 96.00 |
| 1/18/2005 | Reviewing file ; Phone call(s) to Pennsylvania Secretary of State; Researching Registered Agent/Service Information online; Preparing a note to file regarding service in Pennsylvania and Preparing Alias Summons | 1.00 | 240.00 |
| 1/26/2005 | Phone call(s) with Yolanda from Caplan & Caplan, Process servers regarding whether service was obtained | 0.40 | 96.00 |
| 2/7/2005 | Phone call(s) with process server regarding Alias Summons | 0.20 | 48.00 |
| 2/24/2005 | Reviewing file ; Preparing e-mail to Court Clerk regarding status of service | 0.40 | 96.00 |
| 2/28/2005 | Reviewing file to determine status of service | 0.30 | 72.00 |
| 3/24/2005 | Researching Delancey Clinton Associates, AMC Delancey and Kenneth Balin, Phone call(s) Secretary of State for Pennsylvania, Phone call(s) to Massachusetts Clerk of Courts, preparing Alias Summons | 2.50 | 600.00 |
| 5/3/2005 | Reviewing file ; Phone call(s) with Judge's docket clerk regarding Motion to re-open case; Preparing note to file | 0.50 | 120.00 |
| 6/14/2005 | Phone call(s) with opposing counsel regarding Pro Hac Vice ; Preparing Pro Hac Vice for Tracie L. Dickerson; Preparing Pro Hac Vice for John P. Fuller | 1.60 | 384.00 |
| 7/8/2005 | Preparing Motion to Allow Plaintiff's to appear telephonically, Phone call(s) with opposing counsel | 0.80 | 192.00 |
| 7/21/2005 | Review Scheduling Order dated July 20, 2005; prepare memorandum to paralegal | 0.40 | 96.00 |
| 8/18/2005 | Reviewing Defendant's Motion for Extension of time; Reviewing e-mail of opposing counsel regarding same; Preparing Plaintiff's for Extension of time | 0.80 | 192.00 |
| | SUBTOTAL: | [ 9.30 | 2,232.00] |
| | For professional services rendered | 92.40 | $28,972.50 |

Delancey Clinton Associates, L.P.                                          Page      9

      Additional Charges :

|  |  | Amount |
|---|---|---|
| | Client Expense | |
| 10/27/2004 | Filing Fees - Ck.#13485 | 150.00 |
| 10/29/2004 | Open/Close File Charge | 175.00 |
| | Title Search | 200.00 |
| | Re-Inspection Fee(s) to disability group | 750.00 |
| | Expert Fee(s)<br>Invoice No.<br>Check No. | 1,950.00 |
| | Service of Process - Ck.#13486 | 80.00 |
| | Expert Fee(s) Access-Ability<br>Invoice No.<br>Check No.13487 | 500.00 |
| 10/31/2004 | Photocopies | 18.90 |
| 1/18/2005 | Service of Process - Ck.#13655 | 80.00 |
| 1/27/2005 | Telephone Charges | 2.33 |
| 1/31/2005 | Photocopies | 0.45 |
| 4/26/2005 | Telephone Charges | 2.63 |
| 4/30/2005 | Postage | 0.83 |
| 5/31/2005 | Telephone Charges | 1.01 |
| | Postage | 0.97 |
| 6/16/2005 | Filing Fees - Ck.# 13980 & 13981 Pro Hac Vice John P. Fuller & Tracie L. Dickerson | 100.00 |
| 6/24/2005 | Telephone Charges | 0.43 |
| 6/30/2005 | Photocopies | 15.75 |
| | Postage | 3.51 |
| 7/1/2005 | Faxing Long-Distance Chrg. | 2.00 |
| 7/19/2005 | Courier Service | 17.41 |

Delancey Clinton Associates, L.P.

Page    10

Amount

Courier Service via fed Express to opposing counsel

| Date | Description | Amount |
|---|---|---|
| 7/22/2005 | Courier Service(federal express) | 17.41 |
| 7/27/2005 | Telephone Charges | 2.78 |
| 7/29/2005 | Postage | 1.89 |
| | Photocopies | 92.25 |
| 8/5/2005 | Travel:  Air fare for attorney | 118.95 |
| | Travel:  Lodging, Meal(s) & Tip(s), Rental Car for expert | 589.46 |
| 8/19/2005 | Faxing Long-Distance Chrg. | 2.00 |
| 8/24/2005 | Attending Inspection and Preparing report | 3,937.50 |
| 8/31/2005 | Photocopies | 111.15 |
| | Telephone Charges | 1.93 |
| 9/19/2005 | Courier Service | 27.25 |
| 9/26/2005 | Telephone Charges | 1.02 |
| 9/30/2005 | Postage | 1.06 |
| | Photocopies | 19.35 |
| 10/31/2005 | Photocopies | 19.35 |
| | Telephone Charges | 1.02 |
| 11/8/2005 | Faxing Long-Distance Chrg. | 2.00 |
| 11/9/2005 | Faxing Long-Distance Chrg. | 2.00 |
| 11/29/2005 | Telephone Charges | 0.07 |
| 11/30/2005 | Photocopies | 19.35 |
| 12/27/2005 | Telephone Charges | 0.37 |
| 1/31/2006 | Telephone Charges | 1.03 |
| | Photocopies | 0.45 |

Delancey Clinton Associates, L.P.                                                    Page    11

|  |  | Amount |
|---|---|---|
| 3/7/2006 | Telephone Charges | 3.12 |
| 3/28/2006 | Telephone Charges | 0.20 |
| 3/31/2006 | Photocopies | 4.95 |
| 4/30/2006 | Telephone Charges | 0.80 |
|  | Photocopies | 4.95 |
| 5/31/2006 | Telephone Charges | 1.14 |
| 6/30/2006 | Photocopies | 1.35 |
|  | Telephone Charges | 0.76 |
| 12/29/2006 | Faxing Long-Distance Chrg. | 2.00 |

SUBTOTAL:                                          [   9,040.13]

Total costs                                            $9,040.13

Total amount of this bill                          $38,012.63

Balance due                                          $38,012.63

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**



RECEIVED
NOV 2 6 2002
BY: 3154 ᴄᴏ

Case No.  01-4795-CIV-JORDAN/BANDSTRA

ACCESS 4 ALL, INC., a Florida
not-for-profit corporation, and
MARTIN MARCUS, individually,

    Plaintiffs,

vs.

SAFIRA INVESTMENTS, INC., a Florida
corporation,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS MATTER** is before the Court on Plaintiffs' Verified Application ("Motion") for

Attorneys' Fees and Costs, filed May 3, 2002. The Court has considered the Motion, the Response,

the Reply, and all pertinent materials in the file.

## BACKGROUND

Plaintiffs' filed this action against Defendant under the auspices of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq*. On April 23, 2002, the Court entered a Final

Consent Judgment wherein the Court ordered that costs and attorneys' fees shall be taxed upon

proper motion.

## DISCUSSION

### I.  Entitlement to an Award of Attorneys' Fees Pursuant to 42 U.S.C. § 12205

The Court, using its discretion, may allow the prevailing party a reasonable attorney's fee in

1



EXHIBIT
10

an ADA case. 42 U.S.C. § 12205. A review of the ADA's legislative history makes it clear that

Congress intended § 12205 to be "interpreted in a manner consistent with the Civil Rights Attorney's

Fees Act," 42 U.S.C. § 1988, "including the statute's definition of prevailing party, as construed by

the Supreme Court." Webb v. James, 967 F. Supp. 320, 322 (N.D. Ill. 1997) (quoting H.R. REP.

No. 101-485, 101st Cong., 2d Sess., pt. 3, at 73 (1990)). A party can collect attorney's fees under 42

U.S.C. § 1988 (and § 12205), provided that the party demonstrates that it is the prevailing party and

that its fee request is reasonable. See id. at 322 (citing Farrar v. Hobby, 506 U.S. 103, 109-114

(1992)).

It is unnecessary to discuss the issue of "prevailing party" as the Consent Decree specifically

provides that Plaintiffs are entitled to fees upon proper motion.

## II. Determination of Attorneys' Fees

The District Court has the ultimate discretion in determining whether or not a party to a case

should receive an award of fees. See Cullens v. Georgia Dept. of Transp., 29 F.3d 1489, 1491 (11th

Cir. 1994) (quoting 42 U.S.C. § 2000e-5(k)). Any fees to be awarded must be reasonable and follow

the guidelines the Eleventh Circuit has promulgated. See, e.g., Norman v. Housing Auth. of City

of Montgomery, 836 F.2d 1292 (11th Cir. 1988). It is the prevailing party's burden to justify the

requested fees. Duckworth v. Whisenant, 97 F.3d 1393, 1396 (11th Cir. 1996); see also, e.g.,

Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). However, the court itself can be an expert

on the question of fees and may properly consider its own knowledge and experience in determining

reasonable and proper fees. Loranger, 10 F.3d at 781 (citing Norman, 836 F.2d at 1303).

Additionally, it is also within the Court's discretion to adjust the fees to an amount it deems proper.

See, e.g., Columbus Mills, Inc. v. Freeland, 918 F.2d 1575, 1580 (11th Cir. 1990).

2

The standards to be applied in determining reasonable attorney's fees are enunciated in Hensley v. Eckerhart, 461 U.S. 424 (1983).[1] The Court noted that the "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 433. This is referred to as the "lodestar" method, which has been adopted by the Eleventh Circuit as the proper method to calculate fee awards in federal statutory fee-shifting cases. See, e.g., Duckworth, 97 F.3d at 1396; Loranger, 10 F.3d at 781.

Before discussing the calculation of attorneys' fees, Defendant argues, inter alia, that the Court should deny or substantially limit the award of fees because Plaintiffs "merely cloaked themselves in the ADA in order to generate a claim for fees and costs." The Court rejects this argument for two reasons. First, as stated above, fees are statutorily provided for under the ADA. If Defendant really believed that this case was all about generating attorneys' fees, then it should have never entered into the Consent Decree. The Court must also reject this argument based on the rule enunciated by the Supreme Court in Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health and Human Resources, 532 U.S. 598 (2001). There, the Supreme Court held that judgments on the merits and court ordered consent decrees create the material alteration of the legal relationship of the parties necessary to permit an award of attorneys' fees. Buckhannon, 532 U.S. at 604. The Court further noted that an award of fees is still permissible even though the consent decree contains no admission of liability. Id. Had Defendant done what Plaintiffs asked without any judicial imprimatur, Defendant may have had a defense under Buckhannon against any subsequent claim for attorneys' fees by Plaintiffs. That not being the case here, however, Plaintiffs are entitled to

---

[1]Although Hensley involved attorney's fees under 42 U.S.C. § 1988, the U.S. Supreme Court stated that "[t]he standards set forth in [Hensley] are generally applicable in *all cases* in which Congress has authorized an award of fees to a 'prevailing party.'" Hensley, 461 U.S. at 433 n.7 (emphasis added).

3

attorneys' fees as the prevailing parties in this action.

## A. Calculating the Reasonable Hourly Rate

Factors to be considered when setting an hourly rate include the time and labor required, novelty and difficulty of the issues, skill required, preclusion of other employment, customary fee, whether the fee is fixed or contingent, time limitations, results obtained, attorney experience, and awards in similar cases. See Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974). The most critical factor is the prevalent rate in the community. Martin v. University of S. Alabama, 911 F.2d 604, 610 (11th Cir. 1990).[2]

Plaintiffs have been represented by Lawrence A. Fuller ("LAF"), John P. Fuller ("JPF"), and James V. Johnstone ("JVJ") of Fuller, Fuller & Associates, P.A. Counsel for the law firm representing Plaintiffs have filed and litigated over 100 ADA Title III cases. All three of Plaintiffs attorneys seek an hourly rate of $290.00.

### 1. Attorney Background

Lawrence A. Fuller received his undergraduate degree from Boston University and his Doctor of Jurisprudence from the University of Miami. LAF was admitted to practice law in Florida in 1974 and is also admitted to the following courts: United States Southern, Middle, and Northern Districts of Florida, and the United States Court of Appeals for the Fifth and Eleventh Circuits. LAF has been a partner in three different law firms and has received an AV rating. LAF claims to have spent 25.70

---

[2]The U.S. Supreme Court has declared that the lodestar method as calculated in Hensley presumptively includes all of the twelve factors derived from the ABA Code of Professional Responsibility DR 2-106 (1980) and adopted in Johnson. Norman, 836 F.2d at 1298-1299.

4

hours and seeks a total of $7,453.00 in fees.[3]

John P. Fuller received his undergraduate degree from the University of Florida and his Doctor of Jurisprudence from Nova University School of Law. JPF was admitted to practice law in Florida in 1979, and is also admitted to the following courts: United States Southern and Middle Districts of Florida and the United States Eleventh Circuit Court of Appeals. Additionally, JPF has been a partner in three different law firms, as well as serving as of counsel to one firm. JPF claims to have spent 5.50 hours on the case and thus, he seeks a total of $1,595.00 in fees.

James V. Johnstone received his undergraduate degree from Cornell University and his Doctor of Jurisprudence from the University of Miami. JVJ was admitted to practice law in Florida in 1967, Georgia in 1975, and Tennessee in 1976. He is also admitted to the following courts: United States Southern and Middle Districts of Florida, the United States Eleventh Circuit Court of Appeals, and the United States Supreme Court. JVJ's resume suggests that he has extensive trial and litigation experience. JVJ claims to have spent 4.50 hours on the case and claims $1,305.00.

### 2. Reasonable Rate

Both Lawrence Fuller and John Fuller have recently received fee awards on the recommendations of this Court. See Association for Disabled Ams., Inc. v. Varadero Invs., Inc., Case No. 01-3280-CIV-HUCK/BROWN (S.D. Fla. May 9, 2002); Advocates for the Disabled, Inc. v. Cotillion Invs., Inc., Case No. 00-8391-CIV-UNGARO-BENAGES/BROWN (S.D. Fla. May 3, 2002). Lawrence A. Fuller, upon consideration of all relevant evidence, much of which was

---

[3] In the Plaintiffs' Verified Application, Lawrence Fuller claims fees in the amount of $6,583 for 22.70 hours expended. In the Plaintiffs' Reply to Defendant's Memorandum in Opposition, he claims an additional $1,160 in fees for the four (4) hours of work expended in reviewing Defendant's Memorandum in Opposition and in preparing the Reply to said Memorandum. Also in the Plaintiffs' Reply, Lawrence Fuller concedes that the amount charged to Defendant should be reduced by one (1) hour for a letter never mailed.

presented to the Court in <u>Varadero</u> and <u>Cotillion</u> (i.e., significant legal experience, held partnerships in various law firms, firm in which he is currently a partner has litigated over 100 Title III ADA cases), should receive the requested hourly rate of $290.00, which is fair, reasonable, and reflects the prevailing market rate. For much of the same reasons cited above in determining LAF's hourly rate, the Court finds that an hourly rate of $250.00 for John P. Fuller is fair, reasonable, relates to his experience, and reflects the prevailing market rate. Lawrence Fuller's additional experience with ADA cases is the cause for the difference.

Regarding attorney Johnstone, the Court finds that the fee request of $290.00 per hour is a reasonable rate. Although Johnstone has less ADA experience than both Lawrence Fuller and John Fuller, he has more overall trial experience than either of them.

Additionally, Plaintiffs' claim that attorney Mark Guariglia spent 0.60 hours on the case for a total of $150.00 ($250.00 per hour). Although Guariglia's resume was not provided with Plaintiffs' Application, the Court has recently recommended that Guariglia receive an hourly rate of $160.00. <u>See Varadero</u>. For the same reasons cited in <u>Varadero</u> (i.e., two years experience as an attorney, no indicated trial experience), the Court finds that $160.00 per hour is a reasonable rate.

## B. Calculating the Reasonable Number of Hours Expended

The Eleventh Circuit requires proof of the hours spent on litigation. <u>See Duckworth</u>, 97 F.3d at 1397. Where there is a lack of documentation or testimonial support for the hours expended the court may make the award based on its own experience. <u>Loranger</u>, 10 F.3d at 781 (citing <u>Norman</u>, 836 F.2d at 1303). The fee applicant bears the burden of demonstrating entitlement to the number of hours reasonably expended. <u>See Norman</u>, 836 F.2d at 1303. Counsel for the prevailing party should exercise billing judgment, that is, make a good faith effort to exclude from a fee request hours

6

that are excessive, redundant, or otherwise unnecessary. Id. at 1301 (citing Hensley, 461 U.S. at 434); see also Gray v. Lockheed Aeronautical Sys. Co., 125 F.3d 1387, 1389 (11th Cir. 1997).

Plaintiffs' submitted time sheets describe in detail the work performed by Plaintiffs' attorneys. These time sheets generally evidence the attorneys' good faith effort to exercise billing judgment. After reviewing the time entries recorded on the time sheets, the Court recommends that Plaintiffs are entitled to reimbursement for 28.30 hours as explained below.

Lawrence Fuller, Plaintiffs' lead attorney in this case, claims to have expended 21.70 hours. The Court finds that some of his claimed time was excessive in relation to the task performed, thereby warranting the adjustments in the following entries: 1/24/02, 2/6/02, 2/9/02, 2/15/02, 2/25/02, 3/29/02, and 4/22/02 entry: The 3.20 hours claimed for preparing the application for fees and costs, legal research, and the conference with Ms. Durbin shall be reduced to 2.00 hours. Plaintiffs have filed numerous motions for fees in these types of cases and have already done most, if not all of the research for same. Moreover, the Court recommends disallowing the one-half (½) hour claimed for reviewing the answer and affirmative defenses. Attorney Johnstone performed this same (or similar) task and therefore, the time expended on this task (as it relates to LAF) should not be recoverable. The Court also recommends disallowing the 0.10 hour claimed for preparing a mediation fax to counsel as this is a clerical task. See Webb, 967 F. Supp. at 324; see also Castle v. Bentsen, 872 F. Supp. 1062, 1067 (D.D.C. 1995) (declining to award fees for clerical tasks under 42 U.S.C. § 2000e-5(k)). Accordingly, the Court recommends awarding attorney Lawrence A. Fuller 18.20 hours.

Attorneys J. Fuller and M. Guariglia claim to have expended 5.50 hours and 0.60 hours, respectively. In reviewing the time entries and concluding that the hours claimed are reasonably

7

commensurate with the work performed, the Court recommends allowing the hours as claimed. Furthermore, attorney Johnstone claims to have spent 4.50 hours on this case. In reviewing the time entries, the Court recommends reducing slightly the entry on 2/1/02 because the amount claimed for the work is excessive. Therefore, the Court recommends awarding 4.00 hours to attorney Johnstone.

Accordingly, the Court recommends an attorneys' fee award of $7,909.

**III. Expert Fees and Litigation Costs**

The ADA gives the Court statutory authority to use its discretion in awarding costs to the prevailing party. See 42 U.S.C. § 12205; see also Buckhannon, 532 U.S. at 624, n.1. Pursuant to § 12205, costs of litigation are recoverable by the prevailing party insofar as they are reasonable. In addition, the ADA provides plaintiffs with "[t]he powers, remedies, and procedures set forth in . . . 42 U.S.C. § 2000e-5." See 42 U.S.C. § 12217. Section 2000e-5(k) states that "[i]n any action or proceeding under this title, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorneys fee *(including expert fees)* as part of the costs." See id. § 2000e-5 (emphasis added); see also Hall v. Claussen, Nos. 98-1150, 98-1384, 2001 WL 219088 (10th Cir. March 6, 2001). Expert fees, moreover, are not limited by 28 U.S.C. §§ 1920 and 1821 in an ADA case. See Lovell v. Chandler, 303 F.3d 1039 (9th Cir. 2002); see also Dowdell v. City of Apopka, 698 F.2d 1181, 1188-1189 (11th Cir. 1983) (stating that Federal Rule of Civil Procedure 54(d) and 28 U.S.C. §§ 1920 and 1923(a) are inapplicable where cost-shifting is expressly authorized by statute). However, it is the burden of the prevailing party to submit a request for expenses that would enable the Court to determine what expenses were incurred and whether the prevailing party is entitled to them. Lee v. American Eagle Airlines, Inc., 93 F. Supp. 2d 1322, 1335 (S.D. Fla. 2000).

8

Plaintiffs request expert fees due to the involvement of A.D.A. Investigations, Inc. (Carol Durbin, President). Ms. Durbin has attended numerous ADA seminars and classes, primarily in the last two years. It is clear that she is an expert regarding the issues in this case. Ms. Durbin claims to have expended 15.50 hours inspecting Defendant's property and in follow-up activity related to the property's noncompliance with the ADA. Ms. Durbin charged Plaintiffs $150.00 per hour, for a total amount of $2,325.00.

Defendant contends, *inter alia*, that expert fees are not recoverable where the expert did not testify. In support of its argument, Defendant cites to George v. GTE Directories Corp., 114 F. Supp. 2d 1281 (M.D. Fla. 2000). Although it is true that the witnesses in George did not testify, the fees in George were disallowed because the witnesses appearances at trial were not reasonably necessary. The George court clearly stated, "a prevailing party may recover witness fees even for nontestifying witnesses if the party can show that a witness' attendance at trial was reasonably necessary." Id. at 1299. Here, there was no trial. Assuming, *arguendo*, a trial was held, the observations made and the reports written by Ms. Durbin were a crucial part of Plaintiffs' case and there can be little doubt that her attendance at trial would be reasonably necessary. Therefore, the Court finds that expert fees are recoverable under the ADA and it will now determine the recoverable amount.

In Varadero, the Court recommended that Ms. Durbin's services were recoverable at an hourly rate of $125.00. Upon consideration of all relevant evidence including the detailed record of Ms. Durbin's hours, the Court finds that an hourly rate of $125.00 is fair and the hours claimed are generally reasonable. However, one time entry is for "Verification of Property Identification and Owner, with Secretary of State . . . ." The same (or similar) work was done by attorney John Fuller on November 22, 2001. Therefore, the Court will deduct the one (1) hour claimed for this task.

9

Accordingly, the Court recommends expert fees in the amount of $1812.50.

Costs and expenses in this matter are claimed to be $633.12, which is comprised of filing fees, service of process, title search, reinspection fee, photocopies, and postage. Defendant challenges the compensability of these costs on the basis that they were not adequately documented and that the request submitted by Plaintiffs lacked sufficient detail as to how such costs were related to this action.

The Eleventh Circuit traditionally takes a liberal approach when reimbursing attorney expenses. Lee, 93 F. Supp. 2d at 1335; see also Dowdell, 698 F.2d at 1190, n.13; Mallory v. Harkness, 923 F. Supp. 1546, 1557 (S.D. Fla. 1996). However, as stated above, it is incumbent upon the prevailing party to demonstrate to the Court that the costs incurred are reasonable and that they are related to the instant action. Lee, 93 F. Supp. 2d at 1336. In Lee, the District Court disallowed costs for photocopies, telephone and fax charges because the entries relating to those charges were "wholly devoid of explanation." Id. at 1335-1336. Furthermore, the Eleventh Circuit has declined to tax costs where the entries lacked sufficient particularity that would allow the Court to determine the reasonableness of the costs. Villano v. City of Boynton Beach, 254 F.3d 1302, 1311 (11th Cir. 2001); see also Cullens, 29 F.3d at 1494 (disallowing photocopying costs where plaintiffs did not present evidence regarding the documents copied including their use or intended use); Lang v. Reedy Creek Improvement Dist., Nos. 94-693-CIV-ORL-3-ABF(17), 95-956-CIV-ORL-3-ABF(17), 1997 WL 809200 (M.D. Fla. Dec. 23, 1997); Drury v. Pena, No. 95-848-CIV-J-21B, 1997 WL 718831 (M.D. Fla. Oct. 15, 1997) (telephone charges not taxed where the prevailing party failed to provide information about the calls to allow the court to determine the calls' reasonableness).

Here, the generalized cost entries submitted by Plaintiffs relating to the photocopying charges

10

provide no basis on which the Court can determine whether these costs were reasonable or whether these costs were related to this case. Therefore, the Court recommends disallowing the $40.95 claimed for the photocopies. The Court does recommend, however, allowing the costs claimed for filing fees, service fees, title search, reinspection fee, and postage in the amount of $592.17.

Accordingly, the Court recommends allowing expert fees in the amount of $1812.50 and costs and expenses in the amount of $592.17.

## RECOMMENDATION

Consistent with this report, the Court respectfully recommends awarding the following fees and costs:

1. Attorneys' Fees

| | | |
|---|---|---|
| Lawrence A. Fuller | $ | 5,278.00 |
| John P. Fuller | | 1,375.00 |
| John V. Johnstone | | 1,160.00 |
| Mark Guariglia | | 96.00 |
| Total Attorneys' Fees | $ | 7,909.00 |

2. Expert Fees        $    1,812.50

3. Costs        $    592.17

Total Recommended Award        $    10,313.67

Accordingly, the Court respectfully recommends that Plaintiffs' Verified Application for Attorneys' Fees and Costs be **GRANTED** in the sum of $10,313.67.

11

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958, 109 S. Ct. 397 (1988).

**DONE AND ORDERED** in chambers this 25th day of November, 2002, at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

cc:  Honorable Adalberto Jordan
     Lawrence A. Fuller, Esq. - (305) 534-9894
     Michael J. Higer, Esq. - (305) 893-5511

)                              )

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 97-~~6127~~-CIV-HIGHSMITH

133

ASSOCIATION FOR DISABLED
AMERICANS, INC. THE FLORIDA
PARAPLEGIC ASSOCIATION,
EDWARD RESNICK, ERNST
ROSENKRANTZ and DANIEL RUIZ,



FILED by _____ D.C.

JUL 1 6 1998

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

      Plaintiffs,

v.

NORTH BEACH HOTEL, INC.,

      Defendant.

_____/

## FINAL JUDGMENT OF FEES AND COSTS

THIS CAUSE came before the Court upon the Report and Recommendation issued by Magistrate Judge William C. Turnoff on June 21, 1998. Having conducted an independent review of this matter, including consideration of defendant's objections to the Report and Recommendation and plaintiffs' response to said objections, it is

ORDERED AND ADJUDGED that Magistrate Judge Turnoff's Report and Recommendation is APPROVED and ADOPTED in its entirety. The plaintiffs' request for additional attorney's fees incurred in responding to the defendant's objections to the Report and

**SCANNED**



EXHIBIT

dabbies

11

Recommendation is DENIED.  Accordingly, it is further

ORDERED AND ADJUDGED that Plaintiffs Association for Disabled Americans, Inc., the Florida Paraplegic Association, Edward Resnick, Ernst Rosenkrantz and Daniel Ruiz SHALL RECOVER from Defendant North Beach Hotel, Inc. $19,662.00 as reasonable attorney's fees plus $4,260.51 as reasonable costs in this action, for a total judgment of $23,992.51, for which let execution issue.

DONE AND ORDERED in Chambers, at Miami, Dade County, Florida, this 16th day of July, 1998.


SHELBY HIGHSMITH
UNITED STATES DISTRICT JUDGE


cc:  Magistrate Judge Turnoff
     William R. Trueba, Esq.
     William Charouhis, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 99-580-CIV-JORDAN / BANDSTRA

ASSOCIATION FOR DISABLED AMERICANS,
INC., ET AL.,

     Plaintiffs,

v.

MOTIVA ENTERPRISES, L.L.C.,

     Defendant.

_____/





## FINAL JUDGMENT FOR FEES AND COSTS

THIS CAUSE came before the Court upon the Report and Recommendation issued by United States Magistrate Judge Ted E. Bandstra on February 22, 2001. Having conducted a thorough and independent *de novo* review of this matter, including the Report and Recommendation, and their being no objections to the Report and Recommendation filed by any of the parties, it is

ORDERED AND ADJUDGED that United States Magistrate Judge Bandstra's Report and Recommendation, is APPROVED and ADOPTED in its entirety as amended. Accordingly, it is further

ORDERED AND ADJUDGED that plaintiffs' counsel SHALL RECOVER from Defendant Motiva Enterprises, L.L.C. $82,588.00 for attorneys' fees, $3,123.99 in attorneys' costs, $12,339.95 in expert's fees, and $140.82 in expert's costs, for a total judgment of $ 98,192.76, for which let execution issue.

DONE AND ORDERED in Chambers at Miami, Florida, this 23rd day of _____April_____, 2001.

_____
ADALBERTO JORDAN
UNITED STATES DISTRICT JUDGE

cc:

William N. Charouhis, Esq.
Marilyn Holifield, Esq.





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-580-CIV-JORDAN

ASSOCIATION FOR DISABLED
AMERICANS, INC., CORAL SPRINGS
ADVOCACY COMMITTEE FOR THE
HANDICAPPED, INC., DANIEL RUIZ,
JORGE LUIS RODRIGUEZ and
ROBERT COHEN,

     Plaintiffs,

vs.

MOTIVA ENTERPRISES L.L.C.,

     Defendant.

_____/

RECEIVED
DEC 2 3 2005
BY:_____

## REPORT AND RECOMMENDATION

    **THIS CAUSE** came before the Court on Plaintiffs' Verified Application for Attorneys' and Expert's Fees, Litigation Expenses and Costs (D.E. 104) filed on October 10, 2000. On December 22, 2000, this matter was referred to United States Magistrate Judge Ted E. Bandstra by the Honorable Adalberto Jordan for a report and recommendation pursuant to 28 U.S.C. §636(b). Having carefully considered the pleadings, all affidavits, billing records and other materials submitted by the parties, the court file and applicable law, the undersigned recommends that Plaintiffs' Verified Application for Attorneys' and Expert's Fees, Litigation Expenses and Costs be GRANTED to the extent that plaintiff be awarded $82,588.00 in attorneys' fees, $3,123.99 in costs, $12,339.95 in expert fees and $140.82 in expert costs for reasons explained below.

## BACKGROUND

    On May 20, 1999, the Association for Disabled Americans, Inc., Coral Springs,

Advocacy Committee for the Handicapped, Inc., Daniel Ruiz, Jorge Luis Rodriguez, Ernst Rosenkrantz and Robert Cohen ("plaintiffs") filed a Class Action Amended Complaint on behalf of themselves and all other individuals with disabilities as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12101 et seq., seeking injunctive and other relief against Texaco, Inc., Texaco Refining and Marketing, Inc. and Motiva Enterprises L.L.C. ("defendants") for defendants' alleged failure to comply with ADA requirements. Specifically, plaintiffs alleged that defendants, as "owners, lessees, lessors and/or operators" of eleven gas stations and markets, have discriminated against plaintiffs by denying them full and equal enjoyment of the goods, services, facilities and accommodations available at defendants' premises and by failing to remove architectural barriers where such removal was readily achievable in violation of the ADA. See Am.Cpt. ¶¶ 5 & 18.

On June 28, 1999, defendants Texaco, Inc. and Texaco Refining and Marketing, Inc. moved for summary judgment in their favor arguing that they do not own, operate or have any leasehold interest in any of the subject gas stations or the associated markets or facilities. Thus, these defendants argued that they were improper parties to this lawsuit and should be dismissed. On this same date, defendant Motiva moved to dismiss the class action allegations of the amended complaint on the basis that plaintiffs failed to meet the requirements of Rule 23(b) of the Federal Rules of Civil Procedure. On July 23, 1999, plaintiffs filed their motion for class certification.

On July 29, 1999, plaintiffs moved to voluntarily dismiss Texaco, Inc. and Texaco Refining and Marketing, Inc. from this action. Upon stipulation of the parties and by Court Order issued July 20, 1999, defendants Texaco, Inc. and Texaco Refining and Marketing,

2

Inc. were dismissed from this case and their motion for summary judgment was denied as moot. Consequently, Motiva remained as the only defendant.

By Order dated October 15, 1999, this Court denied, without prejudice, plaintiffs' motion for class certification and granted Motiva's ("defendant's") motion to dismiss the class action, finding that plaintiffs had failed to satisfy their burden of demonstrating the commonality element under Rule 23(a).

On November 2, 1999, plaintiffs filed their first amended complaint solely against defendant Motiva, deleting all class action allegations and limiting the premises which are the subject of this action to five gas stations and convenience stores. Essentially, plaintiffs sought injunctive relief against Motiva for violations of the ADA, alleging that they had been denied, inter alia, access to and full and equal enjoyment of the goods and facilities offered at defendant's premises. Trial for this matter was set for August 22, 2000.

On the eve of trial, the parties filed a joint notice of settlement advising that they had reached a resolution regarding all issues in this cause. Pursuant to the parties' joint stipulation, this Court entered a Final Order of Dismissal on September 8, 2000, dismissing all claims with prejudice. The Order further provided that "[t]he court will retain jurisdiction of the case to enforce the terms of the settlement agreement." See Final Order Of Dismissal With Prejudice (D.E. 101). The settlement agreement provided that defendant would pay plaintiffs' counsel for attorneys' fees, litigation expenses and costs incurred, and plaintiffs' expert for reasonable expert fees and costs.

On October 10, 2000, plaintiffs filed the instant application for attorneys' and expert fees, litigation expenses and costs, seeking attorney's fees in the amount of $129,421.00, $3,313.11 in attorneys' costs, $12,339.50 in expert's fees and $140.82 in expert's costs

3

incurred in the prosecution of this matter.[1] Plaintiffs further request that their counsel's and expert's fee award be enhanced by utilizing a multiplier of 2.25.[2]

Motiva does not oppose plaintiffs' entitlement to a fee and cost award pursuant to the terms of the settlement agreement or under 42 U.S.C. §12205, but argues that plaintiffs' fee award should be denied in its entirety as a sanction for "frivolous and groundless conduct" in connection with their request for an "exorbitant" fee award. See Defendant's Response Memorandum, pg. 3. In addition, Motiva challenges the reasonableness of the requested fees and costs. The issues raised with respect to these arguments are addressed below.

## FINDINGS AND CONCLUSIONS

### I. ATTORNEYS' FEES

A. Entitlement to Attorneys' Fees

Plaintiffs seek an award of attorneys' fees and costs from Motiva [1]pursuant to the terms of the settlement agreement and in accordance with the Americans with Disabilities

---

[1]Plaintiffs requested lodestar includes $10,687.00 in attorneys' fees and $538.9 in costs incurred in conjunction with recovering attorneys' fees. These fees were incurred subsequent to their initial application and were requested in plaintiffs' reply memorandum. The general rule recognized in this circuit is that time expended litigating attorney's fees is fully compensable. See e.g., Martin v. University of South Alabama, 911 F.2d 604, 610 (11th Cir.1990). Except for three specific entries, Motiva makes no objection to plaintiffs' entitlement to attorney's fees resulting from this particular motion. Accordingly, the undersigned finds that such fees are recoverable.

[2]Plaintiffs also estimated that they would incur and seek an additional $12,290.00 in attorneys' and expert fees at an evidentiary hearing in this matter. The undersigned finds, however, that an evidentiary hearing on this motion is unnecessary and, therefore, denies plaintiffs' request for such fees without further discussion herein.

Act, 42 U.S.C. §12205. This statute provides, in pertinent part:

> In any action or administrative proceeding commenced pursuant to the Act, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses and costs. . . .

Thus, the party seeking fees must show that it has prevailed and that its fee request is reasonable. Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566 (1992). In Farrar, the Supreme Court held:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent degree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. . . . In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

Id., 113 S.Ct. at 573 (citations omitted).

In this case, plaintiffs secured relief to their direct benefit though settlement with an express reference in their stipulation for settlement that Motiva shall pay plaintiffs' counsel reasonable attorney's and experts fees, litigation expenses and costs. Specifically, the parties, in paragraph 3 of the Addendum to the Stipulation for Settlement agreed that:

> Defendant shall pay Plaintiffs' counsel, William Charouhis & Associates, P.A. for reasonable attorneys' fees, litigation expenses and costs incurred by Plaintiffs in this matter, and Plaintiffs' expert, Michael Brennan, M.A., L.M.H.C, C.R.C., C.C.M., for reasonable expert fees and costs incurred in this matter plus a flat fee of $1450.00 for Michael Brennan's inspection responsibilities as noted under paragraph 1 of this Addendum. Within ten (10) days of the dismissal of this action Plaintiffs' counsel shall provide Defendant's counsel with a copy of Plaintiffs' proposed application complying with the requirements of the Court's Local Rule 7.3, for an award of attorneys' and expert's fee, litigation expenses and costs. If counsel for the parties are unable to determine the attorneys' fees, including litigation expenses, expert's fees and costs to be paid, the amount to be paid shall be determined by the District Judge or a Magistrate Judge as the Court deems

5

> appropriate. Upon agreement by the parties or determination by the District Judge Court or a Magistrate Judge of the attorneys' fees, litigation expenses, expert's fees and costs issue, such fees and costs shall be paid to Plaintiffs' counsel and expert, as the case may be, on or before thirty (30) days from the date of such agreement or determination.

See Plaintiffs' Memorandum, pg. 3. Pursuant to the terms of the Stipulation for Settlement, defendant Motiva shall pay plaintiffs' counsel a reasonable attorney's and expert's fees, litigations expenses and costs. In addition, the Stipulation for Settlement reflects that plaintiffs were successful in obtaining their requested relief. According, the undersigned finds that plaintiffs, as the prevailing parties to this action, are entitled to recover reasonable attorneys' and expert's fees and costs. See Resnick v. Uccello Immobilien GMBH, Inc., 227 F.3d 1347 (2000).

B. Reasonableness of Amount Requested

Having determined that plaintiffs are entitled to an award of attorney's and expert fees and costs incurred in connection with the prosecution of this case, the undersigned next addresses the appropriate amount of that award. In calculating a reasonable attorneys' fee, the court must consider the number of hours expended in prosecuting this action, together with the customary fee charged in this community for similar legal services. See Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988). These two figures are then multiplied together, resulting in a sum commonly referred to as the "lodestar". Under certain circumstances, the lodestar may be adjusted in order to reach a more appropriate attorney's fee. See Blum v. Stetson, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544 (1984). In this case, plaintiffs request attorney's fees totaling $129,421.00 for time incurred in the prosecution of this case and seek enhancement of these fees by utilizing a multiplier of 2.25, resulting in a total fee request of $291,197.25.

6

1. Hourly Rate

The Court must first evaluate plaintiffs' requested fee in terms of the appropriate hourly rate. The Supreme Court has held that a reasonable hourly rate is to be measured by "prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541 (1984). The fee applicant bears the burden of establishing the reasonableness of the requested hourly rate. See Norman at 1299 (citing NAACP v. City of Evergreen, 812 F.2d 1332 (11th Cir. 1987)).

Here, plaintiffs seek an hourly rate of $325.00 for the services of their primary attorney, William N. Charouhis, claiming that this rate is reasonable since it takes into account inflation and delay in payment. Plaintiffs further request an hourly rate of $235.00 for the services of Juliette Lippman, Esq., a seventh year associate. In addition, plaintiffs seek $170.00 per hour for the services of Christina Galindo, Esq. and Lori I. Barkus, Esq., second and third year associates, respectively. Plaintiffs also seek $90.00 per hour for the services of a paralegal. Plaintiffs support their request by submitting the affidavit of Gil Haddad, Esq., an experienced attorney in this community. Based on his review of the pleadings, the underlying documentation and counsel's billing records, Mr. Haddad opined that the hourly rates sought by plaintiffs' counsel are reasonable. See D.E. 110. Defendant opposes the rates requested for plaintiffs' attorneys, arguing that the hourly rates are excessive based on their respective experience and prevailing market rates in this community.

Having considered plaintiffs' attorneys' verified application for fees, the affidavit in support thereof, the documentary evidence and pleadings of record, counsels' reputation and experience in the areas of civil rights law, and the Court's familiarity with ADA litigation

7

and attorneys' fees in general, the undersigned finds that a rate of $290.00 (rather than $325.00) per hour for Mr. Charouhis is reasonable and consistent with previous fee awards in this district. See e.g., Alliance for ADA Compliance, Inc. v. J.A. Bahama Hotel, et al, Case No. 98-6020 (J. Dimitrouleas) (awarding Mr. Charouhis $290.00 per hour). While recognizing that Mr. Charouhis is a highly skilled attorney, the undersigned finds that his requested hourly rate of $325.00 is somewhat excessive based on the prevailing market rates in this community for similar legal services. The undersigned further finds the requested hour rates for plaintiffs' additional attorneys are also excessive so that the Court recommends $160.00 per hour for the services of Juliette Lippman, and $125.00 per hour as a reasonable fee for the services of the other associate attorneys. Finally, the undersigned finds plaintiffs' requested $90.00 per hour fee for the services performed by a paralegal to be reasonable and without objection.

2. Hours Reasonably Expended

This Court must next evaluate plaintiffs' requested fee for reasonableness in terms of the total hours expended by plaintiffs' counsel. Plaintiffs submit billing records reflecting 291 hours for the work of Mr. Charouhis, 10.20 hours for the work of Ms. Lippman, 187.80 hours for the work of Ms. Galindo, .60 hours for the work of Ms. Barkus, and 4.10 hours for the work of a paralegal. Plaintiffs support their fee request by submitting their "Pre-Bill Worksheet[s]" which summarize the work performed, the date of performance and the number of hours worked for each listed task. See Plaintiffs' Motion, Exhibit. 1.

Defendant seeks a substantial reduction in the claimed attorney's fee, arguing that counsels' claimed hours are excessive and unreasonable in that counsel seeks to recover fees for time spent in litigating unsuccessful claims and/or issues. Defendant contends

that plaintiffs' attorney time should be reduced by 270 hours due to time entries "not properly chargeable to Motiva." See Defendant's Response Memorandum, pg. 5. Specifically, defendant argues that the hours incurred by plaintiffs' counsel in relation to the other defendants, including defendants' motions to dismiss and plaintiffs' unsuccessful motion for class certification, as well as various other miscellaneous entries should be disallowed from the requested fee since plaintiffs did not prevail in attempting to keep Texaco and Texaco Refining Corp. as named defendants and in certifying a class action. Essentially, defendant contends that these issues should never have been litigated because plaintiffs should have known that it was unlikely that they would prevail in these matters. In addition, defendant contends that the hours incurred by plaintiffs' counsel subsequent to Motiva's submission of the proposed consent injunction should be also be disallowed since this case was ultimately resolved on essentially the same terms as in the proposed consent injunction.

In reviewing a claim for hours reasonably expended, this Court must exercise its independent judgment. See Norman v. Housing Authority of the City of Montgomery, 836 F.2d 1292, 1301-02 (11th Cir. 1988). The Supreme Court has emphasized the importance of keeping accurate and current records of work done and time spent on a case, particularly when someone other than the client may pay the fee. See Hensley, 461 U.S. at 433. The court may reduce the number of hours for which fees will be awarded if there is inadequate documentation, or if the court finds the claim for hours is "excessive or unnecessary." Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145, 1150 (Fla. 1985). Also within a district court's discretion is the ability to exclude attorney's fees which are attributable to time spent on unsuccessful claims that are not inextricable intertwined

9

with the successful claims. See Popkin v. City of Kennesaw, 820 F.2d 1570 (11th Cir. 1987).

Upon independent review of counsels' fee affidavit and the submitted time/billing records, the undersigned finds that most, but not all, of counsel's time entries are sufficiently documented and reflect a reasonable amount of attorney hours devoted to each listed task. In so finding, the undersigned first notes that defendant does not contest the the sufficiency of the supporting documentation, but rather claims that amount of hours sought is excessive in light of the nature of this case, the disposition of the above referenced motions, and the results eventually obtained. Considering these factors and having reviewed the entire court file, the undersigned finds that a fee award for the hours spent on plaintiffs' class certification motion and in defending the Texaco defendants' motion to dismiss is inappropriate and non-recoverable under the circumstances of this case. Litigating these issues was ill advised as evidenced by the eventually voluntary dismissal of these improper defendants, and the fact that plaintiffs failed to present any evidence in support of its assertion that other proposed class members suffered similar discrimination. As a result, defendant Motiva should not be responsible for the fees incurred in support of this litigation strategy which, in the opinion of the undersigned, was not so inextricable intertwined with plaintiffs' successful ADA claim. In all other respects, the undersigned finds counsels' hours are reasonable. Accordingly, the undersigned recommends a reduction of 66 hours of Mr. Charoushis' time, 9.3 hours for Ms. Lippman's time, 52 hours for Ms. Galindo's time, and 2.5 hours of paralegal time for work related to those unsuccessful claims and efforts.

Recalculating the lodestar, the undersigned recommends an award of attorney's

10

fees in the total amount of $82,588.00, representing 225 of Mr. Charoushis' hours expended at $290.00 per hour, .90 hours of Ms. Lippman's time at $160.00 per hour, 136.40 hours for the work of the other associates expended at 125.00 per hour, and 1.6 para-legal hours expended at $90.00 per hour.

    3. <u>Fee Enhancement</u>

    Having calculated the lodestar, the undersigned next addresses plaintiffs' contention that this figure should be upwardly adjusted through the use of a 2.25 contingency multiplier in order to compensate counsel for the quality of their representation in undertaking this ADA litigation. An enhancement may be warranted under "exceptional" circumstances or where the quality of service rendered was superior. <u>See Hensley v. Eckhart</u>, 461 U.S. 424, 435, 103 S.Ct. 1933 (1983).

    Reviewing the record here, the undersigned finds no "exceptional" circumstances which warrant the application of a multiplier to the award of attorneys' fees. The quality of the representation is adequately reflected in the hourly billing rates of Mr. Charouhis and his associates. As discussed above, the recommended billing rates reflect the qualifications and experience of plaintiffs' counsel and are comparable to the prevailing rates normally charged in this community. In addition, counsel concedes his extensive experience with ADA cases which presumable would have given him an advantage in the preparation of this case rather than serve as a basis for a fee enhancement. Moreover, the Supreme Court has stated in <u>City of Burlington v. Dague</u>, 505 U.S. 567, 112 S.Ct. 2638 (1992), that "no contingency enhancement whatever is compatible with the fee-shifting statutes. . . . " <u>Id.</u>, 112 S.Ct. at 2643. <u>See also McKenzie v. Cooper, Levins & Pastko, Inc.</u>, 990 F.2d 1183, 1186, (11th Cir. 1993) (enhancement for contingency no longer available

in similar federal fee-shifting statutes in light of <u>City of Burlington</u>).

Accordingly, the undersigned declines to apply a multiplier to enhance the attorneys' fee.

## II.  Expert Fees and Costs

Plaintiffs further seek to recover expert fees in the amount of $12,339.50, representing 66.7 hours at the rate of $185.00 per hour, and expert costs in the amount of $140.82 for the services of Michael Brennan, an ADA accessibility expert. In addition, plaintiffs request that a multiplier of 2.25 be applied to Mr. Brennan's expert fees. Plaintiffs support this request with the billing records from Mr. Brennan which describe the tasks performed and the time devoted to each listed task.

Defendant does dispute plaintiffs' entitlement to recover expert fees and costs. Rather, defendant challenges the reasonableness of the requested fee in terms of the expert's hourly rate and time incurred for the preparation of trial. Specifically, defendant suggests that 10 hours of time billed by plaintiff's expert for trial preparation should be excluded from the award in light of this Court's August 17, 2000 Order which prohibited Mr. Brennan from testifying at trial. <u>See</u> D.E. 94. Defendant further suggests that a more appropriate hourly rate for the services of Mr. Brennan is $125.00, and that a fee enhancement is "outrageous" under the circumstance of this case.

Addressing these issues, the undersigned first notes that it is within this Court's discretion to award a prevailing party under the ADA, not only attorney's fees, but also expert fees. <u>See</u> 42 U.S.C. §12117(a) (stating that the powers, remedies, and procedures available under Title VII, 42 U.S.C. §2000e-5 are available under the ADA); <u>see also</u> 42 U.S.C. §12205. Indeed, defendant herein expressly agreed to award plaintiffs their

reasonable expert fees in the Addendum to the Stipulation for Settlement which states as follows:

> Defendant shall pay Plaintiffs' counsel, William Charouhis & Associates, P.A. for reasonable attorneys' fees, litigation expenses and costs incurred by Plaintiffs in this matter, and Plaintiffs' expert, Michael Brennan, M.A., L.M.H.C, C.R.C., C.C.M., for reasonable expert fees and costs incurred in this matter plus a flat fee of $1450.00 for Michael Brennan's inspection responsibilities as noted under paragraph 1 of this Addendum.

While it is true that Mr. Brennan was precluded from testifying at trial [due to plaintiffs' failure to comply with Local Rule 16.1(k)], the undersigned finds defendant's suggestion to delete 10 hours of his time to be arbitrary and contrary to defendant's agreement in the Stipulation to pay Mr. Brennan's reasonable "fees and costs incurred in this matter". Pursuant to this agreement, Mr. Brennan is entitled to an award for all reasonable time incurred in assisting plaintiffs' counsel in preparation of this case and in negotiating the settlement regardless of whether or not he testified at trial. Moreover, Mr. Brennan's billing records do not reflect any time entries related solely to preparing his trial testimony.

The undersigned further finds Mr. Brennan's hourly rate of $185.00 to be reasonable and consistent with other expert fees awarded in this district. See Association for Disabled Americans, Inc., et al. v. North Beach Hotel Inc. Case No. 97-133-CIV-HIGHSMITH (awarding Mr. Brennan $185.00 per hour); Association for Disabled Americans v. Holiday Isle Resort & Marina, Inc., et al., Case Nos. 97-10112-CIV-KING, 97-10113-CIV-KING, 97-10114-CIV-KING (awarding Mr. Brennan $185.00 per hour).

In summary, the undersigned finds that plaintiffs have sufficiently demonstrated that Mr. Brennan's fees were reasonably necessary to the prosecution of this ADA claim and that the fee was properly charged. However, the undersigned continues to find, for the

13

same reasons outlined above, that a fee enhancement in this case would be inappropriate and therefore declines to apply a multiplier to the fee. Accordingly, the undersigned recommends an award of expert fees to plaintiffs in the amount of $12,339.95, and an award of costs in the uncontested amount of $140.82.

### III. Costs

Plaintiffs also request costs and litigation expenses in the amount of $3,313.11, consisting of filing fees, service of process fees, local courier, local facsimile charges, photocopying charges, transportation expenses and travel related meals to be taxable costs and expenses against defendant pursuant to the Stipulation for Settlement and under 42 U.S.C. §12205. Plaintiffs submit billing statements supporting their requested costs. See Plaintiffs' Exh. 1.

Defendant objects to a full award of plaintiffs' requested costs on the basis that certain costs are not recoverable. Specifically, defendant seeks to bar plaintiffs from recovering expenses for courier fees, postage, facsimile and telephone because these costs are not allowable under 28 U.S.C. §1920. In addition defendant object to the reasonableness of plaintiff's copying charges, arguing that plaintiffs' per page charge of $0.25 is excessive.

Addressing defendant's objections, the undersigned again notes that the ADA provides for litigation expenses and costs to be awarded to the prevailing party in the discretion of the court. See 42 U.S.C. §12205. Section 12205's allowance for "litigation expenses" is must broader than the provisions of §1920 and is the controlling statutory authority here. Moreover, the Stipulation for Settlement parrots this language by also providing for an award of "litigation expenses and costs". See also Dowdell v. City of

14

Apopka, Florida, 698 F.2d 1181 (11th Cir. 1983) (awarding all litigation expenses except those normally absorbed as overhead by a practicing attorney). Thus, the undersigned finds that the various costs defendant seeks to exclude are recoverable under §12205 and the settlement agreement.

Having found that plaintiffs' requested costs are recoverable, the undersigned turns to the reasonableness of these costs. As stated above, defendant opposes plaintiffs' costs for photocopying on the basis that the rate of $0.25 per copy is excessive, suggesting that $0.10 per page is a more appropriate charge. Reviewing this cost item, the undersigned finds that the rate of $0.25 per copy is reasonable and consistent with copying costs routinely charged in this community. However, the undersigned finds that plaintiffs' supporting documentation is insufficient to support this expense, thus warranting a reduction of this expense by 25% (from $756.50 to $567.38) As stated in Freeman v. Dole, 609 F.Supp. 531 (D.D.C. 1985), "the issue is not whether such costs are recoverable, but whether the costs upon consideration were reasonably expended." Id. at 544. In this case, plaintiffs fail to describe the nature and/or identify the documents copied. Without this information, the Court concludes that the requested photocopying costs are excessive and, accordingly, reduces this expense by 25%.

In all other respects, the undersigned finds plaintiffs' requested costs to be reasonable and recoverable litigation expenses. Accordingly, the undersigned recommends an award of costs to plaintiffs in the amount of $3,123.99

15

## RECOMMENDATION

For all the foregoing reasons, the undersigned recommends that Plaintiffs' Verified Application for Attorneys' and Expert's Fees, Litigation Expenses and Costs be GRANTED to the extent that plaintiffs be awarded $82,588.00 in attorneys' fees, $3,123.99 in costs, $12,339.95 in expert fees and $140.82 in expert costs.

The parties may serve and file written objections to this Report and Recommendation with the Honorable Adalberto Jordan, United States District Judge, within ten (10) days of receipt. See 28 U.S.C. §636(b)1)c); United States v. Warren, 687 F.2d 347 (11th Cir. 1982); cert. denied, 460 U.S. 1087 (1983); Hardin v. Wainwright, 678 F.2d 589 (5th Cir. Unit B 1982); see also Thomas v. Arn, 474 U.S. 140 (1985).

RESPECTFULLY SUBMITTED this 22⁰ day of February, 2001 in Miami, Florida.

Ted E. Bandstra
United States Magistrate Judge

cc: Honorable Adalberto Jordan
William N. Charouhis, Esq.
Marilyn Holifield, Esq.

16





## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-6833-CIV-HIGHSMITH/GARBER

ADVOCATES FOR THE DISABLED,
INC., et al.,

        Plaintiffs,

v.

BOULEVARD MOTEL CORPORATION,

        Defendant.

_____/

### ORDER

THIS MATTER is before the Court on Plaintiffs' Verified Application for Attorney's Fees and Costs [DE#14] pursuant to an Order of Reference entered by the Honorable Shelby Highsmith. Plaintiffs seek $3,657.50 in attorneys' fees for 13.3 hours at a rate of $275 per hour; $2,000 in expert fees; and $529.78 in costs. Plaintiffs seek an additional award of $825 for fees and costs associated with arguing the present Motion. A hearing was held on this matter on March 30, 2000.

Plaintiffs filed their Complaint alleging violations of the Americans with Disabilities Act in July, 1999. Plaintiffs alleged that a hotel owned by Defendant contained architectural barriers that unlawfully limited Plaintiffs' use of the property in violation of the ADA. On December 8, 1999, the parties entered into a settlement agreement which provided that, subject to various time limitations, certain structural changes would be made to the property in order to bring it into compliance with the ADA. Shortly thereafter, Plaintiffs filed the present Motion.

In order for a party to collect attorney's fees under 42 U.S.C. § 1988 and 42 U.S.C. 12205, a party must show: (1) that it has prevailed; and (2) that its fee request is reasonable. See Farrar v. Hobby, 506 U.S. 103, 109-114 (1992). Defendant argues that Plaintiffs are not prevailing parties. Specifically,

EXHIBIT
13

Defendant contends that it had already undertaken the process of making most of relevant changes prior to the filing of Plaintiffs' lawsuit, and that its decision to settle the case was gratuitous. The Court disagrees. A comparison of the renovations Defendant initially planned to undertake with those actually undertaken pursuant to the settlement agreement leads the Court to the conclusion that Plaintiffs obtained a significant result in this case, and thus, are entitled to prevailing party status. The Court finds that $275 is a reasonable hourly rate, and that Plaintiffs' time should be reduced by one hour, to reflect a deletion of charges for matters involving assessment of fees and costs. The Court otherwise finds that all remaining requested charges are reasonable and necessary in light of the results obtained. Based upon the forgoing, and as Defendant has stipulated to the reasonableness of Plaintiffs' requested hourly rate, Plaintiffs' expert witness expense, and Plaintiffs' other claimed costs, it is hereby

ORDERED that Plaintiffs' Verified Application for Attorney's Fees and Costs [DE#14] is GRANTED. The Court awards Plaintiffs a grand total of $6,737.28, representing $3,382.50 in attorneys' fees, $2,000 in expert fees, $529.78 in costs, and $825 in additional fees and costs incurred in preparing for and arguing the present Motion. Defendant shall pay said amount to Plaintiffs within ten (10) days from the date of this Order.

DONE AND ORDERED in Chambers at Miami, Florida this 30th day of March, 2000.

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE

Copies supplied to:
Judge Highsmith
Counsel of record

2

3732 NW 23 Manor
Coconut Creek, FL 33066
E-mail pwb1966@bellsouth.net

Phone 954-942-1882
Cellular 954-260-4588
Fax 954-781-1282

# Pablo Baez

| | |
|---|---|
| **Summary of qualifications** | Accessibility Inspector / Plans Examiner<br>Certificate Number 5254782-21 |
| **Professional experience** | |

| | |
|---|---|
| 1985 -1987 | New York Life Insurance Co., New York, NY<br>Data Distribution Clerk |
| 1987 -1989 | New York Life Insurance Co., New York, NY<br>Computer Operator |
| 1989-1994 | Xerox Corp., Miami, FL<br>Customer Support Representative |
| 1994-1997 | Xerox Corp., Miami, FL<br>Account Support Representative |
| 1997-2004 | Legal Guardian / Caregiver of Mario Baez an incapicated person suffering from Cerebral Palsy. Provided therapy, homecare, transportation and handled day-to-day matters. Observed, first-hand, architectural barriers when traveling. |
| 2004-2005 | Access-Ability Inc., Pompano Beach, FL<br>ADA accessibility apprenticeship |
| 2005 | Accessibility Inspector / Plans Examiner Certification |
| 2005 - | Access-Ability Inc., Pompano Beach, FL<br>Accessibility Inspector / Plans Examiner, ADA Consultant |
| 2005 - | Herbert Neff & Associates<br>Accessibility Inspector / Plans Examiner, ADA consultant |



EXHIBIT
14

**Notable Inspections**
**ADA Compliance Reports**

Amsterdam Court Hotel, New York, NY - Plaintiff's Expert

Ameritania Hotel, New York, NY - Plaintiff's Expert

The Atlantic Hotel, Ft. Lauderdale, FL – Plaintiff's Expert

Quality Inn & Suites, Sebring, FL - Plaintiff's Expert

Quality Inn, Atlantic City, NJ - Plaintiff's Expert

Ramada Plaza, Pleasantville, NJ - Plaintiff's Expert

Courtyard by Marriott, Woburn, MA – Plaintiff's Expert

Miami Subs, Davie FL – ADA Consultant

Vordermeier Mgmt. Co., Fort Lauderdale, FL – Defendant's Expert

Royal Country Mobile Home Park, Miami, FL – ADA Consultant

**Languages**

English, Spanish

)                                    )

# ACCESS-ABILITY, INC.

*610 E. Sample Road, Pompano Beach, FL 33064*
*VOICE: (954) 942-1882  FAX: (954) 781-1282*
*CGC#: 051895  FED ID#: 650386560*
*www.access-ability.com*

September 15, 2004

Fuller, Fuller & Associates
12000 Biscayne Blvd
North Miami, Fl. 33181

Re:  Holiday Inn
     711 Dwight Street
     Springfield, MA 01104

Dear Mr. Fuller,

Access 4 All, Inc. has requested that an investigative report on ADA violations for the above-referenced property be sent to you.  Obvious areas of non-compliance exist.  We observed and noted the following:

## Parking

1.      In this parking area, there are an insufficient number of spaces designated for disabled use, violating Sections 4.1.2 and 4.6.1 of the ADAAG.

2.      The disabled use spaces do not have clear and level access aisles provided, violating Sections 4.1.2 and 4.6.3 of the ADAAG.

3.      There is no accessible route from the parking areas to the facility, in violation of Sections 4.3.2, 4.6.2 and 4.6.3 of the ADAAG.

4.      There are no signs designating the disabled use spaces, in violation of Section 4.6.4 of the ADAAG.

5.      The ramps provided from the parking areas to the facility have slopes, side-slopes and/or cross-slopes in excess of the limits prescribed in Section 4.8 of the ADAAG.

6.      The accessible parking spaces are improperly dispersed and marked as per US Code 23, Section 109D (striped in white and prominently outlined in blue), and in violation of Section 4.6.2 of the ADAAG.

EXHIBIT
15
tabbies

*2*

**Entrance Access and Path of Travel**

7.    There are ramps at the facility that do not have level landings and/or contain excessive slopes, side slopes or cross slopes in violation of Sections 4.8.2, 4.8.4 and 4.8.6 of the ADAAG.

8.    There are rises at the thresholds of entrances at the facility in excess of ¾ of an inch, violating Sections 4.5.2 and 4.13.8 of the ADAAG.

9.    There are interior doors at several of the building with excessive force required for opening at the facility, in violation of Section 4.13.11 of the ADAAG.

10.    There are stairs provided at the facility that do not comply with the standards prescribed in Section 4.9 of the ADAAG.

11.    There are elevators provided at the facility that do not comply with the standards prescribed in Section 4.10 of the ADAAG.

**Access to Goods and Services**

12.    There are protruding objects present throughout the facility, in violation of Section 4.4 of the ADAAG.

13.    Several public telephones throughout the facility do not provide the prescribed volume control device and/or clear floor space for disabled patrons, in violation of Sections 4.31.1 and 4.31.2 of the ADAAG.

14.    There are counters throughout the facility in excess of 36", in violation of Section 7.2(1) of the ADAAG.

**Accessible Guest Rooms**

15.    The rooms designated for disabled use do not provide a 36-inch clear floor space
on            both sides of the bed in violation of Section 9 of the ADAAG.

16.    The bed(s) provided are not on above ground frames as required in Section 9 of the ADAAG.

17.    There are areas for storage provided without the clear floor space prescribed in Sections 4.2 and 9 of the ADAAG.

*2*

*3*

18.     The rooms for disabled use provide elements with controls/dispensers outside of the required ranges violating Sections 4.2 of the ADAAG.

19.     The rooms for disabled use are not equipped with proper door hardware violating Sections 4.13.9 and 9 of the ADAAG.

20.     There are an insufficient amount of compliant disabled guest rooms available violating several sections of the ADAAG.

21.     The rooms designated for disabled use do not provide a roll-in shower for use by the
        disabled, violating Section 9 of the ADAAG.

**Indoor Pool**

22.     There is no water access for a wheelchair user in violation of Section 9.1.1 of the ADAAG

**Outdoor Pool**

23.     There is no water access for a wheelchair user in violation of Section 9.1.1 of the ADAAG

24.     The gate to gain entry to the pool area is not operable with a closed fist in violation of Section 4.13.9 of the ADAAG.

A more detailed follow up report should be performed in the presence of the property owner or manager.  There may be other violations of the Americans with Disabilities Act that may be revealed in said inspection.





EXHIBIT

15















































# ACCESS-ABILITY, INC.

610 E. Sample Road, Pompano Beach, FL  33064
VOICE: (954) 942-1882  FAX: (954) 781-1282
CGC#: 051895  FED ID#: 650386560
www.access-ability.com

August 11, 2005
Fuller, Fuller & Associates
12000 Biscayne Blvd
North Miami, FL  33181

Re:    Holiday Inn
711 Dwight Street
Springfield, MA 01104

On Friday, August 5, 2005, an ADA (Americans with Disabilities Act) compliance inspection was conducted at the Holiday Inn hotel in Springfield, Massachusetts. In attendance, plaintiff's expert Pablo Baez and plaintiff's attorney John Fuller. Representatives for the property included Michael C. Harrington of Murtha Cullina LLP and Andy Taymans.

## Applicable ADAAG Standard

The Holiday Inn hotel in Springfield, Massachusetts is an existing facility as defined in the Department of Justice's ADA Title III Regulation 28 CFR Part 36 Sec. 36.401. This facility is covered by the Department of Justice's ADA Title III Regulation 28 CFR Part 36 Section 36.304 governing the removal of architectural barriers in existing facilities. Being an existing facility does not exempt the hotel from barrier removal requirements under the ADAAG (Americans with Disabilities Act Accessibility Guidelines). Barrier removal must be strictly adhered to in order to promulgate a "barrier free society".

## Sec. 36.304 Removal of barriers.

(a) General. A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense.

(b) Examples of steps to remove barriers include, but are not limited to, the following actions --

(1) Installing ramps;

(2) Making curb cuts in sidewalks and entrances;



EXHIBIT
15

(3) Repositioning shelves;

(4) Rearranging tables, chairs, vending machines, display racks, and other furniture;

(5) Repositioning telephones;

(6) Adding raised markings on elevator control buttons;

(7) Installing flashing alarm lights;

(8) Widening doors;

(9) Installing offset hinges to widen doorways;

(10) Eliminating a turnstile or providing an alternative accessible path;

(11) Installing accessible door hardware;

(12) Installing grab bars in toilet stalls;

(13) Rearranging toilet partitions to increase maneuvering space;

(14) Insulating lavatory pipes under sinks to prevent burns;

(15) Installing a raised toilet seat;

(16) Installing a full-length bathroom mirror;

(17) Repositioning the paper towel dispenser in a bathroom;

(18) Creating designated accessible parking spaces;

(19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain;

(20) Removing high pile, low density carpeting; or

(21) Installing vehicle hand controls.

(c) Priorities. A public accommodation is urged to take measures to comply with the barrier removal requirements of this section in accordance with the following order of priorities.

(1) First, a public accommodation should take measures to provide access to a place of public accommodation from public sidewalks, parking, or public transportation. These

measures include, for example, installing an entrance ramp, widening entrances, and providing accessible parking spaces.

(2) Second, a public accommodation should take measures to provide access to those areas of a place of public accommodation where goods and services are made available to the public. These measures include, for example, adjusting the layout of display racks, rearranging tables, providing Brailled and raised character signage, widening doors, providing visual alarms, and installing ramps.

(3) Third, a public accommodation should take measures to provide access to restroom facilities. These measures include, for example, removal of obstructing furniture or vending machines, widening of doors, installation of ramps, providing accessible signage, widening of toilet stalls, and installation of grab bars.

(4) Fourth, a public accommodation should take any other measures necessary to provide access to the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.

Two tax incentives are available to businesses to help cover the cost of making access improvements. The first is a tax credit which can be used for architectural adaptations, equipment acquisitions, and services such as sign language interpreters. The second is a tax deduction which can be used for architectural or transportation adaptations. Consult with your tax advisor.

## Tax Credit

The tax credit, established under Section 44 of the Internal Revenue Code, was created in 1990 specifically to help small businesses cover ADA-related eligible access expenditures. A business that for the previous tax year had either revenues of $1,000,000 or less or 30 or fewer full-time workers may take advantage of this credit. The credit can be used to cover a variety of expenditures, including:

- provision of readers for customers or employees with visual disabilities
- provision of sign language interpreters
- purchase of adaptive equipment
- production of accessible formats of printed materials (i.e., Braille, large print, audio tape, computer diskette)
- removal of architectural barriers in facilities or vehicles (alterations must comply with applicable accessibility standards)
- fees for consulting services (under certain circumstances)

Note that the credit cannot be used for the costs of new construction. It can be used only for adaptations to existing facilities that are required to comply with the ADA.

The amount of the tax credit is equal to 50% of the eligible access expenditures in a year, up to a maximum expenditure of $10,250. There is no credit for the first $250 of expenditures. The maximum tax credit, therefore, is $5,000.

## Tax Deduction

The tax deduction, established under Section 190 of the Internal Revenue Code, is now a maximum of $15,000 per year a reduction from the $35,000 that was available through December 31, 1990. A business (including active ownership of an apartment building) of any size may use this deduction for the removal of architectural or transportation barriers. The renovations under Section 190 must comply with applicable accessibility standards.

Small businesses can use these incentives in combination if the expenditures incurred qualify under both Section 44 and Section 190. For example, a small business that spends $20,000 for access adaptations may take a tax credit of $5000 (based on $10,250 of expenditures), and a deduction of $15,000. The deduction is equal to the difference between the total expenditures and the amount of the credit claimed.

**Example:** A small business' use of both tax credit and tax deduction

$20,000 cost of access improvements (rest room, ramp, 3 doors widened)

- $5,000 maximum credit

$15,000 remaining for deduction

(NOTE: A tax credit is subtracted from your tax liability after you calculate your taxes, while a tax deduction is subtracted from your total income before taxes, to establish your taxable income.)

This report was prepared following a rule 34 inspection and is organized in the following manner;

1. **Black** is the text of the area inspected and the corresponding ADAAG section violated.
2. ***Red and Black italics*** denote the ADAAG section cited as not compliant followed with pictures showing the violation.
3. ***Blue*** denotes the suggested recommended action in order to correct the violation.
4. **Green** denotes policy and procedure recommendations.

The facility currently contains barriers to access, which we have noted in the following areas:

## I. PARKING AND PASSENGER LOADING ZONE

There are 270 parking spaces. 7 parking spaces are required to be designated as accessible with at least 1 of these required to be designated as "van accessible".

    A.    There are 5 designated accessible spaces. There are an insufficient amount of accessible parking spaces violating sections 4.1.2(5)(a) and 4.6.1 of the ADAAG.

    B.    The signage designating accessible parking spaces is not posted at a sufficient height violating section 4.6.4 of the ADAAG.

    C.    There is no signage designating a "van accessible" parking space violating sections 4.1.2(5)(b) and 4.6.4 of the ADAAG.

    D.    There are designated accessible parking spaces which are not properly marked and without access aisles violating section 4.6.3 of the ADAAG. There are obstructions (posted sign, benches) in the path of an access aisle violating section 4.6.3 of the ADAAG. There is a parking space, with a sign on a post designating it as an accessible parking space, which has no access aisle and is not properly marked also violating section 4.6.3 of the ADAAG.



*ADAAG Section 4.1.2(5)(a) If parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with 4.6 shall be provided in each such parking area in conformance with the table below. Spaces required by the table need not be provided in the particular lot. They may be provided in a different location if*

*equivalent or greater accessibility, in terms of distance from an accessible entrance, cost and convenience is ensured.*

| Total Parking in Lot | Required Minimum Number of Accessible Spaces |
|:---:|:---:|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| *201 to 300* | 7 |

*Except as provided in (b), access aisles adjacent to accessible spaces shall be 60 in (1525 mm) wide minimum.*

*ADAAG Section 4.1.2(5)(b) One in every eight accessible spaces, but not less than one, shall be served by an access aisle 96 in (2440 mm) wide minimum and shall be designated "van accessible" as required by 4.6.4. The vertical clearance at such spaces shall comply with 4.6.5. All such spaces may be grouped on one level of a parking structure.*

*ADAAG Section 4.6.1 Minimum Number. Parking spaces required to be accessible by 4.1 shall comply with 4.6.2 through 4.6.5. Passenger loading zones required to be accessible by 4.1 shall comply with 4.6.5 and 4.6.6.*

*ADAAG Section 4.6.3 Parking Spaces. Accessible parking spaces shall be at least 96 in (2440 mm) wide. Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. Two accessible parking spaces may share a common access aisle (see Fig. 9). Parked vehicle overhangs shall not reduce the clear width of an accessible route. Parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions.*



**Figure 9**
**Dimensions of Parking Spaces**

The access aisle shall be a minimum of 60 inches (1525 mm) wide for cars or a minimum of 96 inches (2440 mm) wide for vans. The accessible route connected to the access aisle at the front of the parking spaces shall be a minimum of 36 inches (915 mm).

*ADAAG Section 4.6.4 Signage. Accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility (see 4.30.7). Spaces complying with 4.1.2(5)(b) shall have an additional sign "Van-Accessible" mounted below the symbol of accessibility. Such signs shall be located so they cannot be obscured by a vehicle parked in the space.*

**Recommendations**

Seven (7) accessible parking spaces are required, one (1) of these is required to be designated as "van accessible". The existing designated accessible spaces need to be re-striped. The posted sign at the stand-alone designated accessible parking space



on the east side of the facility should be removed since it is not striped and has no access aisle. Since there is an insufficient amount of accessible parking spaces a solution would be to maintain the 2 existing parking spaces nearest to the east entrance. These spaces should be re-striped with a shared access aisle between them. Neither signage nor any other obstruction should be in the path from the access aisle toward the east entrance door. The remaining 5 accessible parking spaces, including the van accessible space, should be striped in the parking area closest to the main entrance. Provide an adjacent access aisle for each parking space that is at least 60 inches wide.

Ensure that the van accessible space is a minimum of 96 inches wide and served by an access aisle at least 96 inches wide. At the van accessible space, provide an additional "Van-Accessible" sign located below the International Symbol of Accessibility. The "Van-Accessible" designation is meant to be informative, not restrictive, in the use of van spaces. Signage at a height of at least 60 inches (measured to the bottom edge) is generally advisable (taking care not to make the sign a protruding object), although a higher height is better for signs at van spaces.

Ensure that all spaces and access aisles for persons with disabilities are flat and level, with slopes and cross-slopes not exceeding 1:50 in all. The access aisles should lead to a crosswalk which should then lead to a curb cut located at the end of the passenger loading zone.



ADAAG specifies the sign content and symbol/field contrast (light-on-dark or dark-on-light), but not the color or size, which may be addressed by local jurisdictions. Additional signage can clarify this, which may be important in lots with only one accessible space since that space must be a van space.

The method and color of striping is not specified in ADAAG but may be addressed by local code. Access symbols on the parking surface, sometimes required locally, are obscured by vehicles parked in the space and cannot substitute for post- or wall-mounted signage. Since van access aisles can be as wide as spaces, it is important that they be clearly marked (diagonal striping is often used). Bollards or other barriers can help prevent misuse of the aisle as a space provided that they do not obstruct the connecting accessible route.

An essential consideration for any design is having the access aisle level with the parking space. Since a person with a disability, using a lift or ramp, must maneuver within the access aisle, the aisle cannot include a ramp or sloped area. The access aisle must be connected to an accessible route to the appropriate accessible entrance of a building or facility. The parking access aisle must either blend with the accessible route or have a curb ramp complying with 4.7. Such a curb ramp opening must be located within the access aisle boundaries, not within the parking space boundaries. Also, the required dimensions of the access aisle cannot be restricted by planters, curbs or wheel stops. Connecting accessible routes should be configured so that people using wheelchairs, which may not be as visible to drivers backing out of spaces, do not have to travel behind other vehicles.

## II.  EXTERIOR ACCESSIBLE ROUTES

A.  There are 2 curb ramps located adjacent to the pool and the east side parking spaces. The slopes and cross slopes of these curb ramps are in excess of the requirements in sections 4.7.2 and 4.8.2 of the ADAAG. These curb ramps and the curb ramp located at the area of the passenger loading zone, near the front entrance, are chipped and lack a smooth transition from the street to the sidewalk violating sections 4.7.4 and 4.5.1 of the ADAAG.

B.  The ramps lack detectable warnings violating section 4.7.7 of the ADAAG.

8



C.  Both sets of doors at the east side entrance have hardware which is not easy to open with a closed fist violating section 4.13.9 of the ADAAG. Neither set of double-leaf doors provide the required 32 inches of clear width when opened violating sections 4.13.4 and 4.13.5 of the ADAAG.



*ADAAG Section 4.7 Curb Ramps.*

*4.7.1 Location. Curb ramps complying with 4.7 shall be provided wherever an accessible route crosses a curb.*

*4.7.2 Slope. Slopes of curb ramps shall comply with 4.8.2. Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes. Maximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20.*

*4.7.4 Surface. Surfaces of curb ramps shall comply with 4.5*

*4.7.7 Detectable Warnings. A curb ramp shall have a detectable warning complying with 4.29.2. The detectable warning shall extend the full width and depth of the curb ramp.*

*ADAAG Section 4.5.1 General. Ground and floor surfaces along accessible routes and in accessible rooms and spaces including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, slip-resistant, and shall comply with 4.5.*



| | **Figure 12(a)**<br>**Sides of Curb Ramps**<br>**Flared Sides** |
|---|---|
| | *Note: If X is less than 48 inches, then the slope of the flared side shall not exceed 1:12.* |
| | This figure shows a typical curb ramp, cut into a walkway perpendicular to the curb face, with flared sides having a maximum slope of 1:10. The landing at the top, measured from the top of the ramp to the edge of the walkway or closest obstruction is denoted as "x". If x, the landing depth at the top of a curb ramp, is less than 48 inches, then the slope of the flared side shall not exceed 1:12. |
| | **Figure 12(b)**<br>**Sides of Curb Ramps**<br>**Returned Curb** |
| | Where the curb ramp is completely contained within a planting strip or other non-walking surface, so that pedestrians would not normally cross the sides, the curb ramp sides can have steep sides including vertical returned curbs. |

*ADAAG Section 4.13 Doors.*

*4.13.1 General. Doors required to be accessible by 4.1 shall comply with the requirements of 4.13.*

*4.13.4 Double-Leaf Doorways. If doorways have two independently operated door leaves, then at least one leaf shall meet the specifications in 4.13.5 and 4.13.6. That leaf shall be an active leaf.*

*4.13.5 Clear Width. Doorways shall have a minimum clear opening of 32 in (815 mm) with the door open 90 degrees, measured between the face of the door and the opposite stop (see Fig. 24, (b), (c), and (d)). Openings more than 24 in (610 mm) in depth shall comply with 4.2.1 and 4.3.3).*



| **Figure 24a**<br>**Clear Doorway Width and Depth**<br>**Detail** | **Figure 24b**<br>**Clear Doorway Width and Depth**<br>**Hinged Door** |
|---|---|



| Figure 24c | Figure 24d |
|---|---|
| Clear Doorway Width and Depth Sliding Door | Clear Doorway Width and Depth Folding Door |

*4.13.9 Door Hardware. Handles, pulls, latches, locks, and other operating devices on accessible doors shall have a shape that is easy to grasp with one hand and does not require tight grasping, tight pinching, or twisting of the wrist to operate. Lever-operated mechanisms, push-type mechanisms, and U-shaped handles are acceptable designs. When sliding doors are fully open, operating hardware shall be exposed and usable from both sides. Hardware required for accessible door passage shall be mounted no higher than 48 in (1220 mm) above finished floor.*

*4.13.12 Automatic Doors and Power-Assisted Doors. If an automatic door is used, then it shall comply with ANSI/BHMA A156.10-1985. Slowly opening, low-powered, automatic doors shall comply with ANSI A156.19-1984. Such doors shall not open to back check faster than 3 seconds and shall require no more than 15 lbf (66.6N) to stop door movement. If a power-assisted door is used, its door-opening force shall comply with 4.13.11 and its closing shall conform to the requirements in ANSI A156.19-1984.*

**Recommendations**

*1. Provide signage at the curb ramps located adjacent to the pool and the east side parking spaces stating that they are "Not Intended for Disabled Use" or repair them in accordance with sections 4.5, 4.7 and 4.8 of the ADAAG. The ramp located near the main entrance needs to be repaired in order to comply with sections 4.5, 4.7 and 4.8 of the ADAAG (this includes detectable warnings). This ramp must also connect to the accessible route with the "crosswalk" leading to the access aisles of the newly striped accessible parking spaces.*

*The running slope of curb ramps cannot exceed 1:12. In alterations where it is technically infeasible to meet new construction requirements, curb ramps may have a maximum slope of 1:10 if the rise does not exceed 6 inches. It is important that transitions to curb ramps be flush. Lips at the bottom of ramps, a common complaint, impede the momentum needed to propel a wheelchair up-slope. Severe counter slopes can do the same thing and cause footrests to scrape. While a 5% adjoining slope is allowed for drainage, gutters, and roadway crowns, this slope should be minimized wherever possible (a maximum 2% slope is preferred).*

*The minimum clear width of a curb ramp is 36 inches, exclusive of flared sides. Curb ramp surfaces, including flared sides, must comply with requirements in 4.5 for ground and floor surfaces be "stable, firm, and slip resistant." The cross-slope of the curb*

ramp (2% maximum) must be minimized because it makes wheelchair travel difficult by distributing weight and required force to one side and causing front casters to veer. Where pedestrians cross the ramp, curb cuts are required to have side flares; sharp returns present tripping hazards.

The edges of curbs can provide a cue to people with vision impairments. Since curb ramps remove this detectable drop-off, ADAAG requires a distinctive dome patterning for the surface of curb ramps detectable by canes or by foot so that people with vision impairments could detect the transition from pedestrian area to street.

It is important that parked cars, lampposts, utility poles, and other elements placed along sidewalks not obstruct connecting accessible routes. Space is needed at the top and bottom of ramps so that people using wheelchairs can align with the running slope and maneuver from ramps, including when making turns (which is difficult on sloped surfaces). At curb ramps, a landing provides the necessary connection to an accessible route. A landing with a minimum length of 48 inches will provide sufficient turning space. Where space at the top is less than 48 inches, side flares must have a maximum slope of 1:12 instead of 1:10 at the curb face.

The cross slope (2% maximum) must be minimized because it makes wheelchair travel difficult by distributing more weight and required force to one side and causing front casters to veer. Ramp surfaces must comply with requirements for ground and floor surfaces in 4.5 and be "stable, firm, and slip-resistant." A specific level of slip-resistance is not mandated. It is difficult to categorize various materials as acceptable or unacceptable since surface treatments (texturing and applied coatings) can make a considerable difference. It is important that consideration be given to the conditions likely to be found on the surface, such as providing a higher level of slip-resistance on surfaces exposed to moisture. Cross slopes on walks and ground or floor surfaces can cause considerable difficulty in propelling a wheelchair in a straight line.

People who have difficulty walking or maintaining balance or who use crutches, canes, or walkers, and those with restricted gaits are particularly sensitive to slipping and tripping hazards. For such people, a stable and regular surface is necessary for safe walking, particularly on stairs. Wheelchairs can be propelled most easily on surfaces that are hard, stable, and regular. Soft loose surfaces such as shag carpet, loose sand or gravel, wet clay, and irregular surfaces such as cobblestones can significantly impede wheelchair movement.

2. A solution to the problem of a lack of clear width and non-compliant door hardware at the sets of doors at the east side entrance is to replace them with automatic doors.

The clear width of the opening is measured from the face of the door in a 90 degrees open position to the opposite stop. Panic bars and other hardware do not require additional width since they are usually mounted above the widest portion of wheelchairs. In alterations, a projection up to 5/8 inch is permitted for the latch-side stop where it would otherwise be necessary to widen a door. Swing-away or offset

*hinges can provide additional clearance.*

*Hardware used to operate doors, including handles, pulls, latches and locks, must have a shape that is "easy to grasp with one hand" and does not require tight grasping or pinching, or twisting of the wrist to operate (i.e., no round knobs). Various types of hardware are acceptable although those that can be operated with a closed fist (levers, push bars) or a loose grip (D-pull handles) accommodate the broadest range of users. Thumb turns, which are operated with simultaneous hand and finger movement, require a high degree of dexterity and coordination and are not recommended.*

*Fully automatic doors, which produce the most force, are usually activated through control mats or sensory devices and are often used in facilities with heavy traffic such as airport terminals and grocery stores where people may be traveling with luggage or shopping carts. Low-powered doors are typically used at entries with lower levels of traffic to provide an alternative to manual doors, including revolving doors, in the same location. Most operate slowly, allow manual opening, and are often activated by a push button or plate. Devices that can be reactivated before the closing cycle is completed are recommended where traffic may be high. Power-assisted doors facilitate door opening by reducing the resistance force of closers.*

## III. INTERIOR RAMPS

A. The ramp which leads toward Zaffino's Lounge on the 12th floor violates several provisions under the ADAAG. The slope is 9.4 % which violates sections 4.3.2(2), 4.3.7 and 4.8.2 of the ADAAG. The handrails are not continuous. They do not extend at least 12 in beyond the top and bottom of the ramp segment and they are not found on both sides of the ramp violating section 4.8.5 of the ADAAG.

  

 

***ADAAG Section 4.8 Ramps.***

*4.8.1 General. Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp and shall comply with 4.8.*

*4.8.2 Slope and Rise. **The least possible slope shall be used for any ramp. The maximum slope of a ramp in new construction shall be 1:12. The maximum rise for any run shall be 30 in (760 mm) (see Fig. 16). Curb ramps and ramps to be constructed on existing sites or in existing buildings or facilities may have slopes and rises as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 slope or less.***



**Figure 16**
**Components of a Single Ramp Run and Sample Ramp Dimensions**

If the slope of a ramp is between 1:12 and 1:16, the maximum rise shall be 30 inches (760 mm) and the maximum horizontal run shall be 30 feet (9 m). If the slope of the ramp is between 1:16 and 1:20, the maximum rise shall be 30 inches (760 mm) and the maximum horizontal run shall be 40 feet (12 m).

*4.8.4 Landings. Ramps shall have level landings at bottom and top of each ramp and each ramp run. Landings shall have the following features:*

*(1) The landing shall be at least as wide as the ramp run leading to it.*

*(2) The landing length shall be a minimum of 60 in (1525 mm) clear.*

*(3) If ramps change direction at landings, the minimum landing size shall be 60 in by 60 in (1525 mm by 1525 mm).*

*(4) If a doorway is located at a landing, then the area in front of the doorway shall comply with 4.13.6*

*4.8.5 Handrails. **If a ramp run has a rise greater than 6 in (150 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides. Handrails are not required on curb ramps or adjacent to seating in assembly areas. Handrails shall comply with 4.26 and shall have the following features:***

*(1) **Handrails shall be provided along both sides of ramp segments. The inside handrail on switchback or dogleg ramps shall always be continuous.***

*(2) **If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface (see Fig. 17).***



(3) The clear space between the handrail and the wall shall be 1 - 1/2 in (38 mm).

(4) Gripping surfaces shall be continuous.

(5) Top of handrail gripping surfaces shall be mounted between 34 in and 38 in (865 mm and 965 mm) above ramp surfaces.

(6) **Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.**

(7) Handrails shall not rotate within their fittings.

*ADAAG Section 4.3 Accessible Route.*

*4.3.2 Location.*

(2) At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site.

*4.3.7 Slope. An accessible route with a running slope greater than 1:20 is a ramp and shall comply with 4.8. Nowhere shall the cross slope of an accessible route exceed 1:50.*

**Recommendations**

*Provide a ramp with at least 36 inches clear width between handrails, with a slope not exceeding 1:12 and a cross slope not exceeding 1:50; with level landings at least as wide as the ramp and 60 inches long at the top and bottom of the ramp; and with edge protection at least 2 inches high at the drop off sides. Level landings are essential toward maintaining an aggregate slope that complies with these guidelines. A ramp landing that is not level causes individuals using wheelchairs to tip backward or bottom out when the ramp is approached. Provide handrails that are between 1¼ inches and 1½ inches in diameter with a continuous gripping surface along both sides of the ramp, extending at least 12 inches beyond the top and bottom of the ramp parallel with the ground surface. Ensure that handrails are mounted between 34 inches and 38 inches above the ramp surface, with ends rounded or returned smoothly to the floor, wall, or post, and that they do not rotate within their fittings. Ensure that the ramp and approaches are designed so that water will not accumulate on walking surfaces.*

*A maximum slope of 1:12 is specified although ADAAG calls for the "least possible" slope to encourage more gradual slopes which better serve children and people with limited stamina or upper body strength. A recent study by the Access Board ("Technical Requirements for Ramps" (1996) by the Center for Accessible Housing) indicates a significant increase in exertion occurs on ramps with slopes 1:14 or steeper. Consider slopes between 1:16 and 1:20 as preferred, especially at ramps with long runs. The slope should be consistent along the full length of the run. Variation above regular construction tolerances can be disruptive to wheelchair travel, especially in the ascent direction.*

## IV. ACCESSIBLE PUBLIC RESTROOMS

A.  The designated accessible restrooms have a number of ADAAG violations. There is restroom signage which is not located on the wall adjacent to the latch side of the door, mounted 60 inches above the finish floor to the centerline of the sign, violating section 4.30.6 of the ADAAG. There are lavatories which do not provide sufficient knee clearance violating section 4.19.2 of the ADAAG. There are water closets which lack proper grab bar placement and/or have the flush control on the short side toward the side wall violating sections 4.16.4 and 4.16.5 of the ADAAG. There are dispensers which are not at the location required under 4.16.6 and figure 29(b) of the ADAAG. The water closet in the men's restroom, near Zaffino's has the centerline at 17 inches from the side wall. The centerline is required to be an absolute 18 inches from the side wall as required in section 4.17.3 and as shown in figure 30a of the ADAAG. There are toilet stall doors which do not self-close properly violating section 4.13.10 of the ADAAG. The door to the Men's restroom near Zaffino's does not provide the required latch-side clearance violating section 4.13.6 of the ADAAG.



**ADAAG Section 4.30** *Signage.*

*4.30.1 General. Signage required to be accessible by 4.1 shall comply with the applicable provisions of 4.30.*

*4.30.2 Character Proportion. Letters and numbers on signs shall have a width-to-height ratio between 3:5 and 1:1 and a stroke-width-to-height ratio between 1:5 and 1:10.*

*4.30.3 Character Height. Characters and numbers on signs shall be sized according to the viewing distance from which they are to be read. The minimum height is measured using an upper case X. Lower case characters are permitted.*

*4.30.4 Raised and Brailled Characters and Pictorial Symbol Signs (Pictograms). Letters and numerals shall be raised 1/32 in (0.8 mm) minimum, upper case, sans serif or simple serif type and shall be accompanied with Grade 2 Braille. Raised characters shall be at least 5/8 in (16 mm) high, but no higher than 2 in (50 mm). Pictograms shall be accompanied by the equivalent verbal description placed directly below the pictogram. The border dimension of the pictogram shall be 6 in (152 mm) minimum in height.*

*4.30.5 Finish and Contrast. The characters and background of signs shall be eggshell, matte, or other non-glare finish. Characters and symbols shall contrast with their background -- either light characters on a dark background or dark characters on a light background.*

**4.30.6 Mounting Location and Height. Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in (1525 mm) above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in (76 mm) of signage without encountering protruding objects or standing within the swing of a door.**

*4.30.7 Symbols of Accessibility.*

**(1) Facilities and elements required to be identified as accessible by 4.1 shall use the international symbol of accessibility. The symbol shall be displayed as shown in Fig. 43(a) and (b).**



Figure 43a
International Symbol of Accessibility
Proportions

The diagram illustrates the International Symbol of Accessibility on a grid background

Figure 43b
International Symbol of Accessibility
Display Conditions

The symbol contrast shall be light on dark, or dark on light.

**ADAAG Section 4.19.2 Height and Clearances. Lavatories shall be mounted with the rim or counter surface no higher than 34 in (865 mm) above the finish floor. Provide a**

*clearance of at least 29 in (735 mm) above the finish floor to the bottom of the apron. Knee and toe clearance shall comply with Fig. 31.*

***ADAAG section 4.16 Water Closets.***

***4.16.1 General.*** *Accessible water closets shall comply with 4.16.2 through 4.16.6.*

***4.16.2 Clear Floor Space.*** *Clear floor space for water closets not in stalls shall comply with Fig. 28. Clear floor space may be arranged to allow either a left-handed or right-handed approach.*

***4.16.3 Height.*** *The height of water closets shall be 17 in to 19 in (430 mm to 485 mm), measured to the top of the toilet seat (see Fig. 29(b)). Seats shall not be sprung to return to a lifted position.*

***4.16.4 Grab Bars.*** *Grab bars for water closets not located in stalls shall comply with 4.26 and Fig. 29.* ***The grab bar behind the water closet shall be 36 in (915 mm) minimum.***

***4.16.5 Flush Controls.*** *Flush controls shall be hand operated or automatic and shall comply with 4.27.4.* ***Controls for flush valves shall be mounted on the wide side of toilet areas no more than 44 in (1120 mm) above the floor.***

***4.16.6 Dispensers.*** *Toilet paper dispensers shall be installed within reach, as shown in Fig. 29(b). Dispensers that control delivery, or that do not permit continuous paper flow, shall not be used.*



***ADAAG Section 4.17.3*** *Size and Arrangement.* ***The size and arrangement of the standard toilet stall shall comply with Fig. 30(a), Standard Stall.*** *Standard toilet stalls with a minimum depth of 56 in (1420 mm) (see Fig. 30(a)) shall have wall-mounted water closets. If the depth of a standard toilet stall is increased at least 3 in (75 mm), then a floor-mounted water closet may be used. Arrangements shown for standard toilet stalls may be reversed to allow either a left- or right-hand approach. Additional stalls shall be provided in conformance with 4.22.4.*

> *EXCEPTION: In instances of alteration work where provision of a standard stall (Fig. 30(a)) is technically infeasible or where plumbing code requirements*

19

*prevent combining existing stalls to provide space, either alternate stall (Fig. 30(b)) may be provided in lieu of the standard stall.*



**Figure 30a
Toilet Stalls
Standard Stall**

The location of the door is illustrated to be in front of the clear space (next to the water closet), with a maximum stile width of 4 inches (100 mm). An alternate door location is illustrated to be on the side of the toilet stall with a maximum stile width of 4 inches (100 mm). The minimum width of the standard stall shall be 60 inches (1525 mm). The centerline of the water closet shall be 18 inches (455 mm) from the side wall.



**Figure 30d
Toilet Stalls**

The side grab bar shall be 40-42 inches in length, beginning 12 inches maximum from the rear wall, 33-36 inches above the finish floor.

***ADAAG Section 4.13.10 Door Closers.** If a door has a closer, then the sweep period of the closer shall be adjusted so that from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 in (75 mm) from the latch, measured to the leading edge of the door.*

***ADAAG Section 4.13.6  Maneuvering Clearances at Doors.** Minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear.*



**Figure 25**
**Maneuvering Clearances at Doors**

*Recommendation:*

*Mount signage for the restrooms on the latch-side of the entrance doors. Placement of tactile signs to the latch-side provides safety since locating signs on doors that swing out is hazardous. It also provides uniformity which makes signs easier to find by people with little or no vision. (This is why tactile signs are not permitted on doors that swing-in). The 60 inch centerline height also provides uniformity as well as convenience in reading signs from a standing position. At signs containing pictograms or other non-tactile information, this should be measured to the centerline of the raised/Braille portion so that it is not too low (or high). Space must be available for a close approach outside the swing of doors. It is important that fixed elements (e.g., drinking fountains) and furnishings not obstruct the approach. The wheelchair maneuvering clearance required on the pull side of doors should allow adequate space. Where adequate wall space is not available on the latch-side, signs are to be placed on the nearest adjacent wall surface. At double doors or entries with no doors, signs can be placed on either side although attention should be paid to predominant traffic patterns and building-wide uniformity.*

*Provide a lavatory with the top of its rim or counter 34 inches or less above the finished floor; the bottom edge of the apron at least 29 inches above the finished floor; and knee and toe clearances that comply with Fig. 31. An apron clearance of at least 29 inches (minimum depth not specified) allows a person using a wheelchair to get as*

21

close as possible to the front of the lavatory. Provide hot water and drain pipes that are insulated or otherwise configured to protect against contact. To prevent burns, hot water pipes and drain pipes under lavatories must be insulated or otherwise configured to protect against contact. Exposed sharp or abrasive edges are prohibited. Foam or fiber insulation with protective overwrap on drain, hot water supply, and sharp edges or commercially available rigid pipe covers will satisfy this requirement. The P-trap may also be installed parallel to the wall so that it is located outside the knee/toe space. If an underlavatory enclosure is used, the specified knee and toe clearances must be maintained.

Provide a flush control mounted on the "open" side of the toilet's clear floor space; 44 inches or less above the finished floor; and requiring a maximum of 5 pounds of force to operate; or provide an automatic flush device. Provide a rear grab bar that is at least 36 inches in overall length, with the closer end no more than 6 inches from the side wall; mounted 33 to 36 inches above the finished floor. Side grab bars, including those that are continuous, must be mounted to extend at least 54 inches from the back wall; mounted 33 to 36 inches above the finished floor. The centerline of the water closet (toilet) should be positioned at an absolute 18 inches from the side wall in order to allow the full use of the grab bar on the side wall. Flush controls are to be on the wide side. Side transfers are possible where space at least 42 inches from the toilet centerline is available. Toilet paper dispensers should be located below the side grab bar so that they do not obstruct use of this bar. For this reason, large dispensers that do not fit below the grab bar should be avoided in accessible toilet rooms or stalls. Dispensers must provide continuous paper flow; those that have separate sheets or that control delivery are prohibited because they require repetitive hand motion and pinching and are not as usable by people with limited use of hands or arms. The manner of approach and transfer to water closets varies among people with disabilities. The type and extent of disability, the configuration of fixtures, and the availability of space alongside water closets often determine the technique used. ADAAG specifications are based on three types of transfer: perpendicular, diagonal, and side, some of which are illustrated in ADAAG Appendix Figure A6.



*Adjust the closers on the restroom stall doors because it may be difficult for a person with a disability to open a door against the resistance offered by a closer, it is important that the closing action be slow enough to allow entry and exit. ADAAG requires that the sweep period of the closer be adjusted so that from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 inches from the latch, measured to the leading edge of the door.*

*A possible solution to the latch-side clearance issue at the entrance to the Men's restroom near Zaffino's is to remove the outer door. Another option is to install a power-door opener.*

## V.  ACCESSIBLE GUEST ROOMS

We were advised that the hotel has 242 guestrooms. This property requires seven (7) accessible rooms with three (3) additional rooms with a roll-in shower. Another seven (7) guestrooms are required to be equipped with visual appliances for people with hearing impairments. Currently, this property has nine (9) rooms designated as accessible, none with a roll-in shower. There is an insufficient amount of guestrooms with roll-in showers violating section 9.1.2 of the ADAAG. All of the accessible rooms were equipped with double beds. Section 9.1.4 of the ADAAG calls for the rooms to be dispersed among the various classes of sleeping accommodations. The rooms lacked notification devices for individuals with hearing impairments violating section 9.1.3 of the ADAAG. Visual notification devices were not provided in the accessible rooms to alert room occupants of incoming telephone calls and a door knock or bell violating sections 9.3.1 and 4.28 of the ADAAG.

We inspected rooms # 317 and # 417. We were instructed that all of the accessible guestrooms are on the same line of rooms and they were all configured in a like manner. Within the designated accessible rooms there are a number of ADAAG violations;

There is insufficient clear floor space in front of the bathtubs violating section 4.20.2 and figure 33 of the ADAAG. The length of the existing sink does not allow for sufficient clear floor space to make a transfer to the tub. An in-tub seat or a seat at the head end of the tub, mounted securely, is not provided violating section 4.20.3 of the ADAAG. Grab bars as required in section 4.20.4 and figure 34 of the ADAAG are not provided. Controls as shown in figure 34 are not provided.

   

  

The grab bars at the water closets (toilets) do not comply with figure 29 violating section 4.16.4 of the ADAAG. There are dispensers which are not at the location required under 4.16.6 and figure 29(b) of the ADAAG.

  

There are elements with controls which require tight pinching or twisting to operate violating sections 4.27.4 of the ADAAG.

  

There are elements which are outside of the minimum reach ranges as required in sections 4.25, 4.2.5 and 4.2.6 of the ADAAG.

   

The doors exiting the accessible rooms do not provide the required latch-side clearance violating section 4.13.6 of the ADAAG.



The clothes racks near the doors are protruding objects violating section 4.4.1 of the ADAAG.



There are tables which do not provide sufficient knee clearance violating section 4.32.3 of the ADAAG.



There are elements (lamps, A/C, etc) within the accessible guestrooms which are blocked by furniture violating sections 9.2.2(2) and 4.3.2(2) of the ADAAG.



There are alarms within the accessible guestrooms which are not placed 80 inches above the highest floor level within the space or 6 inches below the ceiling, whichever is lower violating section 4.28.3(6) of the ADAAG.



The ADAAG guideline for hotels is as follows:

*ADAAG Section 9 ACCESSIBLE TRANSIENT LODGING.*

*(1) Except as specified in the special technical provisions of this section, accessible transient lodging shall comply with the applicable requirements of section 4. Transient lodging includes facilities or portions thereof used for sleeping accommodations, when not classed as a medical care facility.*

*9.1 Hotels, Motels, Inns, Boarding Houses, Dormitories, Resorts and Other Similar Places of Transient Lodging.*

*9.1.1 General. All public use and common use areas are required to be designed and constructed to comply with section 4 (Accessible Elements and Spaces: Scope and Technical Requirements).*

*9.1.2 Accessible Units, Sleeping Rooms, and Suites. Accessible sleeping rooms or suites that comply with the requirements of 9.2 (Requirements for Accessible Units, Sleeping Rooms, and Suites) shall be provided in conformance with the table below. **In addition, in hotels, of 50 or more sleeping rooms or suites, additional accessible sleeping rooms or suites that include a roll-in shower shall also be provided in conformance with the table below. Such accommodations shall comply with the requirements of 9.2, 4.21, and Figure 57(a) or (b).***

| Number of Rooms | Accessible Rooms | Rooms with Roll-in Showers |
|---|---|---|
| 1 to 25 | 1 | |
| 26 to 50 | 2 | |
| 51 to 75 | 3 | 1 |
| 76 to 100 | 4 | 1 |
| 101 to 150 | 5 | 2 |
| 151 to 200 | 6 | 2 |
| 201 to 300 | 7 | 3 |

*9.1.3 Sleeping Accommodations for Persons with Hearing Impairments. **In addition to those accessible sleeping rooms and suites required by 9.1.2, sleeping rooms and suites***

26

*that comply with 9.3 (Visual Alarms, Notification Devices, and Telephones) shall be provided in conformance with the following table:*

| Number of Elements | Accessible Elements |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |

*9.1.4 Classes of Sleeping Accommodations.*

*(1) In order to provide persons with disabilities a range of options equivalent to those available to other persons served by the facility, sleeping rooms and suites required to be accessible by 9.1.2 shall be dispersed among the various classes of sleeping accommodations available to patrons of the place of transient lodging. Factors to be considered include room size, cost, amenities provided, and the number of beds provided.*

*(2) Equivalent Facilitation. For purposes of this section, it shall be deemed equivalent facilitation if the operator of a facility elects to limit construction of accessible rooms to those intended for multiple occupancy, provided that such rooms are made available at the cost of a single occupancy room to an individual with disabilities who requests a single-occupancy room.*

*9.1.5. Alterations to Accessible Units, Sleeping Rooms, and Suites. When sleeping rooms are being altered in an existing facility, or portion thereof, subject to the requirements of this section, at least one sleeping room or suite that complies with the requirements of 9.2 (Requirements for Accessible Units, Sleeping Rooms, and Suites) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms provided equals the number required to be accessible with 9.1.2. In addition, at least one sleeping room or suite that complies with the requirements of 9.3 (Visual Alarms, Notification Devices, and Telephones) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms equals the number required to be accessible by 9.1.3.*

*9.2 Requirements for Accessible Units, Sleeping Rooms and Suites.*

*9.2.1 General. Units, sleeping rooms, and suites required to be accessible by 9.1 shall comply with 9.2.*

*9.2.2 Minimum Requirements. An accessible unit, sleeping room or suite shall be on an accessible route complying with 4.3 and have the following accessible elements and spaces.*

27

(1) Accessible sleeping rooms shall have a 36 in (915 mm) clear width maneuvering space located along both sides of a bed, except that where two beds are provided, this requirement can be met by providing a 36 in (915 mm) wide maneuvering space located between the two beds.

(2) **An accessible route complying with 4.3 shall connect all accessible spaces and elements, including telephones, within the unit, sleeping room, or suite.** This is not intended to require an elevator in multi-story units as long as the spaces identified in 9.2.2(6) and (7) are on accessible levels and the accessible sleeping area is suitable for dual occupancy.

(3) Doors and doorways designed to allow passage into and within all sleeping rooms, suites or other covered units shall comply with 4.13.

(4) If fixed or built-in storage facilities such as cabinets, shelves, closets, and drawers are provided in accessible spaces, at least one of each type provided shall contain storage space complying with 4.25. Additional storage may be provided outside of the dimensions required by 4.25.

(5) All controls in accessible units, sleeping rooms, and suites shall comply with 4.27.

(6) Where provided as part of an accessible unit, sleeping room, or suite, the following spaces shall be accessible and shall be on an accessible route:

(a) the living area.

(b) the dining area.

(c) at least one sleeping area.

(d) patios, terraces, or balconies.
   EXCEPTION: The requirements of 4.13.8 and 4.3.8 do not apply where it is necessary to utilize a higher door threshold or a change in level to protect the integrity of the unit from wind/water damage. Where this exception results in patios, terraces or balconies that are not at an accessible level, equivalent facilitation shall be provided (e.g., equivalent facilitation at a hotel patio or balcony might consist of providing raised decking or a ramp to provide accessibility).

(e) at least one full bathroom (i.e., one with a water closet, a lavatory, and a bathtub or shower).

(f) if only half baths are provided, at least one half bath.

(g) carports, garages or parking spaces.

28

*(7) Kitchens, Kitchenettes, or Wet Bars. When provided as accessory to a sleeping room or suite, kitchens, kitchenettes, wet bars, or similar amenities shall be accessible. Clear floor space for a front or parallel approach to cabinets, counters, sinks, and appliances shall be provided to comply with 4.2.4. Countertops and sinks shall be mounted at a maximum height of 34 in (865 mm) above the floor. At least fifty percent of shelf space in cabinets or refrigerator/freezers shall be within the reach ranges of 4.2.5 or 4.2.6 and space shall be designed to allow for the operation of cabinet and/or appliance doors so that all cabinets and appliances are accessible and usable. Controls and operating mechanisms shall comply with 4.27.*

**(8) Sleeping room accommodations for persons with hearing impairments required by 9.1 and complying with 9.3 shall be provided in the accessible sleeping room or suite.**

*9.3 Visual Alarms, Notification Devices and Telephones.*

**9.3.1 General. In sleeping rooms required to comply with this section, auxiliary visual alarms shall be provided and shall comply with 4.28.4. Visual notification devices shall also be provided in units, sleeping rooms and suites to alert room occupants of incoming telephone calls and a door knock or bell. Notification devices shall not be connected to auxiliary visual alarm signal appliances. Permanently installed telephones shall have volume controls complying with 4.31.5; an accessible electrical outlet within 4 ft (1220 mm) of a telephone connection shall be provided to facilitate the use of a text telephone.**

*9.3.2 Equivalent Facilitation. For purposes of this section, equivalent facilitation shall include the installation of electrical outlets (including outlets connected to a facility's central alarm system) and telephone wiring in sleeping rooms and suites to enable persons with hearing impairments to utilize portable visual alarms and communication devices provided by the operator of the facility.*

**9.4 Other Sleeping Rooms and Suites. Doors and doorways designed to allow passage into and within all sleeping units or other covered units shall comply with 4.13.5.**

**ADAAG Section 4.28 Alarms.**

**4.28.1 General. Alarm systems required to be accessible by 4.1 shall comply with 4.28. At a minimum, visual signal appliances shall be provided in buildings and facilities in each of the following areas: restrooms and any other general usage areas (e.g., meeting rooms), hallways, lobbies, and any other area for common use.**

**4.28.2 Audible Alarms. If provided, audible emergency alarms shall produce a sound that exceeds the prevailing equivalent sound level in the room or space by at least 15 dbA or exceeds any maximum sound level with a duration of 60 seconds by 5 dbA, whichever is louder. Sound levels for alarm signals shall not exceed 120 dbA.**

**4.28.3 Visual Alarms. Visual alarm signal appliances shall be integrated into the building or facility alarm system.** *If single station audible alarms are provided then single station visual alarm signals shall be provided. Visual alarm signals shall have the following minimum photometric and location features:*

*(1) The lamp shall be a xenon strobe type or equivalent.*

*(2) The color shall be clear or nominal white (i.e., unfiltered or clear filtered white light).*

*(3) The maximum pulse duration shall be two-tenths of one second (0.2 sec) with a maximum duty cycle of 40 percent. The pulse duration is defined as the time interval between initial and final points of 10 percent of maximum signal.*

*(4) The intensity shall be a minimum of 75 candela.*

*(5) The flash rate shall be a minimum of 1 Hz and a maximum of 3 Hz.*

*(6) The appliance shall be placed 80 in (2030 mm) above the highest floor level within the space or 6 in (152 mm) below the ceiling, whichever is lower.*

*(7)* **In general, no place in any room or space required to have a visual signal appliance shall be more than 50 ft (15 m) from the signal (in the horizontal plane).** *In large rooms and spaces exceeding 100 ft (30 m) across, without obstructions 6 ft (2 m) above the finish floor, such as auditoriums, devices may be placed around the perimeter, spaced a maximum 100 ft (30 m) apart, in lieu of suspending appliances from the ceiling.*

*(8)* **No place in common corridors or hallways in which visual alarm signaling appliances are required shall be more than 50 ft (15 m) from the signal.**

**4.28.4 Auxiliary Alarms. Units and sleeping accommodations shall have a visual alarm connected to the building emergency alarm system or shall have a standard 110-volt electrical receptacle into which such an alarm can be connected and a means by which a signal from the building emergency alarm system can trigger such an auxiliary alarm. When visual alarms are in place the signal shall be visible in all areas of the unit or room. Instructions for use of the auxiliary alarm or receptacle shall be provided.**

*Recommendations*

*Three (3) rooms equipped with a roll-in shower are required. Another seven (7) rooms are required which are equipped for persons with hearing impairments.*

*For the additional rooms which are required for persons with hearing impairments an ADA compliance kit is available which includes:*

30

- *TTY (Text Telephone)*
- *Multifunction Alerting System with All-in-One Unit Functions: Telephone, Doorbell, Alarm Clock, Sound Monitor*
- *Telephone Handset Amplifier*
- *Smoke Detector*
- *Assistive Listening Devices available sign (ADA-SIGN)*

*Locating visual emergency alarms in rooms where persons who are deaf may work or reside alone can ensure that they will always be warned when an emergency alarm is activated. To be effective, such devices must be located and oriented so that they will spread signals and reflections throughout a space or raise the overall light level sharply. However, visual alarms alone are not necessarily the best means to alert sleepers. A study conducted by Underwriters Laboratory (UL) concluded that a flashing light more than seven times brighter was required (110 candela v. 15 candela, at the same distance) to awaken sleepers as was needed to alert awake subjects in a normal daytime illuminated room.*

*For hotel and other rooms where people are likely to be asleep, a signal-activated vibrator placed between mattress and box spring or under a pillow was found by UL to be much more effective in alerting sleepers. Many readily available devices are sound-activated so that they could respond to an alarm clock, clock radio, wake-up telephone call or room smoke detector. Activation by a building alarm system can either be accomplished by a separate circuit activating an auditory alarm which would, in turn, trigger the vibrator or by a signal transmitted through the ordinary 110-volt outlet. Transmission of signals through the power line is relatively simple and is the basis of common, inexpensive remote light control systems sold in many department and electronic stores for home use. So-called "wireless" intercoms operate on the same principal.*

*The following figure shows an example of the configuration where a roll-in shower is included in a bathroom.*



**Fig. A7**

Figure A7
Configurations of Toilet Room with Roll-in Shower

31

Diagram (a). A 90-inch by 60-inch toilet room with roll-in shower is illustrated. A 32-inch wide clear opening is centered in the middle of the long wall opposite the fixtures. On the back wall, measured from the left side wall, the centerline of the toilet is 18 inches. The centerline of the lavatory is 30 inches from the centerline of the toilet. The width of the shower stall is 30 inches measured from the right side wall. The depth of the shower seat is 18 inches measured from the front wall.

Diagram (b). A 60-inch by 93-inch toilet room with roll-in shower is illustrated. A 32-inch wide clear opening is centered in the middle of the long wall. On the side wall, the centerline of the toilet is 18 inches from the back wall, and the centerline of the lavatory is 27 inches from the centerline of the toilet. The shower is on the opposite side wall. The depth of the shower seat is 18 inches measured from the front wall.

*Typically a shower chair, a mobility aid more suitable for bathing than standard wheelchairs, is used with roll-in showers. The required folding seat in combination roll-in/transfer showers offers greater flexibility by allowing transfer as well, particularly for people traveling without a shower chair. Two types of design for this combination shower are provided in ADAAG (Figure 57).*

**ADAAG Section 4.21 Shower Stalls.**

**4.21.1* General.** Accessible shower stalls shall comply with 4.21.

**4.21.2 Size and Clearances.** Except as specified in 9.1.2, shower stall size and clear floor space shall comply with Fig. 35(a) or (b). The shower stall in Fig. 35(a) shall be 36 in by 36 in (915 mm by 915 mm). Shower stalls required by 9.1.2 shall comply with Fig. 57(a) or (b). The shower stall in Fig. 35(b) will fit into the space required for a bathtub.

**4.21.3 Seat.** A seat shall be provided in shower stalls 36 in by 36 in (915 mm by 915 mm) and shall be as shown in Fig. 36. The seat shall be mounted 17 in to 19 in (430 mm to 485 mm) from the bathroom floor and shall extend the full depth of the stall. In a 36 in by 36 in (915 mm by 915 mm) shower stall, the seat shall be on the wall opposite the controls. Where a fixed seat is provided in a 30 in by 60 in minimum (760 mm by 1525 mm) shower stall, it shall be a folding type and shall be mounted on the wall adjacent to the controls as shown in Fig. 57. The structural strength of seats and their attachments shall comply with 4.26.3.

**4.21.4 Grab Bars.** Grab bars complying with 4.26 shall be provided as shown in Fig. 37.

**4.21.5 Controls.** Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 37. In shower stalls 36 in by 36 in (915 mm by 915 mm), all controls, faucets, and the shower unit shall be mounted on the side wall opposite the seat.

**4.21.6 Shower Unit.** A shower spray unit with a hose at least 60 in (1525 mm) long that can be used both as a fixed shower head and as a hand-held shower shall be provided.

**4.21.7 Curbs.** If provided, curbs in shower stalls 36 in by 36 in (915 mm by 915 mm) shall be no higher than 1/2 in (13 mm). Shower stalls that are 30 in by 60 in (760 mm by 1525 mm) minimum shall not have curbs.

**4.21.8 Shower Enclosures.** *If provided, enclosures for shower stalls shall not obstruct controls or obstruct transfer from wheelchairs onto shower seats.*



**Figure 57a**
**Roll-in Shower with Folding Seat**

Where a fixed seat is provided in a 30 inch minimum by 60 inch (716 mm by 1220 mm) minimum shower stall, the controls and spray unit on the back (long) wall shall be located a maximum of 27 inches (685 mm) from the side wall where the seat is attached. (4.21.2, 9.1.2)

**Figure 57b**
**Roll-in Shower with Folding Seat**

An alternate 36 inch minimum by 60 inch (915 mm by 1220 mm) minimum shower stall is illustrated. The width of the stall opening stall shall be a minimum of 36 inches (915 mm) clear located on a long wall at the opposite end of the shower from the controls. The shower seat shall be 24 inches (610 mm) minimum in length by 16 inches (330 mm) minimum in width and may be rectangular in shape. The seat shall be located next to the opening to the shower and adjacent to the end wall containing the shower head and controls. (4.21.2, 9.1.2, A4.23.3)

**Figure 35a**
**Shower Size and Clearances**
**36-in by 36-in (760mm by 1525mm) Stall**

The clear floor space shall be a minimum of 48 inches (1220 mm) in length by a minimum of 36 inches (915 mm) in width and allow for a parallel approach. The clear floor space shall extend 1 foot beyond the shower wall on which the seat is mounted.

**Figure 35b**
**Shower Size and Clearances**
**30-in by 60-in (915mm by 915mm) Stall**

The clear floor space alongside the shower shall be a minimum of 60 inches (1220 mm) in length by a minimum of 36 inches (915 mm) in width.

33



**Figure 36**
**Shower Seat Design**

The diagram illustrates an L-shaped shower seat extending the full depth of the stall. The seat shall be located 1-1/2 inches (38 mm) maximum from the wall. The front of the seat (nearest to the opening) shall extend a maximum 16 inches (330 mm) from the wall. The back of the seat (against the back wall) shall extend a maximum of 23 inches (682 mm) from the side wall and shall be a maximum of 15 inches (305 mm) deep.



**Figure 37**
**Grab Bars at Shower Stalls**

Fig. 37(a) 36 inches by 36 inches (915 mm by 915 mm) Stall. The diagram illustrates an L-shaped grab bar that is located along the full depth of the control wall (opposite the seat) and halfway along the back wall. The grab bar shall be mounted between 33 to 36 inches (840-915 mm) above the shower floor. The bottom of the control area shall be a maximum of 38 inches (965 mm) high and the top of the control area shall be a maximum of 48 inches (1220 mm) high. The controls and spray unit shall be within 18 inches (455 mm) of the front of the shower.

Fig. 37(b) 30 inches by 60 inches (760 mm by 1525 mm) Stall. The diagram illustrates a U-shaped grab bar that wraps around the stall. The grab bar shall be between 33 to 36 inches (840-915 mm) high. The controls are placed in an area between 38 inches and 48 inches (965 mm and 1220 mm) above the floor. If the controls are located on the back (long) wall they shall be located 27 inches (685 mm) from the side wall. The shower head and control area may be located on either side wall.

*The following shows the requirements if a tub is in the accessible bathroom;*

***ADAAG Section 4.20  Bathtubs.***

*4.20.1 General  Accessible bathtubs shall comply with 4.20*

*4.20.2 Floor Space  Clear floor space in front of bathtubs shall be as shown in Fig. 33.*

*4.20.3 Seat  An in-tub seat or a seat at the head end of the tub shall be provided as shown in Fig. 33 and 34. The structural strength of seats and their attachments shall comply with 4.26.3. Seats shall be mounted securely and shall not slip during use.*

*4.20.4 Grab Bars  Grab bars complying with 4.26 shall be provided as shown in Fig. 33*

*and 34.*

*4.20.5 Controls. Faucets and other controls complying with 4.27.4 shall be located as shown in Fig. 34.*

*4.20.6 Shower Unit. A shower spray unit with a hose at least 60 in (1525 mm) long that can be used both as a fixed shower head and as a hand-held shower shall be provided.*

*4.20.7 Bathtub Enclosures. If provided, enclosures for bathtubs shall not obstruct controls or transfer from wheelchairs onto bathtub seats or into tubs. Enclosures on bathtubs shall not have tracks mounted on their rims.*

*Place the controls in the "offset" position as shown above in figure 34(b) of the ADAAG. Provide an ADA compliant tub seat (a securely fastened seat is required) and grab bars as shown in figures 33 and 34. Controls must be within reach from outside the tub and cannot interfere with the use of the grab bar on this wall. Tracks on the tub rim are not allowed as they can interfere with the transfer to tub seats. Dual grab bars on the back wall are needed for transfer to the seat and into the tub.*

*Seats at the head of the tub are limited to a 15 inch depth so that back support is available from the side wall (which is why grab bars cannot be placed on the seat wall). Dual grab bars on the back wall must extend to the edge of the seat for use in transferring to the seat and for lowering oneself into the tub where one is able to do so. A hose for shower spray units longer than the required minimum of 60 inches is recommended for easier use of the shower spray unit from the seat.*



**Figure 33**
**Clear Floor Space at Bathtubs**

Fig. 33(a) With Seat in Tub. If the approach is parallel to the bathtub, a 30 inch (760 mm) minimum width by 60 inch (1525 mm) minimum length clear space is required alongside the bathtub. If the approach is perpendicular to the bathtub, a 48 inch (1220 mm) minimum width by 60 inch (1525 mm) minimum length clear space is required.

Fig. 33(b) With Seat at Head of Tub. If the approach is parallel to the bathtub, a 30 inch (760 mm) minimum width by 75 inch (1905 mm) minimum length clear space is required alongside the bathtub. The seat width must be 15 inches (380 mm) and must extend the full width of the bathtub.

**Figure 34. Grab Bars at Bathtubs.**

Controls are required to be located in an area between the open edge and the midpoint of the tub ("offset"), and to be located at the foot of the tub.

**Figure 34(a) With Seat in Tub.** At the foot of the tub, the grab bar shall be 24 inches (610 mm) minimum in length measured from the outer edge of the tub. On the back wall, two grab bars are required. The grab bars mounted on the back (long) wall shall be a minimum 24 inches (610 mm) in length located 12 inches (305 mm) maximum from the foot of the tub and 24 inches (610 mm) maximum from the head of the tub. One grab bar on the back wall shall be located 9 inches (230 mm) above the rim of the tub. The other shall be 33 to 36 inches (840 mm to 915 mm) above the bathroom floor. At the head of the tub, the grab bar shall be a minimum of 12 inches (305 mm) in length measured from the outer edge of the tub.

**Figure 34(b) With Seat at Head of Tub.** At the foot of the tub, the grab bar shall be a minimum of 24 inches (610 mm) in length measured from the outer edge of the tub. On the back wall, two grab bars are required. The grab bars mounted on the back wall shall be a minimum of 48 inches (1220 mm) in length located a maximum of 12 inches (305 mm) from the foot of the tub and a maximum of 15 inches (380 mm) from the head of the tub. Heights of grab bars are as described above. No horizontal grab bar should be placed at the head of the tub.



*The following shows the requirements for a water closet (toilet) in an accessible bathroom. The grab bars and dispensers should be located as shown in the figures below. A portable or attached raised toilet seat shall be provided in all designated permanent disability accessible rooms if the seat is not at a height of 17 – 19 inches):*



**Figure 28. Clear Floor Space at Water Closets.**

[Note: Figure 28 applies to water closets not installed in toilet stalls. Figure 30 covers toilet stalls.]

For a side or forward approach, the water closet must be located along the back wall and the centerline of the water

closet must be 18 inches (455 mm) from the side wall with the side grab bar.

For a forward approach/transfer, when a lavatory is installed beside the water closet, there must be a clear floor space at the water closet that is a minimum 48 inches (1220 mm) in width (parallel to the back wall) and a minimum of 66 inches (1675 mm) in length. An accessible lavatory may overlap the clear floor space at the back wall as long as a minimum 18 inches (455 mm) clearance is maintained between the centerline of the water closet and the nearest edge of the lavatory. Grab bars are provided on the side and back wall (see figure 29).

For a side approach/transfer, when a lavatory is installed beside the water closet, there must be a clear floor space at the water closet that is a minimum of 48 inches (1220 mm) in width (parallel to the back wall) and a minimum of 56 inches (1420 mm) in length. An accessible lavatory may overlap the clear floor space at the back wall as along as a minimum 18 inches (455 mm) clearance is maintained between the centerline of the water closet and the nearest edge of the lavatory. Grab bars are provided on the side and back wall (see figure 29)

For a forward and side approach or for a lateral transfer, there must be a clear floor space at the water closet that is a minimum of 60 inches (1525 mm) in width (parallel to the back wall) and a minimum of 56 inches (1420 mm) in length. There must be a clear floor space of 42 inches (1066 mm) minimum from the centerline of the water closet to the nearest obstruction/wall. A lavatory may not overlap this clear space. Grab bars are provided on the side and back wall (see figure 29).



**Figure 29. Grab Bars at Water Closets.**

Figure 29(a) Back Wall. A 36 inches (915 mm) minimum length grab bar, mounted 33-36 inches (840-915 mm) above the finish floor, is required behind the water closet. The grab bar must extend at least 12 inches (305 mm) from the centerline of the water closet toward the side wall and at least 24 inches (610 mm) from the centerline of the water closet toward the open side.

Figure 29(b) Side Wall. A 42 inches (1065 mm) minimum length grab bar is required on the side wall, spaced a maximum of 12 inches (305 mm) from the back wall and extending a minimum of 54 inches (1370 mm) from the back wall at a height of 33-36 inches (840-915 mm). The toilet paper dispenser shall be mounted below the grab bar at a minimum height of 19 inches (485 mm). The height of the toilet seat shall be 17 to 19 inches (430 - 485 mm) above the finished floor.

*The centerline of the water closet (toilet) should be positioned at an absolute 18 inches from the side wall in order to allow the full use of the grab bar on the side wall. Flush controls are to be on the wide side. Side transfers are possible where space at least 42 inches from the toilet centerline is available. The manner of approach and transfer to water closets varies among people with disabilities.*

*Where plumbing restrictions don't allow for the toilet itself to be moved the wall can be built out as an alternative measure. If the water closet has the flush control on the short side it should be replaced with one which has the flush control on the opposite side.*

*Controls and operating mechanisms (temperature controls, lamp switches, drapery wands, curtain rods, etc.) must be within reach ranges as specified in sections 4.25, 4.2.5 and 4.2.6 of the ADAAG. They must also conform to section 4.27.4 of the ADAAG.*

## ADAAG Section 4.25 Storage.

**4.25.1 General.** *Fixed storage facilities such as cabinets, shelves, closets, and drawers required to be accessible by 4.1 shall comply with 4.25.*

**4.25.2 Clear Floor Space.** *A clear floor space at least 30 in by 48 in (760 mm by 1220 mm) complying with 4.2.4 that allows either a forward or parallel approach by a person using a wheelchair shall be provided at accessible storage facilities.*

**4.25.3 Height.** *Accessible storage spaces shall be within at least one of the reach ranges specified in 4.2.5 and 4.2.6 (see Fig. 5 and Fig.6). Clothes rods or shelves shall be a maximum of 54 in (1370 mm) above the finish floor for a side approach. Where the distance from the wheelchair to the clothes rod or shelf exceeds 10 in (255 mm) (as in closets without accessible doors) the height and depth to the rod or shelf shall comply with Fig. 38(a) and Fig. 38(b).*

**4.25.4 Hardware.** *Hardware for accessible storage facilities shall comply with 4.27.4. Touch latches and U-shaped pulls are acceptable.*



**Figure 38a**
**Storage Shelves and Closets**
**Shelves**

If the clear floor space allows a parallel approach by a person in a wheelchair and the distance between the wheelchair and the shelf exceeds 10 inches, the maximum high side reach shall be 48 inches (1220 mm) above the floor and the low side reach shall be a minimum of 9 inches (230 mm) above the floor. The shelves can be adjustable. The maximum distance from the user to the shelf shall be 21 inches (535 mm).



**Figure 38b**
**Storage Shelves and Closets**
**Closets**

If the clear floor space allows a parallel approach by a person in a wheelchair and the distance between the wheelchair and the clothes rod exceeds 10 inches, the maximum high side reach shall be 48 inches (1220 mm). The maximum distance from the user to the clothes rod shall be 21 inches (535 mm).

**ADAAG Section 4.2.5 Forward Reach.** *If the clear floor space only allows forward approach to an object, the maximum high forward reach allowed shall be 48 in (1220 mm) (see Fig. 5(a)). The minimum low forward reach is 15 in (380 mm). If the high forward reach is over an obstruction, reach and clearances shall be as shown in Fig. 5(b).*



**Figure 5a**
**High Forward Reach Limit**

Forward reach range shown in profile and plan view to be 48 inches maximum and 15 inches minimum.

**Figure 5b**
**Maximum Forward Reach over an Obstruction**

The maximum level forward reach over an obstruction with knee space below is 25 inches (635 mm). When the obstruction is less than 20 inches (510 mm) deep, the maximum high forward reach is 48 inches (1220 mm). When the obstruction projects 20 to 25 inches (510 mm to 635 mm), the maximum high forward reach is 44 inches (1120 mm). (4.2.5, 4.25.3).

NOTE: x shall be < 25 in (635 mm), x shall be ≥ x. When x < 20 in (510 mm), then y shall be 48 in (1220 mm) maximum. When x is 20 to 25 in (510 to 635 mm), then y shall be 44 in (1120 mm) maximum.

*ADAAG Section 4.2.6 Side Reach. If the clear floor space allows parallel approach by a person in a wheelchair, the maximum high side reach allowed shall be 54 in (1370 mm) and the low side reach shall be no less than 9 in (230 mm) above the floor (Fig 6(a) and Fig. 6(b)). If the side reach is over an obstruction, the reach and clearances shall be as shown in Fig 6(c).*



**Figure 6(a)**
**Clear Floor Space - Parallel Approach**

The 30 by 48 inch clear floor space is located a maximum 10 inches (255 mm) from the wall.



**Figure 6(b)**
**High and Low - Side Reach Limits**

The 30 by 48 inch wheelchair clear floor space is located a maximum 10 inches (255 mm) from the wall.



**Figure 6(c)**
**Maximum Side Reach over Obstruction**

If the depth of the obstruction is 24 inches (610 mm) and the maximum height of the obstruction is 34 inches (865 mm), the maximum high side reach over the obstruction is 46 inches (1170).

*ADAAG Section 4.27.4 Controls and operating mechanisms shall be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate controls shall be no greater than 5 lbf (22.2 N).*

*Mechanisms which can be operated with a closed fist will generally satisfy these criteria. Controls which have slide or push-button mechanisms are preferable. All doors within designated accessible rooms and spaces should provide lever-operated or push-type mechanisms to facilitate opening/closing. If locks are provided they should not require tight grasping, pinching, or twisting of the wrist to operate. On*

*elements (I/C, lamp, etc.) with controls which require tight grasping, pinching or twisting of the wrist it is preferable to use a slide or push mechanism.*

*Elements which are outside of required reach ranges should be lowered to comply with sections 4.2.5 and 4.2.6 of the ADAAG. Elements which are blocked by furniture or other objects should be made accessible.*

*Proper cane and service animal techniques allow people to walk along a corridor or path without bumping into walls. Overhangs that are above cane sweep height may protrude 4 inches without being hazardous. Objects within the sweep of canes (at or below 27 inches) or above 80 inches can protrude any amount. Wing walls, side partitions, and alcoves or recesses can be used for elements such as drinking fountains with their bottom edges above 27 inches. Fixed elements or barriers can provide detection below objects not required to have knee or toe clearance.*

*The guestroom doors which do not provide the necessary latch-side clearance for exiting the room should be equipped with a power door opener.*

*The fire alarms located in the guestrooms should be either 80 inches above the floor or 6 inches from the ceiling depending on which measurement is lower. ADAAG specifies a signal height 80 inches above the highest floor level within the space or 6 inches below the ceiling, whichever is lower. (This can be measured to the centerline or to the bottom edge of the appliance). The 80 inch height is based on research indicating it to be the most effective for a 75 cd lamp. It is also consistent with the minimum headroom clearance required for protruding objects. What is most important is that strobes, whether projecting from walls or suspended from ceilings, be at least 6 inches below the ceiling plane to minimize smoke obscuration.*

*Tables which do not provide sufficient knee clearance, within an accessible guest room, should have casters which raise them high enough to meet the minimum requirements.*

## VI.  ACCESS TO GOODS AND SERVICES

A.  Fire-safety information, maximum room rate information, telephone and television information cards, guest services guides, restaurant menus, room service menus, and all other printed materials provided for use by guests are not available in alternate formats so that blind persons and persons with low vision can read them (alternate formats include Braille, large print, and audio recordings) violating the Department of Justice ADA Title III Regulation 28 CFR Part 36.303.

*Title III Regulation 28 CFR Part Sec.36.303 Auxiliary aids and services.*

*(a) General. A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or*

*otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.*

*(b) Examples. The term "auxiliary aids and services" includes --*

*(1) Qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;*

*(2) Qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments;*

*(3) Acquisition or modification of equipment or devices; and*

*(4) Other similar services and actions.*

*(c) Effective communication. A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities.*

*(d) Telecommunication devices for the deaf (TDD's). (1) A public accommodation that offers a customer, client, patient, or participant the opportunity to make outgoing telephone calls on more than an incidental convenience basis shall make available, upon request, a TDD for the use of an individual who has impaired hearing or a communication disorder.*

*(2) This part does not require a public accommodation to use a TDD for receiving or making telephone calls incident to its operations.*

*(e) Closed caption decoders. Places of lodging that provide televisions in five or more guest rooms and hospitals that provide televisions for patient use shall provide, upon request, a means for decoding captions for use by an individual with impaired hearing.*

*(f) Alternatives. If provision of a particular auxiliary aid or service by a public accommodation would result in a fundamental alteration in the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or in an undue burden, i.e., significant difficulty or expense, the public accommodation shall provide an alternative auxiliary aid or service, if one exists, that would not result in an alteration or such burden but would nevertheless ensure that, to the maximum extent*

*possible, individuals with disabilities receive the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation.*

**Recommendation**

*Provide guest information in alternate formats so that blind persons and persons with low vision can read them (alternate formats include Braille, large print, and audio recordings) in accordance with the Department of Justice's ADA Title III Regulation 28 CFR Part 36.303.*

**B.   There are counters at the registration desk and at the AVIS desk which exceed 36 inches in height violating section 7.2 of the ADAAG. There are counters at Zaffino's which exceed 36 inches in height violating section 5.2 of the ADAAG.**



*ADAAG Section 5.2 Counters and Bars. Where food or drink is served at counters exceeding 34 in (865 mm) in height for consumption by customers seated on stools or standing at the counter, a portion of the main counter which is 60 in (1525 mm) in length minimum shall be provided in compliance with 4.32 or service shall be available at accessible tables within the same area.*

*ADAAG Section 7.2 Sales and Service Counters, Teller Windows, Information Counters.*

*(1) In areas used for transactions where counters have cash registers and are provided for sales or distribution of goods or services to the public, at least one of each type shall have a portion of the counter which is at least 36 in (915mm) in length with a maximum height of 36 in (915 mm) above the finish floor. It shall be on an accessible route complying with 4.3. Such counters shall include, but are not limited to, counters in retail stores, and distribution centers. The accessible counters must be dispersed*

*throughout the building or facility. In alterations where it is technically infeasible to provide an accessible counter, an auxiliary counter meeting these requirements may be provided.*

*(2) In areas used for transactions that may not have a cash register but at which goods or services are sold or distributed including, but not limited to, ticketing counters, teller stations, registration counters in transient lodging facilities, information counters, box office counters and library check-out areas, either:*

*(i) a portion of the main counter which is a minimum of 36 in (915 mm) in length shall be provided with a maximum height of 36 in (915 mm); or*

*(ii) an auxiliary counter with a maximum height of 36 in (915 mm) in close proximity to the main counter shall be provided; or*

*(iii) equivalent facilitation shall be provided (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with a disability can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).*

*All accessible sales and service counters shall be on an accessible route complying with 4.3.*

---

**Recommendation**

*Signage could be placed at Zaffino's counters offering nearby table service upon request. Provide a counter, at the registration desks, such that a portion of it is at least 36 inches wide and no more than 36 inches above the finished floor, or provide an auxiliary counter with a maximum height of 36 inches in close proximity to the main counter, or provide equivalent facilitation. Equivalent facilitation may be provided in the form of a folding shelf attached to the main counter or an auxiliary table nearby. If choosing the latter signage should be placed on the main counter directing a guest toward the auxiliary table and a sign showing the symbol of accessibility should be placed on the table.*

---

**C. There is an indoor pool at this location. There is no pool lift available violating the Department of Justice's ADA Title III Regulation 28 CFR Part 36.202(a).**



*Department of Justice ADA Title III Regulation 28 CFR Part 36.202(a)* **Activities.**

*(a) Denial of participation. A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.*

**Recommendations**

*Provide a pool lift or equivalent facilitation to the pool for disabled guests. Once a pool lift is available there should be signage informing guests that a pool lift is available.*

**D. There are non-compliant handrails at the steps leading up to Zaffino's violating section 4.9.4 of the ADAAG.**



*ADAAG Section 4.9.4 Handrails. Stairways shall have handrails at both sides of all stairs. Handrails shall comply with 4.26 and shall have the following features:*

*(1) Handrails shall be continuous along both sides of stairs. The inside handrail on switchback or dogleg stairs shall always be continuous (see Fig. 19(a) and (b)).*

*(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top riser and at least 12 in (305 mm) plus the width of one tread beyond the bottom riser. At the top, the extension shall be parallel with the floor or ground surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal (see Fig. 19(c) and (d)). Handrail extensions shall comply with 4.4.*

*(3) The clear space between handrails and wall shall be 1-1/2 in (38 mm).*

*(4) Gripping surfaces shall be uninterrupted by newel posts, other construction elements, or obstructions.*

*(5) Top of handrail gripping surface shall be mounted between 34 in and 38 in (865 mm and 965 mm) above stair nosings.*

*(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall or post.*

*(7) Handrails shall not rotate within their fittings*



| | |
|---|---|
| | **Figure 19c**<br>**Stair Handrails - Extension at Bottom of Run**<br><br>NOTE:<br>X is the 12 in minimum handrail extension required at each top riser.<br>Y is the minimum handrail extension of 12 in plus the width of one tread that is required at each bottom riser. |
| | **Figure 19d**<br>**Stair Handrails - Extension at Top of Run**<br><br>NOTE:<br>X is the 12 in minimum handrail extension required at each top riser.<br>Y is the minimum handrail extension of 12 in plus the width of one tread that is required at each bottom riser. |

**Recommendations**

**Provide ADA compliant handrails at the stairs.**

**E.** There are light fixtures and shelving (in the pool area shower room) which project out more than 4 inches from the wall and are mounted with the bottom edge between than 27 and 80 inches from the floor violating section 4.4.1 of the ADAAG.

 

*ADAAG Section 4.4.1 General. Objects projecting from walls (for example, telephones) with their leading edges between 27 in and 80 in (685 mm and 2030 mm) above the finished floor shall protrude no more than 4 in (100 mm) into walks, halls, corridors, passageways, or aisles. Objects mounted with their leading edges at or below 27 in (685 mm) above the finished floor may protrude any amount. Free-standing objects mounted on posts or pylons may overhang 12 in (305 mm) maximum from 27 in to 80 in (685 mm to 2030 mm) above the ground or finished floor. Protruding objects shall not reduce the clear width of an accessible route or maneuvering space.*

*Recommendations*

*Replace light fixtures and other protruding objects with ones which do not protrude more than 4 inches from the wall. Other options include placing cane-detectable objects below them or relocating them whereas the bottom edge will be lower than 27 inches high or above 80 inches high.*

**F. There are tables, lacking the required knee clearances, at Zaffino's, the Business Office and the "Bakery Express" for use by persons using a wheelchair violating section 4.32.3 of the ADAAG.**

  

*ADAAG Section 4.32.3 Knee Clearances. If seating for people in wheelchairs is provided at tables or counters, knee spaces at least 27 in (685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep shall be provided (see Fig. 45).*



Fig. 45
Minimum Clearances for Seating and Tables

*Recommendations*

*Provide a number of tables, at each location, which provide the required clearances.*

**G. There are public phone banks which do not provide any of the phones with the highest control within required reach ranges violating section 4.31.3 of the ADAAG. There are house phones which do not provide volume controls violating section 4.31.5 of the ADAAG. None of the banks of public telephones provide a shelf and an electrical outlet, for use of a TTY, violating section 4.31.9.**



*ADAAG Section 4.31 Telephones.*

*4.31.1 General. Public telephones required to be accessible by 4.1 shall comply with 4.31.*

*4.31.2 Clear Floor or Ground Space. A clear floor or ground space at least 30 in by 48 in (760 mm by 1220 mm) that allows either a forward or parallel approach by a person using a wheelchair shall be provided at telephones. The clear floor or ground space shall comply with 4.2.4. Bases, enclosures, and fixed seats shall not impede approaches to telephones by people who use wheelchairs.*

*4.31.3 Mounting Height. The highest operable part of the telephone shall be within the reach ranges specified in 4.2.5 or 4.2.6.*

*4.31.4 Protruding Objects. Telephones shall comply with 4.4.*

*4.31.5 Hearing Aid Compatible and Volume Control Telephones Required by 4.1.*

*(1) Telephones shall be hearing aid compatible.*

*(2) Volume controls, capable of a minimum of 12 dbA and a maximum of 18 dbA above normal, shall be provided in accordance with 4.1.3. If an automatic reset is provided then 18 dbA may be exceeded.*

*4.31.6 Controls. Telephones shall have pushbutton controls where service for such equipment is available.*

*4.31.7 Telephone Books. Telephone books, if provided, shall be located in a position that complies with the reach ranges specified in 4.2.5 and 4.2.6.*

*4.31.8 Cord Length. The cord from the telephone to the handset shall be at least 29 in (735 mm) long.*

### 4.31.9 Text Telephones (TTYs) Required by 4.1.

(1) Text telephones (TTYs) used with a pay telephone shall be permanently affixed within, or adjacent to, the telephone enclosure. If an acoustic coupler is used, the telephone cord shall be sufficiently long to allow connection of the text telephone (TTY) and the telephone receiver.

(2) Pay telephones designed to accommodate a portable text telephone (TTY) shall be equipped with a shelf and an electrical outlet within or adjacent to the telephone enclosure. The telephone handset shall be capable of being placed flush on the surface of the shelf. The shelf shall be capable of accommodating a text telephone (TTY) and shall have 6 in (152 mm) minimum vertical clearance in the area where the text telephone (TTY) is to be placed.

(3) Equivalent facilitation may be provided. For example, a portable text telephone (TTY) may be made available in a hotel at the registration desk if it is available on a 24-hour basis for use with nearby public pay telephones. In this instance, at least one pay telephone shall comply with paragraph 2 of this section. In addition, if an acoustic coupler is used, the telephone handset cord shall be sufficiently long so as to allow connection of the text telephone (TTY) and the telephone receiver. Directional signage shall be provided and shall comply with 4.30.7.

**Recommendations**

A wheelchair accessible public phone is required at all interior and exterior pay phone "banks" (i.e., two or more adjacent phones). If phones are installed as single units, one per floor must be accessible. Generally, access can be provided with either a forward or side approach. Where multiple banks are provided on a floor (or exterior site), at least one accessible phone must provide a forward approach (considered more convenient in the use of phones). Clear floor space is required to the face of the unit; a portion can be provided below the unit where clearance is available for toes/knees. (Since the seated forward reach does not extend far beyond the toes, knee space can make it easier to reach to the phone). The maximum reach depth for a high (54 inch maximum) reach is 10 inches, measured from the clear floor space.

ADAAG requires that wheelchair accessible public phones, including pay and closed circuit phones, provide a volume control and be hearing aid compatible. In addition, 25% of all other public phones are required to have a volume control. Phones with volume control must be dispersed among all public-use phones, including closed circuit phones, throughout the facility. Volume controls on pay phones are located in either the base or the handset and are built into the telephone instrument as purchased or leased from a vendor. Most are located in the base and operated by pressing a button or key. Volume controls located in handsets are often used in retrofitting existing

*phones. Telephones required to have a volume control must be identified by a sign containing a depiction of a telephone handset with radiating sound waves.*

*TTYs provide some form of keyboard input and visual display output. Devices typically include an acoustic coupler for the telephone handset, a simplified keyboard, and a visible message display. Typed messages are converted into audible tones transmitted through the phone line to a receiving unit. Early models were known as TTYs (from their origin in teletype technology). Smaller, more portable versions developed later were called TDD's (telecommunications devices for deaf persons), a term still used on the signage symbol used to identify them. ADAAG refers to these devices as text telephones but the abbreviation "TTY" is preferred by most TTY users.*

*Some people travel with their own portable TTY units. ADAAG includes provisions for portable units shelves and power outlets) at all banks with 3 or more pay phones. (Those who travel with laptop computers will also find these provisions useful). The shelf must provide a vertical clearance of at least 6 inches so that different types of portable TTY devices can be connected. Recommendations: A shelf at least 10 inches square will accommodate most models. Phones should have a standard handset so that they fit the typical TTY coupler. The power outlet must be in or adjacent to the telephone enclosure (typical TTY cord is about 3 feet long).*

**H. There are signs to permanent rooms and spaces which do not comply with sections 4.1.3(16)(a) and 4.30 of the ADAAG by not being mounted at the required location or the finish and contrast of the sign.**

  

*ADAAG Section 4.1.3(16) Building Signage:*

*(a) Signs which designate permanent rooms and spaces shall comply with 4.30.1, 4.30.4, 4.30.5 and 4.30.6.*

*(b) Other signs which provide direction to or information about functional spaces of the building shall comply with 4.30.1, 4.30.2, 4.30.3, and 4.30.5.*

*ADAAG Section 4.30 Signage.*

*4.30.1* General. Signage required to be accessible by 4.1 shall comply with the applicable provisions of 4.30.*

***4.30.2\* Character Proportion.*** *Letters and numbers on signs shall have a width-to-height ratio between 3:5 and 1:1 and a stroke-width-to-height ratio between 1:5 and 1:10.*

***4.30.3 Character Height.*** *Characters and numbers on signs shall be sized according to the viewing distance from which they are to be read. The minimum height is measured using an upper case X. Lower case characters are permitted.*

***4.30.4\* Raised and Brailled Characters and Pictorial Symbol Signs (Pictograms).*** ***Letters and numerals shall be raised 1/32 in (0.8 mm) minimum, upper case, sans serif or simple serif type and shall be accompanied with Grade 2 Braille. Raised characters shall be at least 5/8 in (16 mm) high, but no higher than 2 in (50 mm).*** *Pictograms shall be accompanied by the equivalent verbal description placed directly below the pictogram. The border dimension of the pictogram shall be 6 in (152 mm) minimum in height.*

***4.30.5\* Finish and Contrast.*** *The characters and background of signs shall be eggshell, matte, or other non-glare finish. Characters and symbols shall contrast with their background -- either light characters on a dark background or dark characters on a light background.*

***4.30.6 Mounting Location and Height. Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in (1525 mm) above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in (76 mm) of signage without encountering protruding objects or standing within the swing of a door.***

---

**Recommendation**

*Provide signage to the permanent rooms and spaces as specified in section 4.30 of the ADAAG.*

---

**I. There are showers located near the pool which have curbs in excess of the maximum required in section 4.21.7 of the ADAAG.**

 

*ADAAG Section 4.21.7 Curbs. If provided, curbs in shower stalls 36 in by 36 in (915 mm by 915 mm) shall be no higher than 1/2 in (13 mm). Shower stalls that are 30 in by 60 in (760 mm by 1525 mm) minimum shall not have curbs.*

*Recommendation*

*Provide at least one of the showers with a curb no higher than ½ inch.*

J. There is an exercise room which has no equipment for use by persons in wheelchairs violating the Department of Justice's ADA Title III Regulation 28 CFR Part 36.202(a).



*Department of Justice ADA Title III Regulation 28 CFR Part 36.202(a) Activities.*

*(a) Denial of participation. A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.*

*Recommendations*

*Provide equipment for use by persons in wheelchairs. There are companies such as GPK Uppertone which manufacture such equipment.*

## VII.  ALARMS

There are areas throughout the facility (I.E. Courtyard West meeting room) where alarms are required but not found violating section 4.28 of the ADAAG. Also, there are alarms which are not mounted at the required heights violating section 4.28.3(6) of the ADAAG.



*ADAAG Section 4.28 Alarms.*

**4.28.1 General.** *Alarm systems required to be accessible by 4.1 shall comply with 4.28. At a minimum, visual signal appliances shall be provided in buildings and facilities in each of the following areas: restrooms and any other general usage areas (e.g., meeting rooms), hallways, lobbies, and any other area for common use.*

**4.28.2 Audible Alarms.** *If provided, audible emergency alarms shall produce a sound that exceeds the prevailing equivalent sound level in the room or space by at least 15 dbA or exceeds any maximum sound level with a duration of 60 seconds by 5 dbA, whichever is louder. Sound levels for alarm signals shall not exceed 120 dbA.*

**4.28.3 Visual Alarms. Visual alarm signal appliances shall be integrated into the building or facility alarm system.** *If single station audible alarms are provided then single station visual alarm signals shall be provided. Visual alarm signals shall have the following minimum photometric and location features:*

*(6) The appliance shall be placed 80 in (2030 mm) above the highest floor level within the space or 6 in (152 mm) below the ceiling, whichever is lower.*

*(7) In general, no place in any room or space required to have a visual signal appliance shall be more than 50 ft (15 m) from the signal (in the horizontal plane). In large rooms and spaces exceeding 100 ft (30 m) across, without obstructions 6 ft (2 m) above the finish floor, such as auditoriums, devices may be placed around the perimeter, spaced a maximum 100 ft (30 m) apart, in lieu of suspending appliances from the ceiling.*

*(8) No place in common corridors or hallways in which visual alarm signaling appliances are required shall be more than 50 ft (15 m) from the signal.*

**4.28.4 Auxiliary Alarms.** *Units and sleeping accommodations shall have a visual alarm connected to the building emergency alarm system or shall have a standard 110-volt electrical receptacle into which such an alarm can be connected and a means by which a signal from the building emergency alarm system can trigger such an auxiliary alarm. When visual alarms are in place the signal shall be visible in all areas of the unit or room. Instructions for use of the auxiliary alarm or receptacle shall be provided.*

### Recommendation

Provide a visual/audio alarm appliances in restrooms and any other general usage areas (e.g., meeting rooms), hallways, lobbies, and any other area for common use. Alarms must be placed 80 inches above the highest floor level within the space or 6 inches below the ceiling, whichever is lower.

In general, it is not sufficient to install visual signals only at audible alarm locations. Audible alarms installed in corridors and lobbies can be heard in adjacent rooms but a visual signal can be observed only within the space it occupies. Visual alarms are required in hallways, lobbies, restrooms, and any other general usage and common use areas, such as meeting and conference rooms, classrooms, cafeterias, employee break rooms, dressing rooms, examination rooms and similar spaces. Visual alarms are not required in areas used solely as employee work areas or in mechanical, electrical, or telephone closets, janitor's closets, or similar non-occupiable spaces.

ADAAG specifies a signal height 80 inches above the highest floor level within the space or 6 inches below the ceiling, whichever is lower. (This can be measured to the centerline or to the bottom edge of the appliance). The 80 inch height is based on research indicating it to be the most effective for a 75 cd lamp. It is also consistent with the minimum headroom clearance required for protruding objects. However, photometric calculations of lamp intensity for mounting heights of 80 and 96 inches show only nominal differences and can be practically considered to be equivalent. What is most important is that strobes, whether projecting from walls or suspended from ceilings, be at least 6 inches below the ceiling plane to minimize smoke obscuration.

## Policies and Procedures

A lodging facility should have in place policies and procedures in compliance with the Department of Justice's ADA Title III Regulation 28 CFR Part 36.302(a).

*ADAAG section 36.302(a) Modifications in policies, practices, or procedures.*

*(a) General. A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.*

1. A policy so staff is properly trained and familiarized with the available disabled features of the hotel including the number of disabled rooms by category, the available elements used in accessible rooms (i.e. TTY equipment, accessible routes, areas of rescue, etc.)

2. Inform front desk personnel of the procedure to assist disabled guests using wheelchairs at the lower counter during check-in, check-out and any other transaction.

3. Establish a policy whereas housekeeping incorporates lowering shower spray units when cleaning accessible shower stalls.

4. Implement a policy of advising disabled guests of the availability of ADA compliant tub seats.

5. Staff should read fully, upon request, and provide assistance, if necessary, in completing registration folios, hotel bills, service request forms, menus, and other documents. You may find it more helpful to your guest to provide frequently used documents such as menus or important documents such as contracts in Braille, tape, or large print. When reading a menu, personnel should first read broad categories of items and allow the guest to choose which categories should be fully read.

6. When handing currency to a guest, bills should be individually identified and counted. A person who is blind or visually impaired usually identifies currency by folding it in different ways and/or by placing denominations in separate locations in a wallet or purse. Identifying coins is usually not a problem because of their varying sizes and milled edges. Credit cards should be handed to guests after imprint, not simply laid on a counter or table. A piece of cardboard or a plastic or metal signature template can be used to indicate where a signature is required. Place cardboard edge horizontally below line or orient opening of signature template where signature is required.

7. Implement a policy which will include verbal descriptions, hands-on demonstrations, and/or provision of tactile maps, large-print maps, or recorded materials as aids to wayfinding for disabled guests.

8. Implement policies requiring that accessible rooms will not be reserved for non-disabled persons unless all other rooms in a facility have been reserved and accessible rooms are the only ones available.

9. Implement policies that the central reservations office will be able to guarantee accessible rooms for a customer's request, provided such rooms are available.

10. Implement policies that the guest relations office will maintain a list of accessible rooms and will keep the list updated.

11. Implement policies whereas employees will receive training so that they are generally familiar with the obligations of places of lodging under the ADA.

12. Implement a policy whereas the company's website for booking reservations or other information is accessible. Accessibility requirements are set forth in the Web Accessibility Initiative of the World Wide Consortium (W3C). Following an investigation by the New York Attorney General, Elliot Spitzer, two US travel sites, Ramada.com and Priceline.com have both agreed to make changes to their respective websites to ensure they are more accessible to the blind and visually impaired. The main change the two companies were required to make is to ensure that users with screen reader software and other similar technology can navigate their way through the websites by listening to the text. To be accessible in this manner, a web site must use code that is comprehensible to screen reader software. For more information visit http://www.ada.gov/websites2.htm

13. Implement a policy whereas accessible parking spaces are monitored to prevent illegal parking within the spaces or access aisles.

14. Implement an evacuation plan. A US court has declared that the Americans with Disabilities Act (the ADA ) requires places of public accommodation to consider the needs of people with disabilities in developing emergency evacuation plans. This groundbreaking decision - issued on December 28th, 2004 by Judge John W. Debelius III of the Circuit Court for Montgomery County, Maryland - means that shopping malls, stores, restaurants, movie theaters, museums, and other private entities subject to the ADA throughout the country, whether landlords or tenants, must now seek to accommodate people with disabilities in the development and modification of emergency evacuation procedures.

15. Implement a policy maintaining in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities.

# *ACCESS-ABILITY, INC.*

610 E. Sample Road, Pompano Beach, FL  33064
VOICE: (954) 942-1882  FAX: (954) 781-1282
CGC#: 051895  FED ID#: 650386560
*www.access-ability.com*

September 15, 2004

Fuller, Fuller & Associates
12000 Biscayne Blvd., Suite 609
North Miami, Fl.  33181

Re:  Holiday Inn
     711 Dwight Street
     Springfield, MA 01104

## INVOICE

1. Phone conversations with Plaintiff.  **1 hrs.**

2. Analyze, record and print photographs depicting violations.  **2.5 hrs.**

3. Collaboration & verification of ADA violations. Review various photographs; various meetings with staff to review project.  **4.5 hrs.**

4. Research in conjunction with ADA violations, and preparation of initial report outlining ADA violations. **5.5 hrs.**

5. Phone conversations with plaintiff's counsel.  **.5 hrs.**

**TOTAL HOURS**      **14 @ 175.00 per hour**
**TOTAL DUE**        **$2,450.00**
**TOTAL DUE NOW**    **$500.00**
**BALANCE DUE**      **$1,950.00**



EXHIBIT
16

3638

# ACCESS-ABILITY, INC.

*610 E. Sample Road, Pompano Beach, FL  33064*
*VOICE: (954) 942-1882  FAX: (954) 781-1282*
*CGC#:  051895  FED ID#:  650386560*
*www.access-ability.com*

August 24, 2005

Fuller, Fuller & Associates
12000 Biscayne Blvd., Suite 609
North Miami, FL  33181

Re:  Holiday Inn
     711 Dwight Street
     Springfield, MA 01104

## INVOICE

Phone conversations with Plaintiff.  2.0 Hrs. @ $175

Travel to and from location to perform ADA inspection.  2.0 Hrs. @ $175

On site verification of ADA violations, included but not limited to performing
Various testing and measuring of ramps, slopes, cross slopes, thresholds, counters, doors,
restrooms and photographing specific ADA violations.  3.0 Hrs @ $175

Analyze, download and print photographs depicting violations to prepare ADA final
investigative report.  2.0 Hrs. @ $175

Research in conjunction with ADA violations, calls to the Access Board, and preparation
of final report outlining ADA violations and recommendations for improvements.   12.5
Hrs. @ $175

Phone conversations with plaintiff's counsel.  1.0 Hrs @ $175

**TOTAL HOURS**        **22.5 @ 175.00 per hour**
**TOTAL DUE**          **$3,937.50**

